TABLE OF CONTENTS

1 [Submitting counsel below]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case No. 3:23-md-03084-CRB |
| | **DEFENDANTS' RULE 50(A) MOTION FOR JUDGMENT AS A MATTER OF LAW** |
| This Document Relates to: | Judge:          Hon. Charles R. Breyer |
| *Jaylynn Dean v. Uber Technologies, Inc., et al.*, No. 3:23-cv-06708 | Courtroom:   Courtroom 6 – 17th Floor |
| | Date Filed: February 2, 2026 |
| | Trial Date: January 13, 2026 |

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

**PHOENIX DIVISION**

| | |
|---|---|
| JAYLYNN DEAN, | CASE NO. 25-cv-4276-PHX-CRB |
|          Plaintiff, | Judge:          Hon. Charles R. Breyer |
| | Courtroom:   501 |
| v. | **ORAL ARGUMENT REQUESTED** |
| UBER TECHNOLOGIES, INC., et al., | |
|          Defendants | |

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.   ARGUMENT ................................................................................................. 2

      A.    Turay Was Not Uber's Apparent Agent................................................... 2

            1.    Plaintiff's Agreement to Uber's Terms Forecloses Her from Establishing Either the Required Representation or Reasonable Reliance..................... 3

            2.    A Sexual Assault Would Fall Outside the Scope of Any Agency Relationship. ......................................................................................... 4

      B.    Plaintiff's Negligence Claims Fail Because Uber Neither Owed nor Breached Any Cognizable Duty................................................................. 6

            1.    The Trial Evidence Did Not Establish a Special Relationship. ................... 6

            2.    The Evidence Was Legally Insufficient to Establish Breach of Any Public Policy Duty. ........................................................................................ 13

      C.    No Evidence Supports Plaintiff's Product-Liability Claim. ................................ 16

      D.    Plaintiff's Direct-Liability Claims Fail Because There Is No Legally Sufficient Evidence that Breach of a Duty by Uber Caused Plaintiff's Injury......................... 19

      E.    The Court Should Grant Judgment as a Matter of Law on Punitive Damages ...... 25

III.  CONCLUSION ............................................................................................. 30

---

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Acri v. Int'l Ass'n of Machinists & Aerospace Workers*,
781 F.2d 1393 (9th Cir. 1986)..................................................................... 8

*Anderson v. Chicago Transit Auth.*,
131 N.E.3d 1245 (Ill. App. Ct. 2019) ......................................................... 9

*Antone v. Greater Arizona Auto Auction*,
155 P.3d 1074 (Ariz. App. 2007)............................................................... 21

*Ariz. Corp. Comm'n v. Cont'l Sec. Guards*,
443 P.2d 406 (Ariz. 1968).......................................................... 11, 12, 13

*Ariz. Corp. Comm'n v. Reliable Transp. Co.*,
346 P.2d 1091 (Ariz. 1959)......................................................................... 12

*ASARCO, LLC v. England Logistics, Inc.*,
71 F. Supp. 3d 990 (D. Ariz. 2014)........................................................... 10

*Beville v. Ford Motor Co., Inc.*,
2006 WL 8440462 (D. Ariz. Mar. 31, 2006) ..................................... 33, 34

*Bishop v. State, Dep't of Corr.*,
837 P.2d 1207 (Ariz. Ct. App. 1992) ........................................................ 15

*Bolden v. Walsh Grp.*,
2012 WL 1079898(N.D. Ill. Mar. 30, 2012)............................................. 27

*Cal-Am Props. Inc. v. Edais Eng'g Inc.*,
509 P.3d 386 (Ariz. 2022).......................................................................... 16

*Dart v. Wiebe Mfg., Inc.*,
709 P.2d 876 (Ariz. 1985)................................................................... 23, 25

*Kassman v. Busfield Enters., Inc.*,
639 P.2d 353 (Ariz. App. 1981).................................................................. 18

*CGU Intern. Ins., PLC v. Keystone Lines Corp.*,
2004 WL 1047982 (N.D. Cal. May 5, 2004) ............................................ 10

*Chavez v. Glock, Inc.*,
207 Cal. App. 4th 1283 (2012)................................................................... 29

*Chubb Group of Ins. Cos. v. H.A. Transp. Sys. Inc.*,
243 F.Supp.2d 1064 (C.D. Cal. 2002)....................................................... 10

*Clark v. New Magma Irrig. & Drainage Dist.*,
92 P.3d 876 (Ariz. App. 2004).................................................................... 6

*Connes v. Molalla Transp. Sys., Inc.*,
831 P.2d 1316 (Colo. 1992) ....................................................................... 18

*Cordova v. Parrett*,
703 P.2d 1228 (Ariz. App. 1985)................................................................ 17

*Crawley v. Uber Techs., Inc.*,
No. BER-L-5888-20 (N.J. Super. Ct. Law Div. Sept. 22, 2025) ............... 4

*Da Silva v. Lyft Inc.*,
2023 WL 7166546 (D. Ariz. Oct. 31, 2023) ........................................................................ 19

*Dabush v. Seacret Direct LLC*,
478 P.3d 695 (Ariz. 2021) ................................................................................................... 14

*Dillard Dep't Stores, Inc. v. Associated Merch. Corp.*,
782 P.2d 1187 (Ariz. App. 1989) ....................................................................................... 21

*Doe 30's Mother v. Bradley*,
58 A.3d 429 (Del. Super. Ct. 2012) .................................................................................... 14

*Doe A.F. v. Lyft, Inc.*,
2024 WL 3497886 (E.D. Pa. July 19, 2024) ....................................................................... 15

*Doe v. Roman Catholic Church of Diocese of Phoenix*,
533 P.3d 214 (Ariz. App. 2023) ....................................................................................... 5, 6

*Doe v. Uber Technologies, Inc.*,
2020 WL 13801354 (Cal. Super. Nov. 30, 2020) .......................................................... 21, 22

*Dupray v. JAI Dining Servs. (Phoenix), Inc.*,
432 P.3d 937 (Ariz. App. 2018) .......................................................................................... 25

*Eiter v. Wright Med. Tech. Inc.*,
2022 WL 4104559 (D. Ariz. 2022) ..................................................................................... 34

*Engler v. Gulf Interstate Eng'g, Inc.*,
280 P.3d 599 (Ariz. 2012) .............................................................................................. 4, 5

*Fadely v. Encompass Health Valley of Sun Rehab. Hosp.*,
515 P.3d 701 (Ariz. App. 2022) ................................................................................... 2, 3, 4

*Ft. Lowell-NSS Ltd. P'ship v. Kelly*,
800 P.2d 962 (Ariz. 1990) .................................................................................................. 16

*Gaines v. Kelly*,
235 S.W.3d 179 (Tex. 2007) ................................................................................................. 3

*Grafiti-Valenzuela ex rel. Grafitti v. City of Phoenix*,
167 P.3d 711 (Ariz. App. 2007) .......................................................................................... 25

*Green v. ADT, LLC*,
2016 WL 3208483 (N.D. Cal. June 10, 2016) .................................................................... 25

*Grubb v. Do It Best Corp.*,
279 P.3d 626 (Ariz. App. 2012) .......................................................................................... 20

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
546 F.3d 981 (9th Cir. 2008) ............................................................................................... 21

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices, & Prods. Liab. Litig.*,
553 F. Supp. 3d 211 (D.N.J. 2021) ...................................................................................... 15

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
702 F. Supp. 3d 809 (N.D. Cal. 2023) ........................................................................... 22, 23

*In re Uber Rideshare Cases*,
No. CJC-21-005188 (Cal. Super. June 22, 2023) ............................................................... 21

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Jackson v. Airbnb, Inc.*,
   639 F. Supp. 3d 994 (C.D. Cal. 2022).......................................................................... 23

*Jacobs v. Meta Platforms, Inc.*,
   2023 WL 2655586 (Cal. Super. Mar. 10, 2023) .......................................................... 24

*Johnson v. Pankratz*,
   2 P.3d 1266 (Ariz. App. 2000) ..................................................................................... 21

*Kennedy v. Performance Dodge, LLC*,
   2008 WL 4787630 (Ariz. App. 2008)........................................................................... 19

*Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc.*,
   24 F. Supp. 2d 755 (W.D. Ky. 1998) ........................................................................... 15

*Larry's Sandwiches, Inc. v. Pac. Elec. Ry. Co.*,
   318 F.2d 690 (9th Cir. 1963), *implicitly overruled on other grounds by Missouri Pac. R. Co.
   v. Elmore and Stahl*, 377 U.S. 134 (1964) .................................................................. 10

*Mayall v. USA Water Polo, Inc.*,
   174 F. Supp. 3d 1220 (C.D. Cal. 2016)........................................................................ 15

*Menendez v. Paddock Pool Const. Co.*,
   836 P.2d 968 (Ariz. App. 1991)....................................................................... 19, 20, 22

*Nat'l Ass'n of Regul. Util. Comm'rs v. F.C.C.*,
   525 F.2d 630 (D.C. Cir. 1976) ..................................................................................... 14

*Newsome v. Dignity-Kindred Rehab. Hosp. E. Valley LLC*,
   2023 WL 2242865 (D. Ariz. Feb. 27, 2023) ............................................................... 26

*Nunez v. Pro. Transit Mgmt. of Tucson, Inc.*,
   271 P.3d 1104 (Ariz. 2012)............................................................................................ 8

*Pacheco v. Coffman*,
   2023 WL 7896261 (Ariz. App. Nov. 16, 2023) ..................................................... 17, 18

*Phoenix Union High Sch. Dist. No. 210 v. Cnty. of Maricopa*,
   572 P.3d 80 (Ariz. 2025)................................................................................................ 7

*Purolator Sec., Inc. v. Thorneycroft*,
   569 P.2d 824 (Ariz. 1977) ............................................................................................ 12

*Quiroz v. ALCOA Inc.*,
   416 P.3d 824 (2018)................................................................................................. 7, 16

*Readenour v. Marion Power Shovel*,
   719 P.2d 1058 (Ariz. 1986) .......................................................................................... 24

*Ryman v. Sears, Roebuck & Co.*,
   505 F.3d 993 (9th Cir. 2007)......................................................................................... 5

*Sanchez-Ravuelta v. Yavapai Cnty.*,
   569 P.3d 47 (Ariz. 2025).............................................................................................. 19

*Santa Fe, Prescott & Phoenix Ry. Co. v. Grant Bros. Const. Co.*,
   108 P. 467 (Ariz. 1910), *rev'd on other grounds*, 228 U.S. 177 (1913).................... 12

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Shaner v. Tucson Airport Auth., Inc.*,
573 P.2d 518 (Ariz. App. 1977) ........................................................................ 29

*Social Media Cases*,
2023 WL 6847378 (Cal. Super. Oct. 13, 2023) ............................................ 22, 23

*Stair v. Maricopa Cnty.*,
429 P.3d 1151 (Ariz. App. 2018) ...................................................................... 18

*State Farm Fire & Cas. Co. v. Amazon.com Inc.*,
407 F. Supp. 3d 848 (D. Ariz. 2019) ............................................................ 20, 21

*State v. Schallock*,
941 P.2d 1275 (Ariz. 1997) .............................................................................. 4, 5

*Stencel v. Lyft, Inc.*,
2024 WL 4008752 (N.D. Cal. Aug. 29, 2024) ...................................................... 6

*Sw. Pet Prods., Inc. v. Koch Indus., Inc.*,
273 F. Supp. 2d 1041 (D. Ariz. 2003) ............................................................... 20

*Swift Transp. Co. v. Carman*,
515 P.3d 685 (Ariz. 2022) .................................................................... 33, 34, 35

*Teran v. Citicorp Person-to-Person Fin. Ctr.*,
706 P.2d 382 (Ariz. App. 1985) ...................................................................... 4, 11

*Terminal Taxicab Company v. Kutz*,
241 U.S. 252 (1916) ........................................................................................ 12, 13

*Thompson v. Better-Bilt Aluminum Prods. Co.*,
832 P.2d 203 (Ariz. 1992) ................................................................................ 33

*Tollenaar v. Chino Valley Sch. Dist.*,
945 P.2d 1310 (Ariz. App. 1997) ...................................................................... 14

*Tonner v. United States*,
2025 WL 2097927 (D. Ariz. 2025) ...................................................................... 4

*Torres v. Goodyear Tire & Rubber Co.*,
786 P.2d 939 (Ariz. 1990) ................................................................................ 20

*Valenzuela v. ADT Sec. Servs., Inc.*,
475 F. App'x 115 (9th Cir. 2012) ...................................................................... 24

*Volz v. Coleman Co., Inc.*,
748 P.2d 1191 (Ariz. 1987) .......................................................................... 34, 36

*Weade v. Dichmann, Wright & Pugh*,
337 U.S. 801 (1949) ....................................................................................... 9, 11

**Statutes**

A.R.S. § 12-689 ................................................................................................ 2, 25

A.R.S. § 12-689(A)(2) ............................................................................. 25, 26, 27

A.R.S. § 12-689(A)(3) .................................................................................... 25, 27

A.R.S. § 23-1603(A) ............................................................................................ 9

**TABLE OF AUTHORITIES**
(continued)

Page(s)

A.R.S. § 28-9551 .................................................................................................. 15, 26

A.R.S. § 28-9551(3) ..................................................................................................... 9

A.R.S. § 28-9552(B) ................................................................................................... 26

A.R.S. § 28-9553(C) ................................................................................................... 27

A.R.S. § 28-9555(A)(2) .............................................................................................. 26

A.R.S. § 28-9555(B)(2)-(3) ........................................................................................ 26

A.R.S. § 28-9555(B)(4) .............................................................................................. 26

A.R.S. §§ 28-4808 ...................................................................................................... 26

A.R.S. §§ 28-9507(C) ................................................................................................ 27

A.R.S. §§ 28-9554(A) ................................................................................................ 27

A.R.S. §§ 28-9555 ...................................................................................................... 26

**Other Authorities**

13 Am. Jur. 2d Carriers § 1 .......................................................................................... 8

14 Am. Jur. 2d Carriers § 678 ...................................................................................... 7

Restatement (Second) of Torts § 416 ......................................................................... 13

Restatement (Second) of Torts § 418 ......................................................................... 13

Restatement (Second) of Torts § 425 ......................................................................... 14

Restatement (Third) of Torts: Product Liability § 19(a)-(b) ...................................... 16

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 3:23-MD-03084-CRB/ 25-CV-4276-PHX-CRB

1

## **MEMORANDUM OF POINTS AND AUTHORITIES**

2

## **I.    INTRODUCTION**

3      No reasonable jury could find Uber liable on this trial record. The Court should grant

4   Uber judgment as a matter of law on all claims.

5      *First*, Plaintiff's apparent-agency theory of vicarious liability is foreclosed by her

6   agreement to Uber's Terms of Service ("Terms"), which unambiguously disclaim an agency

7   relationship and explain drivers' independence from Uber. And even if an apparent agency had

8   existed, Turay's alleged sexual assault—an independent course of conduct not intended to serve

9   Uber's purposes—fell outside the scope of any conceivable authority as a matter of Arizona law.

10     *Second*, Plaintiff's negligence claim fails because she presented no evidence that Uber

11  breached a cognizable duty. In Arizona, a duty must arise out of a special relationship or from

12  public policy. Plaintiff invokes a common-carrier special relationship, but has waived that theory,

13  and, even if she had not, the trial evidence would not support it. For one, Uber is not a carrier at

14  all—it facilitates pairings with independent contractors who use their own (or others') vehicles to

15  provide transportation. In addition, both Uber and drivers retain and exercise the right to refuse

16  service, negating common-carrier status under Arizona law. The trial evidence was likewise

17  insufficient to establish a voluntary-undertaking special relationship: Plaintiff presented evidence

18  only of general safety marketing, not the specific promises required for a voluntary undertaking.

19  Nor did the evidence suffice to show breach of a public-policy duty: Arizona law imposes no duty

20  to prevent intentional torts by an independent contractor, and Plaintiff's evidence—for example,

21  that the independent driver, Turay, had various supposed and unquantified "risk factors"—does

22  not permit a finding that Uber was unreasonable in allowing Turay to drive on the Uber platform.

23     *Third*, Plaintiff's product-liability claims fail because the Uber App is not a product. As

24  numerous courts have held, an intangible app that connects riders to drivers is, by definition, a

25  service. Even under the Court's defect-specific approach to identifying products, the alleged

26  "defects" here—the absence of gender matching and ride-recording—relate to services: the

27  matching of riders and drivers and the deterrence of third-party criminal conduct.

28

*Fourth*, both Plaintiff's negligence and product-liability claims fail for lack of evidence that breach of a duty by Uber caused Plaintiff's injuries. Although Plaintiff pointed to various "risk factors," she made little effort to quantify them, leaving the jury no basis to conclude the match between Plaintiff and Turay was unreasonably risky. Nor does the evidence permit a non-speculative inference that the other precautions Plaintiff urges would more likely than not have prevented Plaintiff's the alleged assault.

*Finally*, the trial evidence forecloses punitive damages. There is no evidence—much less clear and convincing evidence—that Uber acted with the requisite "evil mind." On the contrary, Uber undertook significant, innovative investments to address and protect against sexual assault, including by developing the S-RAD machine-learning tool, releasing an unprecedented Safety Report that publicly disclosed data about sexual assault on the platform (which is available within the Uber App), and introducing pioneering safety features such as in-app ride recording, RideCheck, an in-app 911 button, live ADT trip agents for real-time assistance, and the creation of continuous driver criminal alerts with annual background check re-runs. Uber also launched a RAINN hotline that offers survivors first-of-its-kind, no-strings-attached support (i.e., no releases), which Uber sent to Ms. Dean (who did not pursue the option). Plaintiff's theory is not that Uber failed to act, but that it should have done even more. But Arizona law makes clear that such a theory cannot support punitive damages. On top of that, Uber's undisputed compliance with all Arizona rideshare regulations—including those relevant and material to the risk of sexual assault—squarely trigger Arizona's punitive-damages safe-harbor, A.R.S. § 12-689.

## II.    ARGUMENT

### A.    Turay Was Not Uber's Apparent Agent.

Plaintiff claims that Uber is vicariously liable for Turay's conduct based on an apparent agency theory. "An apparent agency is created only when (1) a principal intentionally or inadvertently leads one party to believe an agency exists, and (2) the party ***justifiably*** relies on ***the principal's representations***." *Fadely v. Encompass Health Valley of Sun Rehab. Hosp.*, 515 P.3d

701, 706 (Ariz. App. 2022).[1] In addition, it is "indisputable that 'apparent authority must be based on the acts of the principal' and 'is limited to the scope of responsibility that is apparently authorized.'" PTO 17 (quoting *Gaines v. Kelly*, 235 S.W.3d 179, 184–85 (Tex. 2007)); *see* Dkt. 1932 at 3 ¶ 12 (applying PTO 17 to Arizona-law cases). Here, the trial evidence failed to show the required representation or justifiable reliance because Plaintiff undeniably contractually agreed Turay was not Uber's agent. And there is no argument at all—and simply no evidence— that an assault was "authorized" even if the evidence had supported an agency relationship. The **only** evidence on the record on scope is Uber's express prohibition on sexual activity of any kind, that Turay knew this and acknowledged he would have been deactivated if he engaged in even consensual intercourse (which he was), and this testimony was not countered in any way by Plaintiff.

### 1. Plaintiff's Agreement to Uber's Terms Forecloses Her from Establishing Either the Required Representation or Reasonable Reliance.

Plaintiff's agreement to Uber's Terms, which memorialize drivers' independence from Uber, forecloses her apparent agency claim. *See Fadely*, 515 P.3d at 705-06. In *Fadely*, the plaintiff's agreement to a contract stating that a hospital's doctors "practice independently" and directly bill patients for their services foreclosed her from asserting apparent agency. 515 P.3d at 706. Because the hospital "did not represent [the doctors] as its employees or agents to [p]laintiff," and "instead inform[ed] her of the independent relationship," the plaintiff could "not show either the representation or justifiable reliance needed for an apparent agency." *Id.*

This case is even easier. Uber's Terms expressly stated the independent status between Uber and the drivers that use its platform on matters such as ride selection, control, and billing. P-4531.00013, 18-19, 21. Uber's Terms unequivocally informed Plaintiff, among other things, that: (1) "Uber does not control, manage, or direct any third-party providers," (2) drivers on the Uber platform retain discretion whether to accept or reject any ride, and (3) Uber collects payment on the drivers' behalf as their limited-purpose billing agent. P-4531.00013, 18-19, 21 (Uber Terms of

---

[1] Unless otherwise noted, all emphases are added, and all internal citations, quotation marks, and alterations are omitted.

Use). It also informed Plaintiff that "independent drivers" like Turay are "not actual agents, apparent agents, ostensible agents, or employees of Uber in any way," P-4531.00013. Each of these terms accurately describes the division of responsibilities between Uber and drivers that use its platform, and accurately reflects Arizona law, which provides that a Transportation Network Company ("TNC") driver "shall be treated as an independent contractor for all purposes." A.R.S. 23-1603(A). Because, as the Court has already held, this agreement binds Plaintiff, *see* PTO 29 at 4-5, 12-13, Arizona law imputes to Plaintiff knowledge of its terms. *See Teran v. Citicorp Person-to-Person Fin. Ctr.*, 706 P.2d 382, 384 (Ariz. App. 1985). Under *Fadely*, Plaintiff cannot assert reasonable reliance on beliefs contrary to her own contractual agreements—not to mention Arizona law and the facts on the ground. *See Fadely*, 515 P.3d at 706; *cf.* Dkt. 5144.2, *Crawley v. Uber Techs., Inc.*, No. BER-L-5888-20 (N.J. Super. Ct. Law Div. Sept. 22, 2025) (agreement to Uber's Terms of Service precluded "purported claim of apparent authority").

## 2. A Sexual Assault Would Fall Outside the Scope of Any Agency Relationship.

Even if an apparent agency existed (it does not), Plaintiff's claim would still fail because this case does not involve the narrow circumstances in which sexual assaults can fall within the scope of agency under Arizona law. "To be within the . . . scope [of employment], the act must be, at least in part, motivated by a purpose to serve the master rather than solely to serve personal motives unconnected to the master's business." *State v. Schallock*, 941 P.2d 1275, 1283 (Ariz. 1997). And "Arizona courts have consistently held that sexual misconduct rarely furthers an employer's business." *Tonner v. United States*, 2025 WL 2097927, at *4 (D. Ariz. 2025).

For example, in *Doe v. Roman Catholic Church of Diocese of Phoenix*, the Arizona Court of Appeals held that, as a matter of law, a priest did not act within the scope of employment when sexually assaulting a youth parishioner during a one-on-one counseling trip, concluding that "[t]he acts were committed not for any purpose of the employer, but solely to gratify [the priest's] personal, apparently sexual desires." 533 P.3d 214, 222 (Ariz. App. 2023). In so holding, the court distinguished *Schallock*, 941 P.2d 1275, the lone Arizona Supreme Court case allowing vicarious liability for sexual misconduct, because "*Schallock* is narrowly applicable to cases involving longstanding abuse and harassment in the workplace by a manager with authority to

1    hire and fire, promote and demote, and instruct and control subordinates the manager victimizes."

2    *Id.* at 223-24 (cleaned up). Where "[n]o such facts are present," *Doe* explained, "a reasonable jury

3    could not find [the employer] implicitly authorized [the employee's] abuse." *Id.* at 224. That

4    reading of *Schallock* controls here absent "clear evidence" the Arizona Supreme Court would not

5    follow it. *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007). There is none: Like

6    *Doe*, the Arizona Supreme Court's decisions in *Schallock* and *Engler* "recogniz[e] that 'special

7    factual and legal considerations' distinguish [supervisory harassment claims] from the great

8    majority of cases involving torts committed by a servant against a third party." *Engler*, 280 P.3d

9    at 603-04 (quoting *Schallock*, 941 P.2d at 1282).

10    Consistent with *Doe*, Judge Chesney last year held that an alleged sexual assault by a

11    rideshare driver against a rider "fall[s] short of cases in which Arizona courts have found an

12    assault is within the scope of employment." *Stencel v. Lyft, Inc.*, 2024 WL 4008752, at *4-5 (N.D.

13    Cal. Aug. 29, 2024). The Court, echoing *Doe*, emphasized that *Schallock* found a jury question on

14    authorization "where the defendant was aware for close to a decade" of "egregious improprieties

15    and did little to nothing." *Id.* at *4. By contrast, Lyft's deactivation of the driver accused of

16    assault "negates any inference of express or implied authorization." *Id.*

17    *Doe* entitles Uber to judgment on apparent agency, just as it did for Lyft in *Stencel*. There

18    is no material distinction between a church that authorizes a one-on-one camping trip and a

19    rideshare company that facilitates a one-on-one ride. As in *Doe*, Turay was not Plaintiff's

20    workplace supervisor and there is no evidence that Uber had notice of any sexual misconduct by

21    Turay, much less of "longstanding misconduct" of which Uber "knew or should have known" and

22    which Uber "condoned and implicitly authorized." 533 P.3d at 224. On the contrary, Turay

23    testified that he knew having sex with Plaintiff "was unprofessional" and "wrong" and that Uber

24    would deactivate him as a driver for having even consensual sex with a rider. 7/23/25 Turay Dep.

25    62:19-25, 86:11-23, 88:17-24. Uber did, in fact, deactivate Turay's account minutes after

26    Plaintiff's report, and permanently banned him within two days. Tr. 1692:19-1693:3 (Tremblay

27    Cross); Tr. 1107:5-1108:3 (Cissna). There is no evidence to the contrary. A "jury could not find

28    [Uber] implicitly authorized [Turay's alleged] abuse of [Plaintiff]." *Doe*, 533 P.3d at 224.

**B.    Plaintiff's Negligence Claims Fail Because Uber Neither Owed nor Breached Any Cognizable Duty.**

A "duty owed to the plaintiff" and "a breach thereof" are "basic elements of actionable negligence." *Clark v. New Magma Irrig. & Drainage Dist.*, 92 P.3d 876, 878 (Ariz. App. 2004). Duty is a question of law for the Court. *Phoenix Union High Sch. Dist. No. 210 v. Cnty. of Maricop*a, 572 P.3d 80, 83 (Ariz. 2025). "Arizona does not use risk creation to determine duty," but rather "base[s] duty solely on special relationships and public policy." *Quiroz v. ALCOA Inc.*, 416 P.3d 824, 838 (2018). Plaintiff has premised duty on two special relationships: a common-carrier relationship and a voluntary undertaking. But Plaintiff has waived any common-carrier claim, which the trial evidence failed to support in any event. The evidence likewise does not allow a finding that Uber made any specific commitments that could create an undertaking duty. Nor does the evidence permit a finding that Uber breached a cognizable public-policy duty: The evidence does not satisfy Arizona's high bar for negligent selection of an independent contractor, and there is no evidence whatsoever that Uber breached a duty under Arizona's TNC statutes.

### 1.   The Trial Evidence Did Not Establish a Special Relationship.

#### a.   Plaintiff Has Waived Any Common-Carrier Duty, and the Trial Evidence Is Legally Insufficient to Support One.

Plaintiff's common-carrier theory of duty is both waived and unsupported by legally sufficient evidence.

1. The Master Long-Form Complaint ("M.C.") (Dkt. No. 269), incorporated into Plaintiff's complaint by reference, *see* Dkt. 2506, at 1, states: "Uber owed a duty as a common carrier to protect passengers under the laws of states *except the* following: Arizona…." M.C. ¶ 363(l). The Master Complaint also dropped any claim for "Common Carrier's Non-Delegable Duty" under Arizona law. *See* M.C. ¶ 386. Plaintiff subsequently stipulated that "Plaintiffs do not assert any claims based on the 'common carrier's non-delegable duty' under the laws of Arizona." Dkt. 1932, ¶ 5 (Stipulation).

Plaintiff has since asserted that she never waived common-carrier claims because the Master Complaint's negligence claim "specifically included any duty based on a 'special

1  relationship' between Uber and its passengers," asserting that her waiver of common-carrier

2  duties, M.C. ¶ 363(l), referred only to a common carrier's duty to use utmost care. Dkt. 4893 at 5

3  (citing M.C. ¶ 363(j)). But that is not what the Master Complaint and stipulation say. The Master

4  Complaint states Uber did not "*owe a duty as a common carrier*" in Arizona. M.C. ¶ 363(l).

5  Subsumed in that waived claim is Plaintiff's theory that Uber had a "duty to keep [Uber's]

6  passengers safe from misconduct (including any sexual misconduct) during its rides, especially

7  from its participating drivers." M.C. ¶ 392. Plaintiff cannot undo her express waivers mid-trial,

8  particularly "when the facts and the theory have been known . . . since the inception of the cause

9  of action." *Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1398 (9th Cir.

10 1986). In light of Plaintiff's representations, Uber was deprived of the opportunity to elicit

11 pretrial rulings on and prepare evidence against a common-carrier theory. Permitting a judgment

12 resting on that waived theory would be fundamentally unfair.

13      2. In any event, Plaintiff did not present legally sufficient evidence to establish a common-

14 carrier duty: Uber is not a carrier at all, and even if it were, it would not be a *common* carrier.

15      A. A common carrier relationship arises from a "passenger's dependence upon the

16 carrier," *Nunez v. Pro. Transit Mgmt. of Tucson, Inc.*, 271 P.3d 1104, 1109 (Ariz. 2012), and

17 therefore does not attach unless the passenger is "in some substantial sense in the custody or

18 under the control of [the] carrier," 14 Am. Jur. 2d Carriers § 678; *see Anderson v. Chicago

19 Transit Auth.*, 131 N.E.3d 1245, 1256 (Ill. App. Ct. 2019) ("[A] person must have placed himself

20 under the control of a carrier in order to be entitled to its care as a passenger[.]").

21      Consistent with that rationale, "a mere arranger of transportation does not incur the

22 liability of a common carrier." *Weade v. Dichmann, Wright & Pugh*, 337 U.S. 801, 807 (1949). In

23 *Weade*, a passenger sued the agent of a steamboat operator after being sexually assaulted by a

24 cook onboard the ship. *Id.* at 803. Although the ship was operated by the U.S. government, the

25 agent had responsibility "to issue tickets, maintain the vessel in the service directed by the United

26 States, maintain terminals and offices, arrange for the loading and unloading of passengers,

27 arrange for advertising, provisioning of the ship, and the procuring of officers and crew for hire

28 by the master." *Id.* at 805. Applying federal general maritime law, the Supreme Court held that

1    "[t]he [agent's] duties ended at the shore line." *Id.* at 807. Because the agent "was not in any way

2    engaged in the carriage of passengers . . . and had never held itself out to the public as ready to

3    engage in such traffic," it was not a common carrier. *Id.* at 808.[2]

4        Cases analyzing common-carrier status under the Carmack Amendment[3] likewise draw a

5    "crucial distinction" between "a carrier and a broker," which turns on "whether the party legally

6    binds itself to transport, in which case it is considered a carrier." *ASARCO LLC v. England*

7    *Logistics, Inc.*, 71 F. Supp. 3d 990, 995 (D. Ariz. 2014); *Chubb Group of Ins. Cos. v. H.A.*

8    *Transp. Sys. Inc.*, 243 F. Supp. 2d 1064, 1069 (C.D. Cal. 2002) (broker not a carrier).[4] Under that

9    distinction, "if [Uber] accepted responsibility" to transport a person or cargo pursuant to a

10    contract "then [Uber] qualifies as a carrier," but if Uber "merely agreed to locate and hire a third

11    party to transport the goods, then it was acting as a broker." *CGU Intern. Ins., PLC v. Keystone*

12    *Lines Corp.*, 2004 WL 1047982, *2 (N.D. Cal. May 5, 2004); *cf.* 13 Am. Jur. 2d Carriers § 1 ("A

13    . . . company that hires another company [to carry] . . . . is not a 'carrier.'")

14        The evidence makes clear Uber is not a carrier or a transportation company: it is a

15    technology company that facilitates connections to a wide variety of services, from rides to meal

16    deliveries to scooters. Uber does not own vehicles used to provide transportation and does not

17    employ the drivers who do so. Instead, like a broker, Uber operates as an intermediary connecting

18    riders to independent third-party drivers who provide and operate the means of carriage and

19    assume responsibility for the transportation. Tr. 2235:7–14, 2230:16–25, 2248:11–2249:12

20    (Dobbs). Those independent drivers are not confined to a single rideshare platform, retaining the

21

22    [2] As explained below, the requirement that a common carrier "h[o]ld itself out to the public," *Weade*, 337 U.S. at 808, operates to distinguish common carriers from contract carriers based on

23    whether they reserve the right to refuse service. *See infra* at 10. It is not a source of common-carrier duties for a company that, like Uber, has never contracted to transport anything, and does

24    not convert a non-carrier into a common carrier based on ambiguities in its advertising.

25    [3] The "Carmack amendment to the Interstate Commerce Act, 49 U.S.C. § 20(11)" has "been construed as codifying the common law rule of a carrier's liability." *See Larry's Sandwiches, Inc.*

26    *v. Pac. Elec. Ry. Co.*, 318 F.2d 690, 691–92 (9th Cir. 1963), *implicitly overruled on other grounds by Missouri Pac. R. Co. v. Elmore and Stahl*, 377 U.S. 134 (1964).

27    [4] Federal regulations explicitly define "broker," but courts interpreting those regulations apply

28    common-law principles in distinguishing between brokers and carriers. *See, e.g., Chubb*, 243 F. Supp. 2d at 1070 (applying common law "holding out to the public" test).

1    right to simultaneously operate on Lyft or any other platform. Tr. 2389:20-2390:1 (Okpaku)

2    (many independent drivers are "dual app[ers]"). And they "have no obligation to follow [Uber's

3    suggested] navigational directions," which are "offered in the Driver App" for "convenience

4    only." D-4180.0004.

5         Arizona's Transportation Network Company ("TNC") statute expressly blesses this

6    arrangement, stating that a "[t]ransportation network company" like Uber "is not deemed to *own,*

7    *operate or control* a personal motor vehicle of a transportation company driver." A.R.S. § 28-

8    9551(3). Instead, Uber's role under the statute is to operate a "software application" that

9    "connect[s] passengers to transportation networks services," which are "*provided by*

10   *transportation network company drivers.*" *Id.* Arizona law further holds that the drivers who

11   provide those transportation services are independent contractors, not Uber's employees. *See*

12   A.R.S. § 23-1603(A). And Uber's Terms clearly conveyed this arrangement to Plaintiff, telling

13   her that (1) Uber "DOES NOT TRANSPORT YOU OR YOUR GOODS" but instead allows

14   users to "find, request, or receive [] Third-Party Services from third party service providers" such

15   as "independent drivers," (2) "UBER DOES NOT CONTROL, MANAGE, OR DIRECT AND

16   THIRD-PARTY PROVIDERS," and (3) Uber "DOES NOT GUARANTEE THE QUALITY,

17   SUITABILITY, SAFETY OR AVAILABILITY OF THIRD-PARTY PROVIDERS." P-

18   4531.00013, 00021. Plaintiff agreed to that accurate description of Uber's responsibilities and is

19   deemed to have knowledge of it. *See Teran*, 706 P.2d at 384. "As a mere arranger of

20   transportation [Uber] does not incur the liability of a common carrier." *Weade*, 337 U.S. at 808.

21        B. Even if Uber were a carrier (it is not), the evidence would not support finding it a

22   *common* carrier, rather than a contract or private carrier.[5] "The fundamental distinction" between

23   common and contract carriers "is that the private carrier enters into a contract with each of his

24   customers and assumes no obligation to carry for any other, while the common carrier undertakes

25   _____

26   [5] If the Court determines that Uber is a carrier, it need not and should not determine whether it is
     a common or contract carrier. Plaintiff invokes the common carrier doctrine only to establish a
     special relationship supporting a duty to protect—but contract carriers likewise have a special
27   relationship obligating them to protect their passengers. *E.g.*, *Howell v. City Towing Assocs., Inc.*,
     717 S.W.2d 729, 732–33 (Tex. App. 1986)  The Court should not decide a waived issue on which
28   nothing turns and on which Uber had no opportunity to make a complete record.

1    to carry for all persons indifferently," *id.*—that is, a common carrier "holds itself out to the public

2    generally," *Ariz. Corp. Comm'n v. Reliable Transp. Co.*, 346 P.2d 1091, 1100 (Ariz. 1959).[6]

3    As Arizona's territorial Supreme Court first held in 1910, a carrier does not "hold [itself]

4    out [to the public] generally" when it publicly reserves and exercises the right to refuse service.

5    *See Santa Fe, Prescott & Phoenix Ry. Co. v. Grant Bros. Const. Co.*, 108 P. 467, 469 (Ariz.

6    1910), *rev'd on other grounds*, 228 U.S. 177 (1913). "Where there is a right to refuse to perform

7    the services requested, there is a right to contract for their performance in a different capacity

8    from that which rests upon a . . . common carrier." *Id.* Subsequent Arizona cases analyzing

9    common-carrier status have consistently turned on whether the carrier reserved and exercised the

10   right to refuse. *Compare See Ariz. Corp. Comm'n v. Cont'l Sec. Guards*, 443 P.2d 406, 415 (Ariz.

11   1968) (armored car company not a common carrier where it "openly reserve[d] the right to refuse

12   to carry for any applicant") *with Purolator Sec., Inc. v. Thorneycroft*, 569 P.2d 824, 828 (Ariz.

13   1977) (armored car company a common carrier where "there is nothing in the record to indicate

14   that [it] reserved the right to refuse business") *and Reliable Transp. Co.*, 346 P.2d at 1094, 1101

15   (motor carrier of petroleum a common carrier where it served "seven of the eight major oil

16   companies doing business in Arizona" and the "willingness of appellants to serve . . . the other oil

17   companies doing business in Arizona is apparent from the record"). In doing so, they have

18   approvingly quoted Justice Holmes's holding that a vehicle service that "asserts the right to refuse

19   the service" is not a common carrier even when it "advertises extensively and . . . generally

20   accepts any seemingly solvent customer." *Terminal Taxicab Company v. Kutz*, 241 U.S. 252, 255

21   (1916) (quoted by *Continental*, 443 P.2d at 412).

22   The undisputed evidence is that Uber not only reserves but also exercises its right to

23   refuse service, and that independent drivers retain and exercise the same right. Uber requires

24   anyone wishing to request a ride to download its App and agree to its Terms, which inform all

25   users—including Plaintiff—that "Uber may, in its sole discretion, immediately terminate these

26   Terms or any Services with respect to you, or *generally cease offering or deny access to the*

27

28   _____

[6] *Reliable Transport*, like most Arizona cases on the common/contract distinction, addressed regulatory rather than common law status, but applied common-law principles to do so.

*Services* or any portion thereof, *at any time for any reason*." P-4531.00003. Uber routinely exercises that discretion by deactivating users (both riders and drivers) for a variety of reasons, including low ratings, fraud, and misconduct. Tr. 2978:7-2979:13 (Kansal); 2245:18-2246:8, 2247:12-19 (Dobbs) (Terms of Use); Tr. 1184:3-5 (Cissna) (banning rider); P-4073.0004 (Uber "blocks rider accounts with fake names . . . . [W]e have banned over 15,000 rider accounts from the platform as a result of these checks."). Under its Terms, drivers retain complete discretion to "decide when, where and whether [they] want to offer [transportation] service facilitated by [the Uber] Platform" and whether "to accept, decline, ignore, or cancel a ride . . . request," including based on the price. D-4180.0002; Tr. 2260:1-13 (Dobbs). Because both Uber and drivers retain an unqualified right to refuse service, and drivers can use any other platform at any time, they are at most contract, not common carriers.

Other aspects of Uber's business reinforce that conclusion. Uber facilitates prearranged transportation services of the sort that courts—including the *Kutz* decision quoted approvingly in *Continental*—routinely hold to be characteristic of contract carriers. *See* 241 U.S. at 255–56; Tr. 2374:21-2375:20 (Okpaku) ("for-hire" transportation is divided into "two categories"—public transportation "like a taxi" or "prearranged services" like rideshare). Uber does not guarantee that transportation services will be available through its platform, *see supra* at 9, instead pairing riders and drivers on a case-by-case basis, transmitting dynamic market-based prices that both riders and drivers can renegotiate among themselves, and leaving the ultimate route entirely to the independent driver's (or rider's) discretion. *See* D-4180.0004 (route discretion); P-3609.00185-86 (describing dynamic pricing); Tr. 2260:1-13, 2236:22-2237:12 (Dobbs), 2409:3-8 (Okpaku) (drivers retain "ability" to renegotiate fees). The fact that Uber facilitates such discretionary prearranged transportation services at scale does not convert their fundamental character as "individualized decisions, in particular cases"—the hallmark of private carriage. *Nat'l Ass'n of Regul. Util. Comm'rs v. F.C.C.*, 525 F.2d 630, 641 (D.C. Cir. 1976).

### b.  Plaintiff Presented No Evidence Supporting an Undertaking Duty.

Nor did the evidence support a special relationship under the voluntary-undertaking doctrine. Arizona has adopted Restatement (Second) of Torts § 323 "with respect to a negligent

undertaking (or assumed duty)." *Dabush*, 478 P.3d at 703. Such a duty arises when "[o]ne . . . undertakes. . . to render services to another which he should recognize as necessary for the protection of the other's person or things," and "(a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking." *Tollenaar v. Chino Valley Sch. Dist.*, 945 P.2d 1310, 1311–12 (Ariz. App. 1997) (quoting § 323). A voluntary undertaking can arise only from a promise: "The degree of action or inaction required to constitute a § 323 'undertaking' ranges across courts from a mere promise to act to a promise coupled with an affirmative act in performance of the promise." *Doe 30's Mother v. Bradley*, 58 A.3d 429, 455 (Del. Super. Ct. 2012). The promise must be sufficiently specific, as any "assumed duty is limited to the extent of the *specific* undertaking, and can "be no broader than the undertaking actually assumed." *Dabush*, 478 P.3d at 704. Mere "public statements espousing aspirational goals, statements of generic intent, or statements vowing or acknowledging . . . a duty do not constitute promises that would create a legal duty based on a voluntary undertaking." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices, & Prods. Liab. Litig.*, 553 F. Supp. 3d 211, 229–30 (D.N.J. 2021) (collecting cases).

Plaintiff asserts an undertaking exists because "Uber affirmatively promoted itself as offering safe transportation services, including ensuring its drivers were safe." Dkt. 4838 at 38 (citing Dkt. 4622-2 at 2–3, 28). But that is not a promise to undertake any particular action. "[V]aguely promissory statements to the general public" "do not create legal duties." *Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755, 774 (W.D. Ky. 1998); *Mayall v. USA Water Polo, Inc.*, 174 F. Supp. 3d 1220, 1229 (C.D. Cal. 2016) (rejecting undertaking based on defendant's assertions that it "would provide a healthy and safe environment"). As one federal court explained in rejecting an identical undertaking claim against Lyft: "guaranteeing a 'safe' ride through its marketing materials" is not "a 'specific undertaking' and courts have routinely found that generalized promises of safety are insufficient to create a duty under § 323." *Doe A.F. v. Lyft, Inc.*, 2024 WL 3497886, at *5 (E.D. Pa. July 19, 2024).

Further, Uber's Terms expressly disclaim any undertaking to protect users, stating that Uber "makes no representation, warranty, or guarantee" about the "quality, suitability, [or]

1  safety" of "third-party providers" like Turay. P-4531.00021. That is the opposite of an

2  undertaking, and independently forecloses an undertaking duty as a matter of law. *See, e.g.*,

3  *Bishop v. State, Dep't of Corr.*, 837 P.2d 1207, 1211 (Ariz. App. 1992) (plaintiff "cannot

4  establish that defendants undertook a duty to travel" with students because "students were

5  informed" that they were "responsible for providing their own transportation").[7]

### 2. The Evidence Was Legally Insufficient to Establish Breach of Any Public Policy Duty.

8      Just as no special relationship supports a duty, no duty arises from Arizona public policy.

9  "In Arizona, [the] primary source for identifying a duty based on public policy is our state

10  statutes." *Quiroz*, 416 P.3d at 830; *Cal-Am Props. Inc. v. Edais Eng'g Inc.*, 509 P.3d 386, 390

11  (Ariz. 2022). Courts can also base a public-policy duty "on the common law—specifically, case

12  law and Restatement sections consistent with Arizona law." *Quiroz*, 416 P.3d at 831. Courts

13  cannot establish "duties based on [their] own notions of appropriate public policy," *id.*, and must

14  "decline to extend [duties] beyond what [caselaw or the Restatement] expressly contemplate[],"

15  *Cal-Am Props. Inc.*, 509 P.3d at 39. Plaintiff presented no evidence that Uber breached any

16  public-policy duty.

17      To start, the trial evidence was legally insufficient to establish breach of any duty under

18  the Restatement or Arizona common law. "The present general rule for independent contractor

19  cases is still that the employer is not liable" for an independent contractor's torts. *Ft. Lowell-NSS*

20  *Ltd. P'ship v. Kelly*, 800 P.2d 962, 967 (Ariz. 1990). The Second Restatement recognizes limited

21  exceptions to that rule. *See id.* Most concern whether an employer is liable for the ***negligence*** of

22  the independent contractor, not intentional torts. *See, e.g.*, Restatement (Second) § 416

23  (negligence for work involving "peculiar risk of physical harm"); *Id.* § 418 ("negligent failure" to

---

[7] The absence of a special relationship forecloses Plaintiff's contention that Uber owed a duty to warn her of circumstances increasing the risk of sexual assault.  Under Arizona law, "[t]here is no separate tort named 'failure to warn,'" and liability for any "failure to warn" is wholly contingent on "a duty to prevent harm to the individual who is injured." *McGeorge v. City of Phoenix*, 572 P.2d 100, 105–06 (Ariz. App. 1977) ("[F]ailure to warn does not occupy a special place in the law of negligence which would require us to apply a different concept of duty.").

1   maintain public highway in safe condition); *Id.* § 425 ("negligent failure" to maintain land held

2   open to the public).

3       Plaintiff's assertion that Uber was negligent in selecting Turay is governed by

4   Section 411, which "imposes liability upon the employer of an independent contractor for failure

5   to exercise reasonable care in employing a competent contractor if the work to be performed

6   requires skill in order to avoid the risk of harm to others." *Cordova v. Parrett*, 703 P.2d 1228,

7   1230 (Ariz. App. 1985). Liability attaches only if the harm "result[s] from some quality in the

8   contractor which made it negligent for the employer to entrust the work to him." *Pacheco v.*

9   *Coffman*, 2023 WL 7896261, at *2 (Ariz. App. Nov. 16, 2023). A defendant "can be liable under

10  § 411 only if an investigation would have shown [contractor] had a reputation for inattention and

11  careless work." *Id.* at *2.

12      Plaintiff adduced no trial evidence from which a jury could find that duty breached. Uber

13  screened Turay and verified his competence to drive through **twelve** clean continuous background

14  checks and a review of his driving history. Tr. 1590:2-14 (Tremblay); D-3701 (summary of

15  background checks). Uber likewise conducted the required screening of Turay against the

16  national sex offender registry database. *See* P-1901.00002. Its screenings revealed no criminal

17  record or any other reason to suspect Turay had criminal propensity. *Id.*; *see* 7/23/25 Turay Dep.

18  104:05-14. Although Plaintiff faulted Uber for "incomplete" or insufficiently "rigorous"

19  background checks, *e.g.*, Tr. 1371:14-1372:5; 1374:5-7 (Tremblay); 8/7/25 Nilles Dep. 327:19-

20  327:25, Uber's background checks not only complied with but exceeded applicable Arizona

21  regulations, *see infra* at 29, and there is no evidence that any peer company used more rigorous

22  processes, that international background checks would have been feasible, or that Uber missed

23  any disqualifying fact in Turay's history—as the U.S. government apparently agreed in

24  naturalizing him as a citizen. Turay Dep. 14:13-14. Uber's indisputably reasonable conduct in

25  verifying Turay's qualifications satisfied its duty under § 411 as a matter of law. *Cf. Kassman v.*

26  *Busfield Enters., Inc.*, 639 P.2d 353, 357 (Ariz. App. 1981) (affirming directed verdict where the

27  "record disclose[d] no evidence showing that [an employee] was known to be a vicious or

28  careless person when he was hired" and reference-check disclosed no past problems).

1    Nor did any evidence obtained after Turay's onboarding give Uber notice of a "quality in

2    the contractor" that caused the harm. *Pacheco*, 2023 WL 7896261, at 2. As the Court's curative

3    instruction about the "Jennifer" complaint makes clear, there is no evidence that the Jennifer and

4    Kevin complaints were anything other than fraudulent "support abuse"—both riders lodged a

5    series of verbatim complaints about other drivers that were marked invalid. *See* Tr. 1180:24-

6    1185:11 (Cissna). It is therefore effectively undisputed that Uber had zero notice of prior sexual

7    misconduct by Turay. Nor did the other "red flags" Plaintiff cites give notice of unfitness. *See,*

8    *e.g.*, Tr. 1385:23-1386:7 (Tremblay) (1-star ratings); 1395:20-1396:2 (Tremblay) ("long stops,"

9    "midway drop-offs," or "route deviations"). Put simply, there is absolutely nothing in Turay's

10   record with Uber or in his background check history that would have given Uber reasonable

11   foreseeability that he would commit a future intentional crime such as sexual assault. Absent

12   expert evidence quantifying the risk associated with the "risk factors" at issue, there is no sound

13   basis for the jury to conclude that Uber breached a duty by not acting on them. *See Connes v.*

14   *Molalla Transp. Sys., Inc.*, 831 P.2d 1316, 1323 (Colo. 1992) ("no reason to foresee [defendant's]

15   hiring of [a driver] . . . would sexually assault" plaintiff absent specific "circumstances

16   antecedently giv[ing] the employer reason to believe" such a risk exists).

17       2. Plaintiff likewise did not present evidence that Uber breached any duty founded in

18   Arizona statutory law. "[T]he public policy reflected in [certain] statutes *does not create a duty*

19   enforceable in tort against one who did not violate any of those statutes." *Stair v. Maricopa Cnty.*,

20   429 P.3d 1151, 1156 (Ariz. App. 2018); *Sanchez-Ravuelta v. Yavapai Cnty.*, 569 P.3d 47, 58-59

21   (Ariz. 2025) (a statute "does not create a duty" absent an "allegation that the [defendant]" failed

22   to abide by specific statutory mandate" or that "the injuries arose from such failure").

23       The only statute at issue in this case is Arizona's TNC statute which is the only statute that

24   governs rideshare in the state of Arizona and is controlling here. *See* A.R.S. § 28-9551 *et seq.* The

25   duties it creates are plainly stated. *See Da Silva v. Lyft Inc.*, 2023 WL 7166546, at *3 (D. Ariz.

26   Oct. 31, 2023) (Arizona's TNC statutes do not create a "duty to provide more insurance . . . than

27   required by Arizona law," nor does such a duty "arise as a matter of public policy"). Uber has not

28   only complied with but exceeded those duties, as confirmed by the Arizona Department of

Transportation's (AZDOT) renewal of Uber's permit under the TNC regulatory scheme. D-4239; *see* Tr. 2251:12-15, 2253:4-2255:14 (Dobbs); Tr. 2231:7-16, 2233:7-10 (Dobbs); *see also infra* Section E. The trial record is devoid of any contrary evidence.

**C.    No Evidence Supports Plaintiff's Product-Liability Claim.**

Plaintiff also asserts a product-liability claim against Uber. "[A]n implicit condition precedent" of any product-liability claim is "that the object or instrumentality claimed to be defective is a 'product' as defined either by section 402A of the Restatement (Second) of Torts, legislation, or caselaw." *Menendez v. Paddock Pool Const. Co.*, 836 P.2d 968, 972 (Ariz. App. 1991).[8] "Whether an object or instrumentality is a 'product' is a question of law. *Id*. The Uber App is not a product.

Neither the Second "Restatement, Arizona Revised Statutes Annotated ('A.R.S.'), nor [Arizona] caselaw provide a comprehensive definition of product for characterization purposes," *id.*, but the Third Restatement defines "product" to include: "tangible personal property distributed commercially for use or consumption," as well as "[o]ther items, such as real property and electricity, . . . when the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property that it is appropriate to apply the rules [for product liability]." Restatement (Third) of Torts: Products Liability § 19(a)-(b).[9] "Services, even when provided commercially, are not products." *Id.* § 19(b); *see* PTO 17 at 44 (CA & TX law) ("Axiomatically, services are not products and do not give rise to strict liability.").

***The Uber App Is a Service***. Arizona law applies strict product liability only to "manufacturers and sellers of defective products," *Torres v. Goodyear Tire & Rubber Co.*, 786 P.2d 939, 942 (Ariz. 1990), not entities "provid[ing] a service," such as brokers, auctioneers, or third-party fulfillment services, which merely facilitate transactions between "parties in the direct

---

[8] *Menendez* pre-dated the Restatement (Third), and applied Restatement § 402A to define "product" under Arizona law.  "Although the Arizona Supreme Court has never adopted [Section 19] of the Third Restatement," the Third Restatement was "was cited as persuasive authority" by the Court of Appeals. *State Farm Fire & Cas. Co. v. Amazon.com Inc.*, 407 F. Supp. 3d 848, 855 & n3. (D. Ariz. 2019) (noting § 20 "appears generally consistent with Arizona . . . law").
[9] "The Supreme Court of Arizona (and other Arizona courts) have relied on the Restatement (Third) of Torts to determine the current state of the law on strict products liability and consider it relevant to today's tort law regime." *Sw. Pet Prods., Inc. v. Koch Indus., Inc.*, 273 F. Supp. 2d 1041, 1052 n.17 (D. Ariz. 2003).

chain of commerce." *Antone v. Greater Ariz. Auto Auction*, 155 P.3d 1074, 1079 (Ariz. App. 2007) (auctioneer not subject to strict product liability); *Dillard Dep't Stores, Inc. v. Associated Merch. Corp.*, 782 P.2d 1187, 1188 (Ariz. App. 1989) (same, broker); *Amazon.com Inc.*, 407 F. Supp. 3d at 854–55 (same, product distribution facilitators). Like those intermediaries, the Uber App facilitates a transaction between riders and independent drivers without assuming control over any physical products, *Amazon.com Inc.*, 407 F. Supp. 3d at 855, or "acquiring ownership in the car," *Doe*, 2020 WL 13801354, at *7. The function of "being driven from one location to another . . . is a service," *id.*, as is pairing riders with drivers, *see* PTO 28 at 16 (analogizing Uber "to a dispatcher who sends drivers to riders based on convenience, thereby ***performing a service***") (emphasis added). There is no cogent reason why strict liability would turn on Uber's choice to facilitate that service through an app rather than a call center.

A long line of authority thus holds that "the Uber App is intangible property" and not a "product." *In re Uber Rideshare Case*s, No. CJC-21-005188, at 17 (Cal. Super. June 22, 2023) (granting demurrer in part); *Doe v. Uber Technologies, Inc.*, 2020 WL 13801354, at *6 (Cal. Super. Nov. 30, 2020).[10] As those cases recognize, Uber's App provides a quintessential "service": a technology platform to help users find "a ride"—i.e., "being driven from one location to another by the person who owned the car." *Doe*, 2020 WL 13801354, at *7. That in itself forecloses Plaintiff's product-liability claim.

***The defect-specific approach misapplies product-liability principles.*** The Court has previously used a "defect-specific approach" to conclude that certain functions *not* included in the Uber App are "sufficiently analogous" to be actionable in strict product liability. PTO 17 at 42, 46; PTO 28 at 15 (citing *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 848–855 (N.D. Cal. 2023) ("*Social Media MDL*")). That ruling cannot be squared with basic product-liability rules. Arizona law asks whether the "*object or instrumentality* is a 'product'"—not one specific feature. *Menendez*, 836 P.2d at 972. This case illustrates the defect-specific approach's disconnect from that and other product-liability tests: the Court defined

---

[10] *See* Dkt. 2791-1 at 16-17 (MTD App'x D.7) (collecting cases holding the Uber App and similar apps are not products).

the Uber App as a product based on features *it does not have* (gender-matching and in-app ride

recording features). PTO 28 at 15-18. Features that do not exist have nothing to do with the

"distribution and use" of the Uber App or whether it is analogous to a tangible product.

Restatement (Third) § 19(a). That question can only be logically analyzed at the level of the app

itself, which facilitates a *service* not covered by product liability law. The same is true for other

product-liability inquiries. *See Dart v. Wiebe Mfg., Inc.*, 709 P.2d 876, 881 (Ariz. 1985) ("In a

strict-liability risk/benefit analysis, . . . *the product* is the focus of the inquiry."); *Readenour v.

Marion Power Shovel*, 719 P.2d 1058, 1063 (Ariz. 1986) ("Strict liability in tort is found only

when the defective condition causes *the product* to be unreasonably dangerous.").

***The features at issue are not products under the defect-specific approach.*** Even under

the Court's test, the two defects Plaintiff identifies are services, not products. Under the Court's

defect-specific approach, "the key question" is whether "the alleged 'defects' [are] really defects

in the Uber app, or . . . just problems with Uber's services (or with some other aspect of its

business model)." PTO 28 at 15; *Social Media MDL*, 702 F. Supp. 3d at 849 (weighing "whether

the functionality is analogizable to tangible personal property"). Here, at most, the alleged

"defects" are complaints regarding supposed shortcomings with Uber's services.

Gender matching. Algorithmically facilitating a transaction between two third parties—

including by matching their gender—is a service, not a product. *See Jackson v. Airbnb, Inc.*, 639

F. Supp. 3d 994, 1011 (C.D. Cal. 2022) (A "platform that connects users . . . is more akin to a

service than to a product."); *Social Media Cases*, 2023 WL 6847378, at *16 (Cal. Super. Oct. 13,

2023) ("algorithms . . . [that] tailor the user's experience to the individual consumer" are a

service, not a product). The Court already so held in ruling that Plaintiff's "safe-ride matching"

theory of defect concerned "send[ing] drivers to riders based on convenience, thereby ***performing

a service.***" PTO 28 at 16 (emphasis added). The same is true of a feature that would "send drivers

to riders based on [matched gender]," which likewise targets Uber's choices about which drivers

to pair with which drivers. PTO 28 at 16.

Recording. Plaintiff also claims the Uber App was defectively designed because it was not

"designed to trigger automatic video recording of rides and the time period immediately around

them" through "a driver's cell phone" or an "external device linked to the App." Dean. Am. Compl. ¶ 68. That supposed defect is not analogous to a tangible product. Plaintiff's claim is not that the Uber App is like a defective camera that blinds a user with her flash—it is that the App is not a camera at all. That theory is akin to alleging a security service failed to recommend and install adequate security equipment—claims sounding in negligence, not product liability. *See, e.g.*, *Valenzuela v. ADT Sec. Servs., Inc.*, 475 F. App'x 115, 117 (9th Cir. 2012) (failure to properly install alarm system did not breach negligence duty).

   **Uber's App is not unreasonably dangerous.** Plaintiff's strict liability claim independently fails because Uber's App is not unreasonably dangerous. "Strict liability in tort is found only when the defective condition causes *the product* to be unreasonably dangerous." *Readenour*, 719 P.2d at 1063 . "*[T]he product*"— not extrinsic danger –"is the focus of the inquiry." *Dart*, 709 P.2d at 881. Plaintiff does not suggest that the absence of gender-matching or in-app video recording made the Uber App itself dangerous, she alleges that because of their absence the App failed to prevent a danger originating outside the App, in the performance of a service: a driver's alleged criminal conduct during the ride.[11] The absence of evidence of any danger from the App itself—as opposed to from a broader danger in society—independently forecloses Plaintiff's design-defect claim.

   **D.**  **Plaintiff's Direct-Liability Claims Fail Because There Is No Legally Sufficient Evidence that Breach of a Duty by Uber Caused Plaintiff's Injury.**

   Even assuming a negligence or product-liability duty existed, Plaintiff's trial evidence cannot support a finding that a breach of such a duty caused Plaintiff's injuries. Given the highly technical nature of the various features of the Uber platform, Plaintiff was *required* to present *expert* evidence sufficient to prove her theories of breach and causation. *See Kennedy v. Performance Dodge, LLC*, 2008 WL 4787630, at *2 (Ariz. App. 2008) ("Expert testimony is

---

[11] The only context where a product has been held unreasonably dangerous for failing to prevent harms extrinsic to the product involve malfunctioning protection technology, such as alarm systems or bulletproof vests, whose sole purpose is to protect against crime. *See, e.g.*, *Green v. ADT, LLC*, 2016 WL 3208483 (N.D. Cal. June 10, 2016). Uber did not sell consumers a camera or gender-match feature that malfunctioned. The App cannot be "unreasonably dangerous" for failing to perform functions it was never intended to provide.

1    required when the issues are beyond the common understanding of the jurors."). Plaintiff failed to

2    do so here. Plaintiff presented no evidence—expert or otherwise—sufficient to show that the

3    ride's S-RAD score or Turay's "risk factors" made the pairing between Turay and Plaintiff

4    unreasonable. As for the other precautions Plaintiff urges, the record permits the jury only to

5    impermissibly speculate that Plaintiff's alleged assault "would not have happened" if Uber had

6    adopted the remaining precautions she proposes. *Dupray v. JAI Dining Servs. (Phoenix), Inc.*, 432

7    P.3d 937, 942–43 (Ariz. App. 2018); *see Grafitti-Valenzuela ex rel. Grafitti v. City of Phoenix*,

8    167 P.3d 711, 719 (Ariz. App. 2007) (granting judgment as a matter of law where plaintiff

9    offered "nothing more than speculation" that safety upgrades would have deterred an attacker).

10        **S-RAD**. Plaintiff's primary theory is that Uber caused her alleged injuries by making a

11   "risky" driver-rider match with Turay. But no reasonable jury could conclude that Uber should

12   have identified the match as unreasonably risky at the time. Plaintiff bases her risky-ride

13   argument on the score assigned to the ride by Uber's S-RAD algorithm, a machine-learning tool

14   that scores potential driver-rider pairings for safety risk on a scale from 0 to 1. 6/25/25 Wong

15   Dep. 27:15-27:20; 10/14/25 Wong Dep. 368:18-25. The evidence shows that the S-RAD score for

16   Plaintiff's ride was .810984373. 1/7/26 Wong Dep. 104:2-7. But beyond the fact that this S-RAD

17   score fell *below* the .936161816 threshold then in place in Phoenix, at which S-RAD would de-

18   prioritize the pairing in favor of another,[12] Plaintiff offers no evidence from which a reasonable

19   jury could determine the *magnitude* of risk represented by 0.81 score. **S-RAD scores are not**

20   **predictors of sexual assault** and "should absolutely not be interpreted as probabilities"—

21   especially given how "extremely rare" such misconduct "is on the platform." 1/7/26 Wong Dep.

22   106:12-25, 107:4-69, 107:9-107:20. Plaintiff offered no evidence from which the jury could infer

23   that a 0.81 S-RAD score represents an unreasonably high degree of risk, much less to foresee that

24   a sexual assault might occur for the specific trip in question. *See Newsome v. Dignity-Kindred*

25   *Rehab. Hosp. E. Valley LLC*, 2023 WL 2242865, at *4 (D. Ariz. Feb. 27, 2023) ("[E]xpert

26   testimony is required whenever proof of an element of a claim, such as causation, calls for

27

28   _____

[12]  The S-RAD threshold depends on a "trigger rate," which changes based on time of day and
geographic location. 1/7/26 Wong Dep. 139:8-17.

information that is outside an ordinary person's common knowledge."); *Kennedy*, 2008 WL 4787630, at *2 ("Expert testimony is required when the issues are beyond the common understanding of the jurors."). Even assuming there were "rides with lower S-RAD scores out there available," Tr. 2134:7-24 (Keller), reasonableness does not require the match with the lowest score—only a reasonably safe match considering all the circumstances. *See Johnson v. Pankratz*, 2 P.3d 1266, 1270 (Ariz. App. 2000). Plaintiff presented no evidence from which the jury could find that a 0.81 pairing breaches that duty or any evidence that Mr. Turay himself presented a reasonably foreseeable risk.

To the extent Plaintiff grounds her risky-ride theory on various "risk factors" in Turay's history, her evidence fails for much the same reason. The "risk factor[s]" identified by Plaintiff's expert are simply a list of asserted correlations—e.g., that drivers of rental cars have a "26 percent higher safety incident rate" (not sexual assault rate), Tr. 1419:17-1420:3 (Tremblay); that "sexual assaults caused by drivers are nearly three times more likely to be caused by a driver with a 1-star rating greater than the mean," Tr. 1383:6-14 (Tremblay); or that drivers with feedback tags for "professionalism, comfort, and conversation" had "three to five times . . . higher risk to commit sexual assault or misconduct in the next 30 trips." Tr. 1387:5-16 (Tremblay).[13] Countless variables—from lead pipes to poor high school grades—correlate with criminal behavior. *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 989 (9th Cir. 2008) (correlation "does not establish a sufficient causal relationship"). Plaintiff's experts conducted no statistical analysis to interpret the import of any of the risk factors at issue and offered no basis for the jury to conclude that they represented an unreasonable level of risk **as to Mr. Turay for the trip question**. *Grafitti-Valenzuela*, 167 P.3d at 717 ("The mere possibility of causation is not enough."). Plaintiff spent the whole trial speaking in generalities versus Turay-specific evidence–even failing to recognize that the S-RAD score factors in the **plaintiff's own risk behaviors as well** versus some driver-specific score.

---

[13] This "risk factor" is also inapplicable here because it describes a correlation during the 30 trips following the relevant feedback tags, and Turay's last rating or feedback tag was on September 8, 2023, more than thirty rides before the alleged incident. D-4142 ("Turay Feedback and Ratings Log").

The same flaws foreclose Plaintiff's theory that Uber breached a duty to warn Plaintiff based on certain "risk[y]" aspects of her November 15, 2023 ride, such as "a woman . . . traveling alone, while intoxicated, at night after midnight" or "being picked up near a bar." Tr. 1795:8-1796:8 (Dean). Plaintiff's evidence again boils down to correlations, which are "not causations and are not controlled for other factors"—for example, that a "report of sexual assault is . . . 4x more likely if the trip occurred between 12am - 3am," that a report is "2x more likely if the pick up location is within 150 feet of a bar," P-1699.00012, that "33% of audited reports" of sexual assault involved a "[r]ider alone in car," or that "52% of audited reports" involved an "[i]ntoxicated rider," P-311.00010; *see also* Tr. 386:3–11 (Drumwright) ("Evenings, weekends and late nights are especially risky for sexual assaults and sexual misconducts."). None of Plaintiff's experts offered any testimony isolating the risk from these variables (rather than merely describing the correlation with assault). Without statistical analysis or interpretation quantifying the risk, there is no basis for a jury to conclude that Uber breached some duty to warn Plaintiff by warning her of a reasonably foreseeable risk of harm.[14]

**Gender Matching**. Plaintiff's evidence was also insufficient to establish that her injuries were caused by the absence of a gender-matching feature. The trial record describes both a "soft preference" gender-matching feature (implemented by Uber's competitor, Lyft), and a "more restrictive" women-driver *guarantee* (i.e., an "'on-demand' feature"), which Uber launched in 2025. 4/11/25 Hasbun Dep. 464:20-465:22: Tr. 3052:12-3053:14 (Kansal).[15] There is no evidence that a "soft preference" like Lyft's would have resulted in a woman-woman match so as to

---

[14] To the extent Plaintiff grounds her theory that Uber should have warned her of the danger of sexual assault writ large, the "open and obvious" character of the risk confirms that any lack of warning did not breach a duty of protection. *See Markowitz v. Arizona Parks Bd.*, 706 P.2d 364, 368 (Ariz. 1985) ("the possibility that the defect or hazard is 'open and obvious' is a factor to be considered in determining whether the possessor's failure to remedy the hazard or provide a warning was unreasonable and therefore breached the standard of care").

[15] Uber also has implemented a pre-booking feature for women-preferences, which allows rides to make "an advance booking," guaranteed to "be with a woman driver." Tr. 3053:15-23 (Kansal). The presence or absence of that feature is irrelevant to Plaintiff's claims, as there is no evidence to indicate that she was planning ahead or had a predetermined time in mind by which she would leave Mr. McLaughlin's apartment (or that she would certainly leave at all). And as explained below, there is no evidence from which a factfinder could conclude she would have used a woman-driver-guaranteed feature, whether in the moment or in advance.

prevent Plaintiff's alleged injury, and in fact Plaintiff's own Lyft records shows this not to be the case given her regular pairings with male drivers when the Lyft feature was activated. D-4185-03, D-4185-04. Plaintiff used Lyft with its women-preference feature before and after the alleged incident—knowing "it wasn't guaranteed" that she would be paired with a woman driver—and she ended up riding with a male driver on the overwhelming majority of her numerous rides "in the months and years since November 15, 2023." Tr. 1855:19-1856:17 (Dean); D-4185-03, D-4185-04 (Lyft records).

The record similarly lacks any evidence that Plaintiff would have used a woman-driver-guarantee feature if one were available. Plaintiff did not testify as to whether she would have used a women-driver-guaranteed feature on the night in question. Indeed, she did not opt to use Lyft's soft-preference gender-matching feature, though she had used it a day earlier. Tr. 1856:1-4 (Dean). She also opted not to use Waymo which was activated on her phone. There is no plausible basis from which a reasonable jury could conclude she would have used an even more supply-constrained women-driver-guaranteed feature on the night of the alleged incident. *See Chavez v. Glock, Inc.*, 207 Cal. App. 4th 1283, 1305-06 (2012) (lack of manual gun safety mechanism not a cause where plaintiff conceded he did not use an existing available safety mechanism).

***Mandatory Dashcams and In-App Video Recording.*** Plaintiff's causal evidence with respect to dashcams or app-based recording is that recording would have had some unquantified "deterrent" effect on bad actors when using the Uber platform. *See, e.g.*, Tr. 1413:18-24 (Tremblay) ("drivers are at a higher risk when there is no recording to commit sexual misconduct, sexual assault"); Tr. 753:5-19 (Valliere) (the more surveillance, "the more deterrent effect it would be"). Her experts' speculative musings about the possibility of a deterrent effect do not suffice for causation. *See Grafitti-Valenzuela*, 167 P.3d at 717 ("The mere possibility of causation is not enough."); *Shaner v. Tucson Airport Auth., Inc*., 573 P.2d 518, 522 (Ariz. App. 1977) (rejecting expert's "sheer speculation" on effectiveness of security precautions and affirming directed verdict where record showed only "possibility," not "reasonable probability" of causation). The only other causal evidence Plaintiff presented linking cameras to safety is a bullet

in an internal Uber presentation stating that recording reduces the incidence of "interpersonal conflict" (IPC) generally by some unspecified statistically significant amount. Tr. 865:14-19 (Valliere); *see also* P-285.00025 (dashcams showed "encouraging results"). But IPC is broader than sexual assault, and in any event, this vague evidence leaves the jury with no grounds but speculation to conclude recording would have made a difference—particularly given Turay's testimony that he "might have" ended the ride, which he "assume[d] . . . might also turn off the camera," or else he "would have [had] to turn it off manually." 7/23/25 Turay Dep. 119:6-119:13.

*Background checks*. Plaintiff's experts criticized Uber's screening as incomplete or insufficiently rigorous. *See, e.g.*, Tr. 1373:24-1374:11 (Tremblay). But Plaintiff offered no evidence that a different process would have shown anything different than Turay's twelve prior background checks, including one just months before the alleged incident, which uncovered no criminal history or other red flags. Tr. 1590:2-14 (Tremblay); *see supra* at 14; 7/23/25 Turay Dep. 104:5-104:14. Turay's naturalization as a U.S. citizen only further confirms that a different background check would not have uncovered any disqualifying offense. Turay Dep. 14:13-14. The insinuations about Turay having some sort of criminal background solely because he immigrated here have been, quite frankly, shocking and prejudicial (with racially charged undertones)—but the bottom line at this stage of the case is that there is no actual evidence that Turay had some sort of background-related issue that would give rise to reasonable foreseeability he would commit an assault.

*Training.* Plaintiff's expert claimed Uber's sexual assault education training for drivers was "vague," left "room for interpretation," and was therefore inadequate to prevent sexual misconduct. *See, e.g.*, Tr. 816:24-817:4 (Valliere). This is incredibly odd. The training specifies in a direct and obvious way that sex is not permitted on the Uber platform. Full stop. But beyond this oddity, no non-speculative evidence suggests different training would have prevented Plaintiff's alleged assault. Turay "reviewed and completed" training modules and **twice** recommitted to Uber's Community Guidelines, including the no-sex rule. Tr. 1629:1-1630:3 (Tremblay). No evidence suggests additional trainings on the topic would have made a difference in this case: On the contrary, Turay testified that he knew, based upon all of these policies and

1    trainings, he "shouldn't" have sex with riders, that Uber "would have let [him] go" if they "found

2    out," and that his conduct was "unprofessional," and "wrong" even though he believed it was

3    consensual. 7/23/25 Turay Dep. 78:22-79:3, 86:18-86:23, 88:17-88:24.

4        **E.**    **The Court Should Grant Judgment as a Matter of Law on Punitive Damages**

5           Uber implemented cutting-edge and industry-leading safety protections—combining

6    extensive background checks, in-ride monitoring and safety-alerts, and algorithmic machine

7    learning—to protect rider and driver safety. The remedy of punitive-damages—reserved for

8    punishing bad actors under Arizona's demanding standards—are prohibited as a matter of law for

9    two independent reasons. First, Plaintiff's evidence was legally insufficient to satisfy Arizona's

10   demanding standard for punitive damages in a negligence action because Uber's exhaustive and

11   careful safety measures cannot provide "clear and convincing" evidence that Uber acted with an

12   "evil mind." Second, the trial evidence established Uber's compliance with all Arizona laws

13   relevant and material to the risk of sexual assault, entitling it to judgment on punitive damages

14   under Arizona's statutory punitive-damages bar.

15         **a.**  **Plaintiff failed to show "clear and convincing evidence" that Uber acted with**

16            **an "evil mind."**

17          Uber is also entitled to judgment as a matter of law on punitive damages because "no

18   reasonable jury could find the requisite evil mind by clear and convincing evidence." *Beville v.*

19   *Ford Motor Co., Inc.,* 2006 WL 8440462, at *7 (D. Ariz. Mar. 31, 2006) (Arizona law). Arizona

20   law is clear: "To be entitled to punitive damages, once a plaintiff establishes that the defendant

21   engaged in tortious conduct of any kind, . . . the plaintiff must prove the defendant engaged in

22   such conduct with an 'evil mind.'" *Swift Transp. Co. v. Carman*, 515 P.3d 685, 692 (Ariz. 2022)

23   (emphasis added). That requirement "limit[s] punitive damage claims to only the most egregious

24   cases"—neither "gross negligence nor reckless indifference [is] sufficient." *Id.* at 690. The evil-

25   mind test "requires clear and convincing evidence that the defendant's actions either (1) intended

26   to cause harm, (2) were motivated by spite, or (3) were outrageous, creating a 'substantial risk of

27   tremendous harm to others.'" *Id.* at 692. Only the last of these prongs is at issue. *See* Dkt. 5167, at

28   26 (Final Jury Instructions). It requires proof "that the defendant knew, or intentionally

disregarded, facts that create an unreasonable risk of physical harm—a risk substantially greater than that necessary to make his or her conduct negligent or even grossly negligent—and consciously disregarded that risk." *Id.* at 693. "[O]nly the rare negligence case" will justify punitive damages under this standard, which requires "outrageous or quasi-criminal" conduct. *Id.* at 692, 694.

Arizona courts rigorously enforce this high bar. In *Volz v. Coleman Co., Inc.*, for example, a stove manufacturer was aware "of the possibility of fuel spraying through the vent hole of the filler cap" due to "defects," and that "improvements . . . would be gained by redesigning the venting system." 748 P.2d 1191, 1193-94 (Ariz. 1987). Despite its "notice . . . of the tendency of the cap to spray fuel," "no warnings were issued," nor did the defendant provide "instructions on how to … prevent the possibility of fuel spraying." *Id.* The Arizona Supreme Court nevertheless held that a five-year-old severely burned by sprayed fuel could not recover punitive damages, reaffirming its rule "reject[ing] . . . punitive damages based on gross negligence or mere reckless indifference of the circumstances." *Id.* at 1194. The defendant's marketing of a product it knew to be defective established "negligence, or even gross negligence," but was "not . . . a case of . . . the 'something more' than gross negligence" required for punitive damages in Arizona. *Id.* at 1195. Arizona-law cases since *Volz* consistently hold, as a matter of law, that selling a defective product even with conscious knowledge of its dangers is insufficient to support punitive damages. *See Eiter v. Wright Med. Tech. Inc.*, 2022 WL 4104559, at *4 (D. Ariz. 2022) ("Defendant's knowledge of a defective product and its decision to continue selling the product . . . is legally insufficient to warrant punitive damages"); *Beville*, 2006 WL 8440462, at *7 (punitive damages unavailable as a matter of law in design-defect case where defendant "had long been aware of the danger posed by its product").

Plaintiff introduced no evidence—let alone clear and convincing evidence—that Uber "outrageous[ly] creat[ed] a 'substantial risk of tremendous harm to others.'" *Swift Transp. Co.*, 515 P.3d at 692. There is no evidence that the risk of sexual assault on the Uber platform is "substantially greater than that necessary to make his or her conduct negligent or even grossly negligent." *Id.* at 693. Quite the opposite, the historical risk of sexual assault on the Uber platform

1   is exceedingly low, with non-consensual sexual penetration reported in only one of 5 million

2   rides, Tr. 2815:7-12 (Stodden), and—even according to Plaintiff's expert's own unexplained

3   assertion—by only one in 50,000 users, Tr. 2141:7-18 (Keller); Tr. 2819:13-2821:9 (Stodden)

4   (noting lack of explanation for calculation).

5          Nor is there any evidence that Uber "consciously disregarded [the] risk." *Swift*, 515 P.3d

6   at 693. Rather, the record shows that Uber invested in and pioneered a variety of interventions to

7   reduce sexual assault on the platform. For example, Uber invested heavily over "many, many

8   years" to "create[] S-RAD to reduce sexual assault and misconduct," Tr. 2177:6-11, 2200:25-

9   2201:2 (Keller), an "unprecedented" tool that seeks to prioritize lower-risk rider-driver pairings.

10  Tr. 2796:3-6 (Stodden); 6/25/25 Wong Dep. 33:11-14. The evidence shows that S-RAD has

11  "helped reduce incidents of sexual assault and sexual misconduct on the Uber platform," 10/14/25

12  Wong Dep. at 539:02-12; 1/7/26 Wong Dep. at 122:16-17 ("able to observe a 15% reduction in

13  [the serious sexual assault/serious misconduct] rate as part of this experiment."); P-1667.003

14  ("4.5% prevention in serious SA/SM IPC globally").

15         Uber similarly **invented** and implemented a host of safety tools such as "Share My Trip,"

16  pin verification, an in-app 911 button, live agent assistance, in-app audio recording, Record my

17  Ride, RideCheck, phone number and address anonymization, and in-app reporting. *See* Tr.

18  2980:18-24 (Share My Trip), 2993:19-22 (in-app emergency button), 3003:8-10 (RideCheck),

19  3004:20-3005:1 (in-app reporting) (Kansal); Tr. 740:25-741:7 (anonymization tools), 744:20-

20  745:6 (Pin verification) (Valliere). It invented continuous screening technology allowing it to

21  identify and remove 185,000 drivers who incurred disqualifying convictions between annual

22  background checks. Tr. 2254:7-17 (Dobbs). It partnered with leading advocacy organizations to

23  create a required sexual-misconduct training for drivers, which Plaintiff's expert agreed "has

24  actually decreased [the sexual assault and misconduct] incidence rate on the Uber platform." Tr.

25  825:23-827:8 (Valiere); P-238.00018 (documenting 10% decrease in sexual assault/misconduct

26  incidence rate among drivers completing training). And it invested significant resources in a first-

27  of-its-kind Safety Report, available within the Uber App, working with leading nonprofits to

28  develop a taxonomy for sexual assault and misconduct incidents and auditing massive data to

1   bring transparency to the risk of sexual assault on the Uber platform. Tr. 2450:5-17, 2452:7-

2   2453:4, 2455:6-2456:5 (Boman).

3          Plaintiff's theory of the case is that Uber should have taken more steps, or different steps,

4   to combat that risk, but that theory cannot establish an evil mind. *See Swift Transp. Co.*, 515 P.3d

5   at 692. Unlike the risks posed by the stove with a defective cap in *Volz*, there are no easy fixes for

6   sexual assault during rides. *See* Tr. 2199:4-19 (Keller); 2722:21-2723:12 (Zgoba); 2/6/25

7   Freivogel Dep. 21:14-21. That risk calls for multilayered interventions whose benefits are

8   challenging to quantify and which can carry significant downstream effects affecting areas such

9   as privacy (e.g., dashcams), legal risk (e.g., gender matching), and ride availability (e.g., S-RAD).

10  Tr. 2516:12-17 (Boman); Tr. 2722:21-2723:12 (Zgoba). Uber continues to innovate and invest in

11  its platform's safety, and, so long as it does so, plaintiffs will continue to argue that it should have

12  innovated sooner or differently. Plaintiff's focus on S-RAD illustrates the issue: Plaintiff

13  criticizes how Uber "set the dial" for S-RAD, but it would be illogical (and create perverse

14  incentives) to hold that disagreements about the contours *of an unprecedented and incredibly*

15  *effective safety tool* can furnish evidence of conscious disregard. Arizona law forecloses that

16  outcome. If, as *Volz* holds, *knowingly marketing an unreasonably dangerous product* does not

17  suffice to award punitive damages, *see* 748 P.2d at 1194, punitive damages cannot be available

18  against a service that did not disregard the risk of sexual assault but instead invested heavily and

19  innovated to combat it. There is no evidence of an evil mind at the time of this incident and all

20  evidence is to the contrary— Uber made Stand for Safety a company-wide priority with ongoing

21  launches of first of their kind safety features that, taken together, give rise to a substantial

22  deterrence impact.

23              **b.  Uber's Undisputed Statutory Compliance Precludes Punitive Damages.**

24         Arizona's statutory punitive-damages bar precludes punitive damages because Uber

25  complied with all rules established by Arizona law and Arizona's regulators. Punitive damages

26  are barred when a "product, activity or service" complied with all statutes and regulations

27  "relevant and material to the event or risk allegedly causing the harm . . . at the time the product

28  left the manufacturer's control." § 12-689(A)(2). They are likewise barred when the "act or

transaction forming the basis for the claim involves terms of service [or] practices authorized by, or in compliance with, the rules, regulations, standards or orders of, or a statute administered by a government agency." § 12-689(A)(3). The undisputed trial evidence of Uber's compliance with applicable Arizona law entitles it to judgment on Plaintiff's demand for punitive damages.

Uber's provision of rideshare services is governed by Arizona's TNC statute, A.R.S. § 28-9551, *et seq*. *See* Tr. 2231:7–16 (Dobbs); Tr. 2376:9–13 (Okpaku). Pursuant to the statute, the Arizona Department of Transportation issued a permit authorizing Uber to offer rideshare services in the state, *see* Tr. 2233:2–10 (Dobbs); D-04239, reflecting the agency's conclusion that Uber "meets the requirements" of the TNC statute. A.R.S. § 28-9552(B). The statute imposes a variety of obligations on Uber in areas ranging from insurance to vehicle inspection to background checks. *See* A.R.S. §§ 28-4808, 28-9555. The undisputed trial evidence was that Uber met or exceeded each of its statutory obligations. *See* Tr. 2377:9-2385:17 (Okpaku); *see, e.g.* Tr. 2251:12–14, 2327:20–2328:5 (Dobbs) (Uber maintains insurance for its TNC operations in compliance with Arizona law, and conducts background checks "above and beyond" what is required by Arizona law).

That includes all regulations "relevant and material to the event or risk" of sexual assault by drivers against riders. A.R.S. § 12-689(A)(2). Uber conducted the statutorily required seven-year-lookback background check and sex-offender registry search through the Checkr background check platform before onboarding Turay in December 2016, conducted 12 subsequent background checks, and used its innovative "continuous screening" tool to identify disqualifying events between background checks. *See* A.R.S. § 28-9555(A)(2); Tr. 1590:2-14 (Tremblay); D-03701 (UBER-MDL3084-DFS00003622–23); 8/27/25 Nilles Dep. at 326:8–17; Tr. 2254:7-22 (Dobbs); Tr. 2715:24-2716:11 (Zgoba). Those checks confirmed Turay had no disqualifying criminal history and was not a registered sex offender. *See* A.R.S. § 28-9555(B)(2)-(3). Before onboarding Turay in 2016, Uber confirmed he held a valid driver's license. *See* A.R.S. § 28-9555(B)(4); Tr. 1576:11-18, 1588:24-1589:3 (Tremblay).[16] It maintained a zero-tolerance

---

[16] Plaintiff has suggested that Turay lacked a valid driver's license or sufficient license history when he completed screening in 2016, in violation of Arizona law. *See* Tr. 1378:13–18 (Tremblay); *see* P-03408. But she has adduced no trial evidence that would permit a reasonable

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 3:23-MD-03084-CRB/ 25-CV-4276-PHX-CRB

policy on driver alcohol or drug use, procedures for riders to report violations of the policy, and notice of both the policy and reporting procedures on its website, and it received no reports of any drug or alcohol use by Turay. *See* A.R.S. §§ 28-9507(C), 28-9554(A); Tr. 2256:11–13 (Dobbs); P-217.00009; P-503.00002. And its app displayed "a picture of the transportation network company driver and the license plate number" to riders "before [they] enter[ed] the . . . vehicle." A.R.S. § 28-9553(C); *see* Tr. 2313:2–6 (Dobbs).

As regulatory expert Joseph Okpaku testified, Uber "[d]efinitely met the Arizona requirements." Tr. 2400:19-2401:3. Plaintiff presented no contrary evidence, instead urging that Uber should have done more than Arizona law required (without indicating with specificity what "more" would have done to prevent this unforeseeable incident). *See, e.g.*, Tr. 2411:16-24 (cross-examination by Ms. Walsh) ("[T]he regulations you talked about, they don't prohibit Uber from doing certain things, right? They don't prohibit Uber from fingerprinting?"). Under A.R.S. § 12-689, that is not a viable basis for punitive damages. Uber's undisputed compliance with all laws "relevant and material to the event or risk" of sexual assault, A.R.S. § 12-689(A)(2), and its safety practices' undisputed "compliance with" Arizona's TNC statute, § 12-689(A)(3), foreclose punitive damages as a matter of law. Any contrary verdict would spring the surprising punishment of punitive damages on a company that invested considerable resources to painstakingly comply with Arizona law.

### III.    CONCLUSION

For the reasons stated, the Court should grant Uber's motion for judgment as a matter of law with respect to Plaintiff's claims for negligence, vicarious liability, product liability, and punitive damages.

---

jury to so conclude. The record reflects that Turay had a valid Arizona's driver's license in 2014 but was rejected because the driving-history check showed insufficient "driving history." Tr. 1574:24-1575:19 (Tremblay). When Turay reapplied two years later, and seven years before the alleged incident, Plaintiff's own witness conceded there was "no question" Turay had both a 2014 Arizona license and a 2016 Georgia license, and therefore "no question that when he applied to Uber to be a driver in December of 2016, he had the requisite [driving] history" to serve as a rideshare driver under Arizona law. Tr. 1576:11-19 (Tremblay); P-01901; P-03408; P-04162.

1    Dated: February 2, 2026            Respectfully submitted,

2                                          */s/* Laura Vartain Horn

3                                          Laura Vartain Horn (SBN 258485)
4                                          **KIRKLAND & ELLIS LLP**
                                         555 California Street, Suite 2700
5                                          San Francisco, CA 94104
                                         Telephone: (415) 439-1625
6                                          laura.vartain@kirkland.com

7                                          Kim Bueno (Admitted *Pro Hac Vice*)
                                         **KIRKLAND & ELLIS LLP**
8                                          401 W. 4th Street
                                         Austin, TX  78701
9                                          Telephone: (512) 678-9100
                                         kim.bueno@kirkland.com

10                                        Allison M. Brown (Admitted *Pro Hac Vice*)
                                         **KIRKLAND & ELLIS LLP**
11                                        2005 Market Street, Suite 1000
                                         Philadelphia, PA 19103
12                                        Telephone: (215) 268-5000
                                         alli.brown@kirkland.com

13                                        Jessica Davidson (Admitted *Pro Hac Vice*)
14                                        **KIRKLAND & ELLIS LLP**
                                         601 Lexington Avenue
15                                        New York, NY 10022
                                         Telephone: (212) 446-4800
16                                        jessica.davidson@kirkland.com

17                                        Sabrina H. Strong (SBN: 200292)
                                       Jonathan Schneller (SBN: 291288)
18                                        **O'MELVENY & MYERS LLP**
                                         400 South Hope Street, 19th Floor
19                                        Los Angeles, CA 90071
                                         Telephone: (213) 430-6000
20                                        sstrong@omm.com
                                         jschneller@omm.com
21

22                                        *Attorneys for Defendants*
                                       UBER TECHNOLOGIES, INC.,
23                                        RASIER, LLC, and RASIER-CA, LLC

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

2       I hereby certify that on February 2, 2026, I electronically filed the foregoing document

3  with the Clerk of the Court by using the CM/ECF system which will automatically send

4  Notification of the filing to all counsel of record.

5
                                    */s/ Laura Vartain Horn*_____
6                                    Laura Vartain Horn

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28