UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Jaylynn Dean, an Individual,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC., a Delaware Corporation; RASIER, LLC, a Delaware Limited Liability Company; and DOES 1 through 50, inclusive,<br><br>Defendants. | ) | 2:25-cv-04276-CRB<br><br>Phoenix, Arizona<br>February 3, 2026<br>8:43 a.m. |

**BEFORE: THE HONORABLE CHARLES R. BREYER, SENIOR JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL - DAY 16 - A.M. SESSION (Pages 3387-3519)**

Official Court Reporter:
Elva Cruz-Lauer, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 33
Phoenix, Arizona 85003-2151
(602) 322-7261

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

A P P E A R A N C E S

For the Plaintiff:

Girard Sharp LLP
By: **Sarah R. London, Esq.**
**Andrew R. Kaufman, Esq.**
601 California St., Ste. 1400
San Francisco, CA 94108

Chaffin Luhana LLP - New York, NY
By: **Roopal P. Luhana, Esq.**
600 3rd Ave., 12th Fl.
New York, NY 10016

Anapol Weiss
By: **Alexandra M. Walsh, Esq.**
14 Ridge Square NW, Suite 342
Washington, DC 20016

Anapol Weiss
By: **Holly Dolejsi, Esq.**
60 South 6th St., Suite 2800
Minneapolis, MN 55402

Anapol Weiss
By: **William Smith, Esq.**
130 N. 18th Street
Philadelphia, PA 19103

Peiffer Wolf Carr Kane Conway & Wise - San Francisco
By: **Rachel Beth Abrams, Esq.**
**Sara Beth Craig, Esq.**
**Brian J. Perkins, Esq.**
555 Montgomery St., Ste. 820
San Francisco, CA 94111

Peiffer Wolf Carr Kane Conway & Wise, LLP - Detroit
By: **Tiffany Rose Ellis, Esq.**
15 E. Baltimore
Detroit, MI 48202

Peiffer Wolf Carr Kane Conway & Wise - New Orleans, LA
By: **Cristine Farah, Esq.**
935 Gravier Street, Suite 1600
New Orleans, LA 70112

A P P E A R A N C E S (Cont'd)

Chang Klein LLP
By: **Deborah S. Chang, Esq.**
126 Lomita Street
El Segundo, CA 90245

Simmons Hanly Conroy LLP
By: **An V. Truong, Esq.**
112 Madison Avenue, 7th Floor
New York, NY 10016

Also present: Evan Wolfe

For the Defendants:

Kirkland & Ellis LLP
By: **Laura Vartain Horn, Esq.**
555 California Street, Suite 2700
San Francisco, CA 94104

Kirkland & Ellis LLP
By: **Tara Blake, Esq.**
609 Main Street
Houston, TX 77002

Kirkland & Ellis LLP
By: **Kim Bueno, Esq.**
401 W. 4th Street
Austin, TX 78701

O'Melvey & Myers LLP - Los Angeles, CA
By: **Louis W. Fisher, Esq.**
400 South Hope Street, Suite 1900
Los Angeles, CA 90071

Also Present: Ryan Knecht

SUMMARY OF PROCEEDINGS

Proceedings Held Outside the Presence of the Jury 3475, 3513
Final Jury Instructions Read by the Court 3391
Closing Argument by Ms. Walsh 3405
Closing Argument by Ms. Chang (Punitive Damages) 3444
Closing Argument by Ms. Bueno 3479

P R O C E E D I N G S

(Proceedings commence at 8:43 a.m.)

(The jury enters the courtroom.)

THE COURT: Let the record reflect the jurors are present. Good morning.

Ladies and gentlemen of the jury, now that you have heard all of the evidence, it is my duty to instruct you on the law that applies to this case.

A copy of these instructions will be sent to the jury room for you to consult during your deliberations. In fact, each of you will get a copy of the instructions.

You must follow these instructions, as well as those that I have previously given to you during the course of the trial.

It is your duty to find the fact from all the evidence in the case. To those facts, you will apply the law as I give it to you.

You must follow the law as I give it to you, whether you agree with it or not, and you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

Please do not read into these instructions, or anything I may say or do that I have an opinion regarding the evidence, or what your verdict should be.

All parties are equal before the law. And a corporation is entitled to the same fair and conscientious consideration by you as any party.

When a party has the burden of proving any claim by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim is more probably true than not true.

You will evaluate most of the claims in this case based on this standard, unless I explain to you otherwise. You should base your decision on all of the evidence, regardless of which party presented it.

The evidence you are to consider in deciding what the facts are consist of the sworn video and live testimony of any witness, the exhibits that are admitted into evidence, any facts to which the lawyers have agreed, and any facts that I have instructed you to accept as proved.

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you must not consider them in deciding what the facts are. I will listen -- I will list them for you.

Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, closing arguments and at other times, is intended to help you interpret the evidence, but it is not evidence.

If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the Court's ruling on it.

Testimony that is excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered.

In addition, some evidence was received only for a limited purpose. When I've instructed you to consider certain evidence only for a limited purpose, you must do so, and you may not consider that evidence for any other purpose.

Anything you may have seen or heard when the Court is not in session is not evidence. You are to decide the case solely on the evidence received in this trial.

Some evidence may have been admitted only for a limited purpose. When I instructed you that an item of evidence has been admitted only for a limited purpose, you must consider it only for that limited purpose and not for any other purpose.

Evidence may be direct or circumstantial. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or

circumstantial evidence. It is for you to decide how much weight to give to any evidence.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

The opportunity and ability of the witness to see or hear or know the things testified to;

The witness's memory;

The witness's manner while testifying;

The witness's interest in the outcome of the case, if any;

The witness's bias or prejudice, if any;

Whether other evidence contradicted the witness's testimony;

The reasonableness of the witness's testimony in light of all the evidence;

And any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember.

Also, two people may see the same event but remember it differently. You may consider those differences, but do not decide the testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things, but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were and how much weight you think their testimony deserves.

You have heard testimony from expert witnesses who testified to opinions and the reasons for their opinions. This opinion testimony was allowed because of the specialized knowledge, skill, experience, training, or education of these witnesses.

Such opinion testimony should be judged just like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's specialized knowledge, skill, experience, training, or education, the reasons given for the opinion, and all the other evidence in the case.

You may have taken notes to help you remember the evidence. If you did take notes, please keep them to yourself until you go to the jury room to decide the case. When you leave, your notes should be left in the jury room.

Whether or not you took notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of other jurors.

Plaintiff's first claim in this case is negligence. Plaintiff claims Uber was at fault. Fault is negligence that was a cause -- that was a cause of plaintiff's injury.

Negligence is the failure to use reasonable care to prevent a foreseeable risk of injury to the plaintiff. To determine whether Uber used reasonable care under the circumstances, you must consider whether a foreseeable risk of injury to plaintiff was created as a result of Uber's conduct.

If you determine that the danger to plaintiff was unforeseeable to Uber or that Uber had taken reasonable precautions to avoid the danger, then Uber's conduct was not negligent.

Negligence may consist of action or inaction. Negligence is the failure to act as a reasonable person would act under the circumstances.

Plaintiff claims that Uber was at fault in part because Uber breached a duty to warn her of a known danger.

Uber's duty of care includes an obligation to discover and warn of hazards that it should have reasonably foreseen as dangerous to riders.

To determine whether Uber unreasonably failed to warn plaintiff, you may consider whether any risk to plaintiff was open and obvious. You may conclude that it is reasonable not to provide a warning of risk if you determine the risk to be open and obvious.

Before you can find Uber at fault, you must find that Uber's negligence was a cause of plaintiff's injury.

Negligence causes an injury if it helps produce the injury and if the injury would not have happened without the negligence. There may be more than one cause of an injury.

In order to prevail on her negligence claim, plaintiff must prove by a preponderance of the evidence:

That Uber was at fault;

Plaintiff was injured;

And plaintiff's damages.

Plaintiff's second claim is that Uber was at fault for the design and creation of a defective and unreasonably dangerous product: The Uber app.

Before you can find Uber at fault on this claim, you must find that Uber designed the Uber app such that it was defective and unreasonably dangerous at the time of its use by plaintiff, and that the defect was a cause of plaintiff's

injury. A defect can occur by the presence or absence of a feature in the operation of the app.

A defect causes injury if it helps produce the injury, and if the injury would not have happened but for the defect.

Plaintiff claims that the Uber app contains two design defects. One, lack of an option to allow female passengers to be matched only with female drivers, that is, a gender match. And two, lack of automatic video recording of rides and the time period immediately around them. This is the app-based ride recording.

The Uber app is defective and unreasonably dangerous because of a design defect if the harmful characteristics or consequences of its design outweigh the benefits of the design. Uber is presumed to have known at all relevant times the facts that this trial has revealed about the harmful characteristics or consequences of the product's design, whether or not Uber actually knew these facts.

If you find that it would not be reasonable for Uber, with such presumed knowledge, to have put the Uber app on the market without changing the design, then the Uber app is defective and unreasonably dangerous because of a design defect.

In order to prevail on her design defect claim, plaintiffs must prove by a preponderance of the evidence:

That the Uber app was defective and unreasonably

dangerous;

The defect was a cause of plaintiff's injury; and

Plaintiff's damages.

You have heard evidence relating to potential legal risk to Uber from adopting certain safety features, particularly the "gender match" feature.

In this lawsuit, Uber does not claim that it took any action, or failed to take any action, on the basis of legal advice, or that legal advice impacted any of its decisions in any way.

Plaintiff's final claim is that Uber is liable because the driver Hassan Turay was its apparent agent and Uber is responsible for his actions. In order to prevail on her apparent agency claim, plaintiff must establish by a preponderance of the evidence:

One, Hassan Turay was at fault for plaintiff's injury;

Two, Hassan Turay was Uber's apparent agent;

And three, plaintiff reasonably believed that Hassan Turay was acting in the scope of his apparent agency.

Hassan Turay was at fault if he engaged in a sexual encounter with plaintiff without her consent, and those actions were a cause of plaintiff's injury.

Agency is a relationship in which one party, a principal, gives authority, by word or by conduct, to another party, an agent, to act on the principal's behalf subject to

the principal's control.

Agency can be based on actual agency authority or apparent authority. I instruct you that drivers like Hassan Turay are not Uber's actual agents as a matter of law, and are not Uber's employees. Therefore, to establish liability under her agency claim, plaintiff must prove that Mr. Turay was Uber's apparent agent.

Apparent agency is a relationship in which the principal has intentionally or unintentionally caused plaintiff to believe that a person was the principal's agent although no actual authority as an agent was given to him.

Apparent agency can never arise from the acts of the agent alone. Here, plaintiff claims that Uber was the principal and Hassan Turay was the apparent agent.

In order to establish this apparent agency relationship, plaintiff must prove:

One, Uber caused plaintiff to believe that Hassan Turay was Uber's agent;

Two, plaintiff relied on this representation to her detriment;

And three, such reliance was reasonably justified.

You have heard evidence that plaintiff and Uber are parties to a contract through Uber's terms of use. You can consider this evidence, along with all the other evidence in this case, in determining whether Hassan Turay was an apparent

agent of Uber.

If plaintiff proves that Hassan Turay was Uber's apparent agent, and that Mr. Turay was at fault for plaintiff's injuries, plaintiff must also show that she reasonably believed that the legitimate conduct and services performed by Mr. Turay as a driver that were incidental to her sexual encounter were done within the scope of his apparent authority as a driver for Uber.

You are not being asked to determine whether the alleged nonconsensual sexual encounter itself is an act within the ordinary scope of Uber's business or Mr. Turay's apparent authority.

To determine whether Mr. Turay's acts were within the scope of his apparent authority from Uber, you must examine when the acts took place, where they took place, and whether they were foreseeable.

If you find Uber liable to plaintiff for any claim, you must then decide the full amount of money that will reasonably and fairly compensate plaintiff for each of the following elements of damages proved by the evidence to have resulted from the fault of Uber.

One, the nature, extent, and duration of the injury. Regarding duration, you are instructed to accept as a fact that plaintiff's life expectancy is an additional 61 years to an age 82, according to the CDC's 2023 United States life tables,

which are available for your review as Court exhibit 30.

Two, the pain, discomfort, suffering, disability, disfigurement, and anxiety already experienced and reasonably probable to be experienced in the future as a result of the injury.

Three, loss of enjoyment of life, that is participation in life's activities to the quality and extent normally enjoyed before the injury.

Plaintiff is not entitled to compensation for any physical or emotional condition that preexisted the fault of Uber, nor for the natural progression of such condition.

However, if plaintiff had any pre-existing physical or emotional condition that was specifically aggravated or made worse by plaintiff's [sic] fault, you must decide the full amount of money that will reasonably and fairly compensate plaintiff for that aggravation or worsening.

You must decide the full amount of money that will reasonably and fairly compensate plaintiff for all damages caused by Uber, even if plaintiff was more susceptible to injury than a normally healthy person would have been, and even if a normally healthy person would not have suffered a similar injury.

If you find plaintiff [sic] liable for plaintiff's damages, you must also assess additional damages to punish Uber or to deter Uber from similar conduct -- pardon me -- from

similar misconduct in the future. Such damages are called "punitive" damages.

Punitive damages must be proven by clear and convincing evidence, rather than by a preponderance of the evidence. When the party has the burden of proving any claim by clear and convincing evidence, it means that the party must present evidence that leaves you with a firm belief or conviction that it is highly probable that the factual contentions of the claim are true.

While this is a higher standard of proof than proof beyond a reasonable doubt -- proof by a preponderance of the evidence, it does not require proof beyond a reasonable doubt.

Therefore, to recover punitive damages, plaintiff must prove by clear and convincing evidence that Uber's conduct was outrageous, oppressive, or intolerable, and Uber knew or intentionally disregarded that its conduct created a substantial risk of significant harm to others.

There is no fixed formula for determining the amount of punitive damages, and you are not required to award any punitive damages.

If you decide to award punitive damages, you should consider all of the following factors in determining the amount:

How reprehensible was Uber's conduct? In deciding how reprehensible Uber's conduct was, you may consider, among other

factors, whether the conduct caused physical harm.

Whether Uber disregarded the health and safety of others.

Whether Uber's conduct involved a pattern or practice, and whether Uber acted with trickery or deceit.

Two, is there a reasonable relationship between the amount of punitive damages and plaintiff's harm or the amount of punitive damages and potential harm to plaintiff that Uber knew was likely to occur because of its conduct;

And three, in view of Uber's financial condition, what amount is necessary to punish it and discourage future wrongful conduct? You may not increase the punitive award above an amount that is otherwise appropriate merely because Uber has substantial financial resources.

Punitive damages cannot be awarded to punish or deter conduct that had no direct relationship -- pardon me -- had no direct relation to plaintiff's alleged harm.

A defendant's acts, independent from the acts upon which liability was premised, may not serve as a basis for an award of punitive damages. You may not award punitive damages against Uber because you find it to be an unsavory business.

In deciding whether to award punitive damages, you should also take into consideration any mitigating evidence. Mitigating evidence is evidence which may demonstrate that there is no need for punitive damages or that a reduced amount

of punitive damages should be imposed against Uber.

So with that, I will now call upon plaintiff to make -- they're going to make an opening statement. Defense is going to make its closing argument. And then the plaintiff is entitled to present a rebuttal argument.

MS. BUENO: Your Honor, I believe there's three more instructions that were not read. And I --

THE COURT: Okay. Were they in this packet?

MS. BUENO: I thought they were, if not, I will hand them up.

THE COURT: Okay. Thank you very much.

No, I read these at the end.

MS. BUENO: Oh, thank you. Okay. Thank you, Your Honor.

THE COURT: It was all by design. All by design. Okay.

MS. BUENO: I misunderstood that.

THE COURT: No, no, it's not a misunderstanding. It's simply that I have the argument, and then I give the three final instructions.

MS. BUENO: Thank you.

THE COURT: Okay. Thank you.

MS. WALSH: Your Honor, Ms. Scott, Madam Court Reporter.

Ladies and gentlemen of the jury, I have been really

excited for this day when I get to face you and speak to you directly about this case. And I want to start by thanking you.

I have tried a lot of cases, and I can honestly say I have not seen a jury that has been this engaged, that has paid this much attention, that has been so alert to looking at, finding the evidence, seeing the evidence, and getting ready to do the incredibly important job that you are about to do.

This -- what we do in this courtroom, is something very special, and it has meant a lot to all of us to be doing it here with you.

And it's a special courthouse. It's a very special courthouse that we are in today, and you probably noticed it as you walked in every day these many days, but this is a courthouse that bears the name of Justice Sandra Day O'Connor.

And probably you've learned this, that Justice O'Connor, she was the first woman justice of the United States Supreme Court. She made history.

And she grew up, like Jaylynn Dean -- like Ms. Dean who's here today, she grew up in Texas. She was born in Texas, and she actually then moved to Arizona. And she grew up on a ranch in remote Arizona, and she studied hard, and she worked hard, and she went to Stanford Law School.

And she graduated near the very tip of the top of her class at Stanford Law School. And despite that, despite that, despite how hard she worked and how well she did, when she

graduated from law school, she couldn't get a job working as an attorney, out of law school. She got hired to work as a legal secretary.

And Justice O'Connor is not with us anymore, but I have to believe that wherever she is, she is looking down on this courtroom with delight, utter delight to see a case being tried, where both of the trial teams are led by women. It's very, very meaningful to all of us.

And in this courtroom, in this courtroom where you've come every day and paid such good, good attention, this is the very first time, the very first time that evidence that you saw, the facts that you saw, the testimony that was given on direct and cross-examination, this is the first time that most of those facts have been made available to the public, and to you, most importantly to you, to render your decision.

And regardless of what happens, with those facts out there right now, every woman, every woman in this country can now make a full and fair decision about whether they feel safe getting in an Uber late at night by themselves after they've been out with friends, or at any time.

Now, you may remember coming through the doors of this courtroom. And when you first came through, there were lots of you, right. There were a lot. We went through a big process. It seems like a long time ago.

But we went through that process, and we chose you.

You were chosen. You were chosen as the people to decide this case.

And every day -- well that first day at least, when you walked into the jury assembly room, you may have noticed this quote. And this is a quote from Socrates from over 2000 years ago. And what he spoke of back then is what you are doing. What you have done these past three weeks, and what you'll do when you get this case.

To hear courteously, to answer wisely, to bring your wisdom to the facts and to the law, to consider soberly, to consider soberly, and to decide impartially.

That is your role. That is your charge. And you're up for it. You're up for it.

Because together, the nine of you, bring something like over 300 years of life experience and common sense and being out there in the world. Your different backgrounds, your different perspectives, your different wisdom, you bring that all for a single purpose, which is to render justice, to render justice in this case, to bring the conscience of the community of Phoenix, Arizona and of the United States to this case.

In this case, Uber does not get to say what is reasonable. Uber does not get to say. You do. You get to say what is reasonable for a company like Uber to do. What is reasonable for that company to do. And you get to decide, just you, you get to decide what happened on the night of November

15th, 2023.

And it is a huge responsibility, and together you nine have that responsibility and that power. No one else in this courtroom. Judge Breyer, he is one of the most respected and experienced federal jurists in this country. He gets to tell you the law, which he just did, he doesn't get to decide.

The lawyers in this room, and there are a fair number of them, we don't get to decide. We don't get to decide. You get to decide. And it's an amazing thing about this country that you have this power.

In most countries in the world, that power is not given to ordinary citizens, to come in and to speak truth to power. That is what you are doing in this case. You are speaking truth to power.

And that right that you have and that responsibility, it is the very cornerstone of our democracy. It truly is. And as you can see, it gets me pretty excited.

Now, when you received your jury summons, you probably didn't imagine that you would be here to decide a case of this magnitude, a case of this magnitude. A case that no matter what the result, will affect the rest of the lives of the parties involved.

As you know, it's a case about Jaylynn Dean, who is here with us today. It's a case about Jaylynn Dean, who when she was 19 years old, 19 years old, she was raped, raped by the

driver that Uber sent her.

Only in this country could a girl, who was 19 years old when that happened to her, from a small town in Oklahoma who had suffered that terrifying experience, only in this country could she come forward and take on one of the biggest, most powerful companies in the world, Uber.

And do you think it was easy? Do you think it was easy -- it has been easy for her to take that stand? Knowing they would pore over her personal lives, her traumas, which all of us have.

All of us come to this courtroom with traumas that have happened to us. Knowing that they'd read every single piece of her social media. But she did it anyway. She did it anyway, and not only did she do that, she could have remained anonymous. She could have sought to remain anonymous in this case, but you heard her testify. She said, "Use my real name. I have nothing to hide."

No matter what has been said and who has said it, she is not ashamed. She is here to speak her truth.

Now, make no mistake -- well, and why is she doing it? She told you this, too. She doesn't want this to happen to other women. She wants the truth to come out, and thanks to this trial, the truth has come out.

So make no mistake, for that reason, what is happening in this courtroom will have an impact that will reverberate far

beyond this courtroom. Because in this case, and Ms. Chang will discuss this later, we've asked not only for compensatory damages to make up for what Ms. Dean suffered, but for punitive damages as well, and that is a serious thing.

It's a serious thing to ask for that. But we are asking for that. We are asking for punitive damages, because the evidence warrants punitive damages in this case.

The evidence warrants punitive damages so that changes are made. So that at the end of this whole trial, in the corporate headquarters of Uber, changes are made.

So let's dig into it.

Verdict. Your verdict, which you will render at the end of all this, that literally means in Latin to say the truth. And your verdict will be the truth.

What is the truth, and how do you find it? That's the work that we've been doing these past three weeks. We have brought you the evidence. We have shown you the documents. And as I said, you have patiently and with intent listened to all of it, and I know both parties appreciate that.

You've heard the law, and we're going to talk about that a little bit. At the end of your deliberations, you'll fill out this verdict form, and we'll show you a little bit about the verdict form and walk you through it just a bit.

So what are some -- only the judge can tell you the law, but what are some of the things that we just heard that

are important for you to keep in mind?

First of all, we, the plaintiff, Ms. Dean, her team, we have the burden of proof, and we take that very seriously. We have the burden to prove this case. We have met that burden.

We have met that burden through the evidence that we have brought you and through the evidence that we are summarizing today.

But it's important for you to keep in mind, this burden of proof in a civil case like this, what we are required to prove is that our case is more probably true than not true.

What does that mean? It's not six, seven, but it's 50.1 to 49.9. That's what it works out to.

This is not a criminal case. This is not a criminal case. This is what -- before I went to law school, this is what most of us were familiar with, right? Beyond a reasonable doubt. You must find it beyond a reasonable doubt. That's for criminal cases. This case is not a criminal case.

You do not need to find that we have proven our case beyond a reasonable doubt. What you need to do, is at the end of the day, if you think of it sort of metaphorically, like all the evidence that you think goes to Uber's side, all the evidence that goes to our side, a feather, a feather on that scale on our side, that is enough. That is enough. That's how it works in this country, okay? That is how the burden of

proof works.

Now, we have presented, and we are going to talk about today, three separate reasons, three separate and distinct reasons, that Uber is liable for what happened to Ms. Dean on November 15th, 2023, and what she will suffer as a result of that.

But keep in mind, one is enough. One is enough. You find one of these, and the plaintiff prevails. So let's talk about what they are. Negligence, design defect, and apparent agency.

We are going to start with negligence, okay. What is negligence? Negligence is the failure to use reasonable care, reasonable. What's reasonable to do in these circumstances? That's where your wisdom and your life experience and the conscience of the community comes in.

What is reasonable to do? What was reasonable to do to prevent what happened to Ms. Dean?

Negligence can consist of something that you actually do, an action that you take, or something that you fail to do. Something that Uber failed to do in carrying out its duty to Ms. Dean.

Our primary claim is that what Uber failed to do at just the most basic level was warn her, was warn her, was tell her the truth about what she was getting into. Just warn her.

We all deserve information that is relevant to the

decisions that we make when we're deciding to use a product, to use a service. We deserve that information so we can decide for ourselves.

You will decide whether it was reasonable of this company not to warn Ms. Dean about the true danger -- about what they knew about what S-RAD told them. What S-RAD told them about the risk of that ride. Just tell her so she can decide for herself. That's what a reasonable company would do.

Now, we also have to show that the negligence that happened, that it caused, it was a reason that her injury occurred. That one is straightforward.

They sent Mr. Turay. Uber sent Mr. Turay knowing about that S-RAD score. They sent him. And what that S-RAD score predicted, it happened. If they had not sent Mr. Turay, that rape on November 15th would not have happened.

Okay. So here are the questions. Did Uber's conduct create a foreseeable risk? "Foreseeable." Could they have known that this could happen? Could they have known that a woman getting into a car late at night, from a bar area, alone, could be sexually assaulted? Of course they knew that it could happen.

Could they have known that it was going to happen to Ms. Dean? Of course they knew. They had S-RAD. Of course they knew. Did they fail to warn? Absolutely. There was no warning at all.

And did they fail to use reasonable care to prevent what happened to Ms. Dean? Yes. That ride never should have been sent. So the answer to each of these questions is yes.

Did Uber's conduct create a foreseeable risk? Uber's conduct creates a foreseeable risk to women everywhere.

They have created -- designed, created, and they control an ecosystem that they know is dangerous for women under certain circumstances. They lull women into thinking it's safe. They say, "Come on into the ecosystem. This is safe. It's fine."

And even once they get there, even when they know that -- their algorithm, their massive computers have made a match that's dangerous, they sent it anyway.

Uber knows that its business is dangerous for women. This is what we found. These are the things that they say when they think no one is looking, and you all were able to see in this trial.

"Interpersonal violence," this is from 2024, "is a serious real threat in our business."

Back in 2017, this is their criminologist. Looking at all of the cases that she examined -- even back then in 2017, "It made me realize what kind of situations Uber creates that might be opportunities for sexual misconduct."

"Yes, we do background checks, but that really doesn't mean we can screen out all the drivers that show this kind of

behavior," and they certainly did not with Mr. Turay.

So what problem did that create for Uber? Because women are smart. We are smart, right? Getting into a car with a stranger late at night -- you know, I grew up before there was Uber. I remember first learning about Uber thinking, huh.

But they knew -- so they knew for their business to work, they needed to get our trust. They knew -- and this is a question that I asked of the head of product marketing for safety and sustainability and we played in this courtroom.

"Without trust, without people trusting Uber with their safety, people aren't going to use Uber, right?"

And she answered the questions very straightforwardly, which we really appreciated.

"No, I don't think they would. If you don't feel safe using a product, you will probably stop using it."

And so Uber's business imperative, their business imperative, what they had to do to grow that business to drive up that stock price, to make those billions of dollars, was establish universal trust. To convince all of us that Uber is the safest place in every city.

We know it's a dangerous world. Women know it's a dangerous world. We know about the risk of sexual assault. They made us believe that this was a place that was safe from that.

We must, we must prioritize safety and feelings of

trust. That safety sentiment, feelings of trust. Because in Uber's world, perception is reality.

How did they do it? From -- I picked out these years as most relevant to leading up to November 15th, 2023. In those years, Uber spent at least $8 billion in global marketing spent. $8 billion.

They did that to convince us, and to convince Ms. Dean, that Uber was a safe place to be that night. And who did they target? We showed you this. Women. Women. Women. They targeted women.

Because they know women are the most likely to think, "That doesn't seem safe. I don't think I should get in that car."

So they went after women. They targeted women alone. They targeted women at night. And they targeted women who had been drinking. This is all marketing of Uber.

So if they stand up here and say, "Well, people should know. People should know it's dangerous at night. Women should know that it's dangerous to ride alone. Women should know that it's dangerous to get in an Uber after drinking."

Women do know that, which is why they spent those billions of dollars convincing us, and Ms. Dean, that it was safe.

And why did they do it? Because what their marketing people told them is this is a huge opportunity for growth. A

huge opportunity to make a whole lot more money. Sell more rides and make more money.

Addressing safety concerns when alone or late at night present the biggest opportunities for growth. That's what Uber realized and documented internally, and didn't tell any of us, until this trial, was true in 2018.

This is just -- you saw a lot of marketing. This is just -- you saw a lot of marketing. These are just some of them.

This one on the left, this is on Uber's website today. They're still doing it. This is an ad that you saw. This shows this woman who has been drinking, and she gets up, and they say, she'll be safe if she takes an Uber.

What Uber did through this marketing, you've seen a lot of it. I picked out some of it for you today. We know that it's a dangerous world, as I said. We know that it can be safe out there late at night. They worked really hard to convince Ms. Dean that Uber was a safe place to be that night.

And that is a really, really, really dangerous thing to do. We brought you Professor Drumwright from the University of Texas. She is a business and marketing expert. And she told us about something she teaches to her students, which is called the "anti-warning."

It's even worse than not warning. Telling people that something is safe when you know that it's not. That's an

anti-warning. And the problem with it is, you let your guard down. You think you're safe when you're really not.

I am safe. I don't really need to worry about what I'm doing. I'm in an Uber.

But Uber knew internally that convincing all these people, lulling all these people into believing it was safe, it was creating a real problem out there in the world.

They were told by law enforcement back in 2019 that with the use of rideshare, police have seen DUIs reduced but increases in excessive alcohol consumption. It's okay, we can all drink a lot; we can take an Uber home.

They knew, and a large majority of sexual assault reports, police and advocates confirm that the victim was typically alone and in an intoxicated vulnerable state.

They knew. If we look at this bottom -- under riders here. That friends of riders, they want to be good friends. They think that the safest and best thing to do is to send people home, people who maybe been drinking too much, people who want to get home, to send them home in an Uber.

What did Uber know internally? What does Uber know even today internally? That is not a safe thing to do. It's not a safe thing to do to put your drunk girlfriend in an Uber late at night.

Uber's internal data, as recently as 2024, this is what they're discussing internally. Intoxication, a risk

factor for sexual assault and sexual mobility. Evenings, weekends, late nights. Particularly between midnight and 3:00 a.m. are especially risky, and riding alone, that's a risk factor too.

Here was their internal finding, which no one has seen until this trial. They know that riders are susceptible to opportunistic crimes when intoxicated, meaning whether or not the person set out that night -- the driver set out that night to find someone to sexually assault, these situations create an opportunity for that to happen.

Uber actually did something called a "root cause analysis." What do we know -- this is in September 2022 -- can cause sexual assaults on our platform?

These opportunistic scenarios where you have got a power imbalance. Maybe the rider has had too much to drink. There's an age difference, as there was with Mr. Turay and Ms. Dean.

It's late at night. It's to or from a bar area. The person is riding alone. All of these things internally Uber knew that these are opportunistic scenarios that can result in sexual assault.

And they did result in sexual assault. We saw evidence after evidence after evidence of Uber learning that people who were relying on their company for a safe way home were getting raped and assaulted.

Back in 2012, here was one of the first reports that we were able to find digging through all of that evidence that they received. More headlines that were coming in to Uber that Uber was discussing. This is in 2016.

By 2019, the truth was really coming out. The truth was coming out. People were talking about this. Like this is an issue, we're hearing lots of reports.

MS. BUENO: Objection, Your Honor. This was not offered for the truth of the matter asserted.

MS. WALSH: I'll correct my -- this is the information that was coming in to Uber, okay? This was a CNN article that Uber distributed amongst its executives about what CNN was reporting. And what it was reporting is that people were saying that they had suffered sexual assaults on their Uber rides.

This we are offering for the truth of the matter asserted, because this is what was said internally by Andrew Hasbun. We heard a lot from him. Based on what he saw working for the company, "We have a sexual assault problem." That is the statement of an Uber executive back in 2018.

So what did they do? What did they do when all of these reports they were receiving -- they were reading reports in the press. Internally they were saying, "We have a sexual assault problem." They said, "We've got to get a hold of this story. We got to get in front of this story." And that's the

explanation for the safety reports. That is the explanation for the safety reports.

What we'll do is we'll put out these safety reports. We'll say, "We're happy to tell you what's actually going on," you know, "Here we are, we're being transparent."

These were the biggest anti-warnings of all. The biggest anti-warnings of all.

And the reason is, if you look at those reports, what you'll see is that they say, "The vast majority of Uber trips end without any safety related issue at all." That's them trying to tell everyone in this transparent safety report, "Don't worry, we're safe."

But what we were able, through cross-examination, to help bring out in this courtroom, is that that number, that's not the number that matters.

If you're trying to be transparent about risk, talk about the risk to the people who are most at risk. And they knew internally that the people most at risk are the women riding late at night after they've been drinking.

And that information, Ms. Boman admitted on the stand, is not in the safety report. To this day, that information has not been disclosed.

Why did they leave it out? Why did they leave out that Uber is especially risky at night? Why didn't they give the percentage for -- let's just look at -- forget proximity to

a bar, everything else. How about just rides at night versus rides during the day? They talked about doing it. They actually talked about doing it.

This is our friend Gus Fuldner. He said, "Well the pro of doing it" -- what was presented to him. The benefit of doing it, "It would serve as a 'compromise' for consumers looking to learn more on how to manage their safety."

What consumer is not looking to learn more about how to manage their safety? We deserve the information that we need to make decisions about our own safety.

The cons? It was a long list. And right at the top, "serious business implications. It may prompt less users in high peak times."

Maybe women will not take Uber as much late at night if we tell them what the risk is at night.

What else have I highlighted here? "Prompts users to ask what Uber is doing to mitigate safety concerns."

We don't want to invite those questions about what we're doing to mitigate safety concerns. Maybe somehow S-RAD will come out then. Because they really didn't want S-RAD to come out, as Ms. Chang will describe.

So what did they do instead? This is Uber's favorite slide. They showed this slide a lot during this trial. We have all these safety features. All these safety features. These were available to Ms. Dean.

These are about sentiment not safety. These are about making people feel like Uber is trying to make itself safer, when they are not actually making Uber safer at all --

The truth about these safety features, the truth is not what you see in marketing materials or in what lawyers say. The truth is what Uber says about them in their internal files.

RideCheck, we've looked at this document. Operations has serious questions about its effectiveness, why it doesn't trigger sooner. Why it doesn't do more. Why sometimes it does nothing.

What about things like the emergency button? Andrew Hasbun again, internally in another one of his Slack messages, and you saw this, and you can ask to look at it during your deliberations. That's why we've put all of these exhibit numbers down here.

"The truth is we aren't helping. You help yourself with the tools we give you, but assistance is misleading. We do not assist."

You press that 911 button, Uber doesn't do anything to protect you.

But what is the ultimate proof that these safety features don't work? You know, if you're wondering, well, I hear a lot about them from Uber. We hear from, you know, Ms. Dean's lawyers that they don't work. What's the ultimate proof that they don't work?

You know who gave us the ultimate proof? Their expert, Victoria Stodden. Victoria Stodden who admitted under cross-examination that nothing Uber has done has had any effect on the rate at which rapes are reported. Nothing. It has not gone down at all during the seven -- from 2017 to 2024.

2024, in fact that was the highest number of rapes ever reported on the Uber platform, and it works itself out to one rape reported to Uber every single day. Think about that?

Every single day on average, more often at night, someone at Uber receives a phone call, or something through their electronic system saying, "I was raped by my Uber driver."

And you listen very, very, very carefully and think and use your common sense about whether someone -- whether that is rare or not. One rape reported a day. Does that make sense to you to call that "rare"?

So why does Uber have these safety features? Again, we saw it in a text message from Katy McDonald. She was complaining about riders. The people who spend a lot of money using their service. They're the worst. And she's talking about safety features, and she says, "We need these riders to feel good so that they give us business."

That's why they have those safety features. And those safety features are being used again in this courtroom to try to make you feel good about Uber, but look at the evidence.

And again, Mr. Kansal --

MS. BUENO: Objection, Your Honor. Once again, this is not offered for the truth, and the title is misleading.

MS. WALSH: Okay. I'll move on from this one.

Okay. So what could Uber have done? What could Uber have done? What could Uber have done differently? We brought you Retired Chief Tremblay, who is a sexual assault prevention expert. How can you prevent sexual assaults and protect people like Ms. Dean? And he described something -- I've not heard of this before -- but it's called the "crime triangle."

And what he said is that for a crime to happen, you need a place. You need an offender. And you need a target, or a victim, okay?

And for each of those sides of the tri -- if any one of those sides of the triangle goes away or is taken care of, the crime can't happen. You don't have an offender, you don't have a crime. You don't have a place, you don't have some -- a location for the crime to take place. You don't have a victim, you don't have a crime.

On each of these things, Uber, its control over its own ecosystem meant that it could have stepped in. It could have stepped in.

What could it have done? Better screening. Just take a closer look at these people that you're allowing to drive on your platform. Take a closer look. Do what you should -- what

a reasonable person would do before putting someone in a car and driving them to pick a woman up late at night.

Hassan Turay. What did they do with respect to Hassan Turay? Well, we showed you -- we showed you evidence that there was something -- there was reason for concern about Mr. Turay from the very beginning.

Because the motor vehicle records that Uber had access to about Mr. Turay said that the license that he had submitted was first issued in 2008. That can't be right. That cannot be right.

Because he testified under oath that he came to the United States in 2013. So one of those things is false. So there was reason to wonder about whether he was a good person to be putting into a car to send to someone like Ms. Dean. There was reason to wonder from the very beginning.

The fact is, they knew almost nothing about him. This is what we heard from Hannah Nilles. Can we play this one? Let's see -- well, I'll tell you this. What is told here is that -- I'm going to give our guy one -- nice Mr. Wolfe one second to see if he can help me play it.

THE COURT: Do you want to take a couple of minutes? Oh, now it's working.

MS. WALSH: Here we go. Okay. I think we need the volume.

THE COURT: Let's wait a minute. Go ahead.

MS. WALSH: Apologies, ladies and gentlemen.

Mr. Wolfe, would you mind starting from the beginning? Thank you.

(Video clip is played for the jury.)

MS. WALSH: None of those things were done before Mr. Turay was allowed to drive on the Uber platform.

And interviews matter. Asking people questions about what they believe and how they act and what they think is appropriate. They matter.

And here is evidence why. This is what we learned from Mr. Turay when we had a chance to depose him.

(Video clip is played for the jury.)

MS. WALSH: This is what you can learn when you take the time to ask someone questions. When you take the time to ask them, you can learn things like this. And knowing this -- this is what we learned when we had an opportunity to ask Mr. Turay questions.

Is that a person who should be driving for Uber? Who should be picking up young women late at night?

Okay. What's another part of the crime triangle. The place. Uber has control over the place. Uber can exercise control over the place to prevent crimes from happening. Like, for example -- I'm giving you examples here -- requiring dashcams.

Uber knows that dashcams deter unsafe behavior. Over

and over and over again they say it in their documents. We've showed you a lot of those documents. I picked out two here.

"Dashcams and audio are the most powerful tools we have to prevent an incident," and they, "have ground truth on what happened."

"We know that recording tools" -- this is just last year in 2025 -- "act as significant deterrents."

Now, you heard from Uber a lot of excuses for why one of the biggest, most technologically sophisticated, richest company in the world can't seem to figure out the dashcams.

Connectivity issues. Hard to scale. What if the driver unplugs them? It could cost some money. Those are all the excuses.

But there are no excuses they can make when it comes to Mr. Turay. They can't make any excuses. The whole reason Mr. Turay was able to give that ride that night is because he rented a car through the vehicle marketplace that Uber created by entering into these contracts, right, with rental companies.

He wouldn't have been in that car if Uber hadn't had that arrangement so that he could rent a car. And in the rental agreement with the rental company -- this was the agreement with the rental company, to be clear.

But it said, it obligated Mr. Turay to comply with all terms imposed by Uber. One of those terms could have been, "You got to use a dashcam. If you want access to one of these

cars to deliver rides to make money, we are making it mandatory, you must use a camera." They did not do that.

What about warning riders of the dangers? What about that? There are all different sorts of things that could have been done to help Uber as the guardian of the target victim. But how about just warning?

So let's go to that next question. Did Uber fail to warn plaintiff, Ms. Dean, of a known danger? And the answer is yes. Did the marketing warn? Did any of that marketing that we looked at, did any of it say like, "But by the way, you should know that if you use Uber under any of these circumstances, you're at an increased risk."

That stuff we say in the safety report about it's so, so, so, so safe, the percentage is so small, that doesn't apply if you're one of these people. No. Uber has never said that.

Do the safety reports warn? No. Was Ms. Dean warned? Absolutely not. She confirmed that on the stand. She was never told that traveling alone, intoxicated at night after midnight created an increased risk. Never told that being picked up near a bar would put her at increased risk.

And she confirmed that if she had known of the increased risk to her in that situation, she would not have gotten into that Uber. What would she have done? What would she have done?

There's a lot of talk about like, public

transportation options in California. I'm not really sure what the relevance of that was.

She could have stayed at Scott's apartment. She could have stayed at Scott's apartment. She wanted to leave. She wanted to get home. But if she knew that the only option, the only alternative was getting in that Uber with Mr. Turay, she would have stayed in Scott's apartment.

Okay. Did Uber fail to use reasonable care to prevent a foreseeable risk of sexual assault to plaintiff? Yes. And this is where S-RAD, which you've learned so much about in this trial, this is where S-RAD comes in.

And it really is -- this is something that has not come out to the public before this trial. And what Uber admits in its internal documents is that S-RAD is a safety product designed to prevent serious sexual incidents. They designed it to do that. That's great.

They should have used it more. They limited S-RAD's power. They applied it only in a small percentage of cases. They should have applied it more. And if they had, it would have prevented Mr. Turay from being sent to Ms. Dean.

Why did they -- this is Sunny Wong, who you heard from. Okay. He gave testimony on behalf of Uber about this. And he explained, it's not that complicated. S-RAD scores potential pairings based on the risk of sexual assault. That's what it does.

And it has this flagging threshold. And I am going to show you a picture of it in a minute. But that -- make no mistake, that threshold, how it decides whether it's going to intervene in a risky trip or not, that is set by Uber.

And how does Uber -- Uber controls that threshold, right? And that's when we showed you the dials. Like they could turn S-RAD up or they could turn it down.

But their own document, take a look at it if you want, it's P-01681. What their own document shows is that they knew internally, by setting it at 1.25, really low down there, they could prevent some sexual assaults. That's great.

They also knew, with this experiment that they did showed, that if they turned it up, just to 10, just to 10, we're not talking about turning it up all the way. Just to ten. They could have prevented 50 percent of the sexual assaults that happened in that experiment. That's what they could have done.

Why did they choose 1.25 rather than 10? Why did they choose that? They choose it because they don't want to disrupt their marketplace. They don't want to sell fewer rides.

They're willing to do a little bit to prevent some sexual assaults, but they're willing to do just a little bit. Turning it up more, that would interfere with their marketplace and interfere with how many rides they could sell.

"We seek to avoid hurting the marketplace." This is

what their internal documents show.

They also show the scoring system. It's designed to influence only 1.1 to 1.25 percent of trips. Just those very top trips. Why? "To minimize disruption to the marketplace."

And what that means is how many rides Uber can sell, and what that means is how much money Uber can make.

So how did this play out for Ms. Dean? Her threshold's here, which we know, you've seen was a .936, all the way up at the tippy top. That was set to minimize disruption to the marketplace. We don't want to block too many rides. The more rides we sell, the more money we make. We don't want to block too many.

The pairing between Ms. Dean and Mr. Turay, their own predictor came in at .81. And because it was just below that threshold, they sent the ride anyway, knowing it was a .81, they sent it anyway.

Now, who else was available that night in Phoenix? Who else was available? Who else could have been sent if they said, you know what, we're not going to make this match between Mr. Turay and Ms. Dean. That's too dangerous.

Well, we know that the average S-RAD score was way below what it was for Ms. Dean and Mr. Turay. And that means that there likely was a safer ride available. But we will never know. We will never know because Uber deleted the data.

And again, through cross-examination, we were able to

learn that just weeks before this trial.

(Video clip is played for the jury.)

MS. WALSH: It would be good to know.

Here's what Mr. Wong also admitted with respect to whether this information was shared with Ms. Dean.

(Video clip is played for the jury.)

MS. WALSH: Uber doesn't tell anyone about what their S-RAD scores are.

Can I switch? Thank you.

Okay. So as a result of that ride being sent, what happened on the night of November 15th, 2023? Because make no mistake, what's being suggested in this courtroom is that Ms. Dean is making this up. That she's not telling the truth.

Let's look at what the evidence shows about that.

This should be -- okay. Apologies all. Okay. Wow. What I'm looking to play here --

(Video clip is played for the jury.)

MS. WALSH: That is -- we saw a lot of testimony yesterday that defendants chose to play, hours after Ms. Dean came into the hotel. That is what happened when she came into the hotel, when she called 911 to say what had happened.

Let's see what -- if we could switch back?

Thank you.

Okay. What did Uber -- this is -- I wanted to show you all this, because in Uber's opening, what Uber said was

that what the evidence would show is that Mr. Turay would say, you see the deposition, and that he'd say that in his heart he believes it was consensual. That Mr. Turay in his heart believes it was consensual.

What did he actually say in his deposition?

(Video clip is played for the jury.)

MS. WALSH: I really apologize. Okay. Here we go.

(Video clip is played for the jury.)

MS. WALSH: Under -- when we questioned him and asked him what he said, what he admitted is that he didn't make sure she was in the right state of mind to give consent. That's what he said under oath.

What do we know from Kenny, remember Kenny, the clerk at the hotel? Kenny, he was there. He witnessed all of this unfolding when Ms. Dean came into that hotel room.

MS. BUENO: Your Honor, I object to the statement that this is testimony by Mr. Bagby.

MS. WALSH: I agree with that.

MS. BUENO: It certainly is not.

MS. WALSH: You know what, we'll play that in the next section. Let's -- we'll move on.

Okay. So Uber's negligence -- we're not going to play that after all.

To wrap this up, if I could go to the next slide, please?

Okay. Uber's negligence. Mr. Turay admits that she was not in the right frame of mind to give consent. That he had a responsibility to make sure that she was, and that he didn't do that.

And why was it able to happen? Because Uber did not warn Ms. Dean of the risk. Because Uber did not require a dashcam, as it could have in that rental car. Because Uber did not offer Women Preferred, which I will talk about in a minute, and because Uber did not block that ride based on a high S-RAD score.

So let's go now -- so when all of these things that I've worked through, with some snafus towards the end, all of them relate to this question that you will be asked to answer on the verdict form.

Do you find Uber liable for negligence?

And we submit, based on all of the evidence, that the answer is yes.

Okay. What is the other reason that we submit that Uber is liable for that rape that happened on November 15th? A design defect. And you are going to have a chance to look at all of the law around design defect.

Our two theories for design defect, the two reasons that this app is defectively designed, is because the lack of a camera, which we talked through. You'll have a chance to look at all of these.

The lack of the camera. We talked through that. That was not provided to Ms. Dean. That was a defect in the service that Uber offered. There should have been a recording of that ride.

Also, Uber's failure to offer a gender match. Uber's failure to do what other ride -- what Lyft has done. What other smaller rideshare companies have done, which is to allow a person to prefer a woman.

What the evidence has shown is that Uber does make this available to women throughout the world. These are the countries where Women Preferred existed before the U.S.

Notwithstanding that, Mr. Kansal admitted, under cross-examination just yesterday in this trial, that Uber did not even try to launch Women Preferred in the U.S. in 2019, in 2020, in 2021, 2022, or 2023. It finally came, it finally came in 2025.

It was introduced back in September of 2025.

MS. BUENO: Objection, Your Honor, to the discussion about other trials.

THE COURT: It's not a discussion.

Go ahead. She is not discussing.

MS. WALSH: This is when -- August 2025, this is when Uber was launched in San Francisco. When was -- Women to Women was launched in San Francisco. When was it offered in Phoenix? In November 2025. Just months before -- one and a half months

before this trial.

So what is reasonable? We submit that this is what is reasonable. What would be a reasonable way to design this app?

I am going to need to play this one, please. Take a look at this, and then we'll talk through it.

Simply a safety notice. Provide a safety notice. If you are a woman riding Uber late at night, provide that safety notice.

Once you type in where you're going, we have all done that. This is the actual -- shows the actual ride that Ms. Dean took that night. It's confirming the ride.

Now, this ride -- this could be -- have an increased risk of sexual assault. It's late at night. The pick-up is near a bar. Person is riding alone. Possible intoxication. Those are the potential risk factors.

Just warn people when they're about to get in that ride. And then once S-RAD calculates its score, we're not saying explain the entire algorithm. Just explain that Uber has calculated a higher than average safety risk score. So that people have that information, and they can decide.

And even if they decide to get in that car, to tell them, be on alert. Don't let your guard down.

If we could go to the next slide? Thank you.

What about when it comes to -- if they had had -- if Women Preferred matching had existed back in 2023, what would

the Uber app have looked like? What would have been an app that was not defectively designed?

We can play this one, please. Thank you.

There we go.

Again, these are some of the things that could increase the risk of your Uber ride. Just tell the people. Just provide that information.

Your ride is matched. Location is typed in. Looking for the ride. Look, women drivers. Maybe you might want to choose a woman driver option for this particular ride.

So that is what we call an Uber app that is not defectively designed.

Let's go to the next slide, please.

Okay. So for those reasons, because no dashcam required, because no Women to Women option, is Uber liable for design defect? Yes.

Okay. Our final theory or basis for liability, apparent agency. You heard a lot of instructions on this. You will have a chance to read them. They will explain how this all works to you.

But the basic theory, the basic theory, is was it reasonable for Ms. Dean to believe that Mr. Turay was acting as Uber? Was an agent of Uber?

Did she have reason to believe that this person, Mr. Turay, was an agent of Uber? Let's look at the evidence as

to that.

The first thing that you may hear about from the defendants is, well, she should have known because it's in the terms of use. Okay. And we all know about terms of use when you sign up for an app.

You can consider the terms of use. You have been instructed. But let's consider it together now, what this terms of use -- these are all of the instructions that you'll get to see. And here is an animation showing what it looks like when you sign up -- what it looked like for Ms. Dean when she signed up for Uber.

If we can switch back, please, Ms. Scott? Oops. Sorry. I am going backwards.

Okay. So when you're signing up, these terms of use that you see -- yes. Well, let me say this, okay. You can look at the terms of use. They are many, many, many, many pages long. And --

MS. CHANG: Here it is.

MS. WALSH: Okay. Here we go. This is typing in your phone number. You get the code, right, when you're signing up for an app. You get the code. You type the code in. Enter your email address.

Jane Doe is signing up for Uber. You have to accept the terms before you can create an account. And look what you can do. You can agree without looking at them at all. You can

agree without looking at them at all.

And you heard Ms. Dean's testimony, that she has no memory of looking at them.

Now, what if you were to look at them? Here we go. Here is scrolling through them. These are the terms. You have to go all this way, all this way, before you get to this language.

And this language that was buried in those terms of use, was this supposed to tell Ms. Dean that Mr. Turay was not actually an agent of Uber? What did Ms. Dean know instead?

She says, "At the time that you downloaded the Uber app for rides, do you remember ever signing any kind of terms of use agreement?"

No, ma'am.

And we've all been there, where you sign up for an app, and you see those long terms of use.

She also testified, "Is it your understanding" -- "in using and downloading the app, was it your understanding that you were paying Mr. Turay or Uber?"

"Uber."

That's who you're submitting your money to.

"Who did you think was responsible for your safety?"

"Uber."

"Who do you believe controlled all aspects of the ride?" And who does in fact control all aspects of the ride?"

You heard this in this trial.

It is "Uber."

"Did you believe that Uber was responsible for its drivers when you downloaded the app?"

"I did."

Those were reasonable things for Ms. Dean to believe. It was reasonable for Ms. Dean to trust Uber, based on all that marketing that we saw, all of the things that are said.

What did she see when she went to the App store, before she even got to the terms of use? It's all about Uber, request and ride with Uber. Not request and ride with some driver who signs up through the Uber app. Request and ride with Uber.

Now, we had -- there was a corporate witness who came in, Mr. Dobbs, Uber Head of U.S. Safety and Operations. And this slide was shown. Common phrases, "Call an Uber." "Uber home." "Work for Uber."

He said, "Those things are wrong. You should not say those things. Those things are wrong."

Well, as that was happening, I was looking on Uber's social media, and I showed it to you in the cross-examination. Uber says these things. Uber says, "I'll call an Uber." It refers to the drivers as "Uber's drivers." It uses Uber as a verb.

It is not unreasonable for anyone in this courtroom to

think that you're relying on Uber when you call an Uber, when you get an Uber driver, and when you decide to Uber home.

So to come in here and say, "That was unreasonable. She should have realized it was just an independent third contract," that is not fair to Ms. Dean or to the rest of us.

So the next question is, did this injury to her happen while Mr. Turay was acting within the scope of his apparent agency for Uber? And the answer is absolutely yes.

Look at this jury instruction, and it will tell you, did the act -- did the rape occur when he was acting as an apparent agent of Uber? Of course he was. It was when he was giving her a ride.

Where? Yes, in the car. It all began in the car that Uber gave him access to through those rental agreements. And was it foreseeable? Absolutely. That's what we've just been talking about. It was absolutely foreseeable.

Uber knows that its drivers commit sexual assault against its riders. And it knew that Mr. Dean [sic] and Ms. Turay [sic] had a high score.

So when you get to this part of the verdict form, the answer again, is yes.

Ladies and gentlemen, thank you very much for your time and attention. Thank you for putting up with my tech issues, which were 100 percent my fault, and we very much appreciate your service.

THE COURT: Okay. Do you want to proceed?

MS. CHANG: Thank you, Your Honor.

Good morning. The next part of the verdict form deals with compensatory damages. And from the date of November 15th, 2023, all the way up to today, a harm was committed. A debt has been owed by Uber to Ms. Dean since that day up to today, and it will continue in the future.

And that debt, there could be no healing, there could be no recovery until that debt is repaid. First recognized, accepted, and squared.

Today is the day we square all debts, and that is what compensatory damages is. So the first part -- we are now on question 4 of the verdict form. And it is, what amount, if any, was her damages?

And you heard the law. I'm just going to briefly go -- there is a full amount due that will reasonably and fairly compensate her for the elements of damages.

And we know that the nature and extent and duration, we will be talking about the past. We will be talking about to the present. And we will be talking about 61 years in the future, because you were instructed that she will have an age expectancy on average of 82 years old. That is in evidence as an exhibit.

And the elements include pain, discomfort, suffering and anxiety in the past, and all the way into the future, and

her loss of enjoyment of life.

So to look at it graphically, we are looking at what she suffered in the 27 months since that day to today, and then all the way 61 years into the future.

And you can't really measure what someone lost until you know what they had and who she was before November 15th. So that's why we looked at her life. Did she have a perfect life? No.

But was she loved? Yes. Was she always beautiful? Yes. Growing up in a small town, she always had a matching bow. She was the one who took care of her siblings. She was the one who was the good girl all the time. She was the one who loved puppies, and there is Brisket and her.

She was the one who could move from a small town in Texas to a new town in Amarillo and never miss a beat. She was the one that her sibling could depend on. She was the first one in her family to graduate from high school and who could even dream of going to all these schools with a full scholarship.

But she was brave, and she was fearless outside her home, and she wanted to go to Oklahoma State.

There she is with her mother. We heard a lot about her mother. But she always made her mother proud. And even today, after all she's been through, this girl is resilient. This girl will rise. She will save lives, and she has saved

lives even today.

This is Jaylynn Dean. And this is her best friend now, who we've heard about throughout this trial, her mother.

Now, we have talked a lot about her life. We knew that inside her house there was things going on with her mother. It stopped in 2017. It made her who she is, good and bad.

We know that she graduated. We know that she went briefly with her father, hoping to get some kind of relationship. Didn't work out.

She went to Oklahoma State. She fell in love for the first time. Had her first and only boyfriend, and it was toxic. She got away from him. She had a bad night with the roommate. No love from her boyfriend Ryan, and then she decides to make something of her life, and that's where we are when we got to it.

So where was she right before this? Finally, she knew, it's over, it's toxic, I am done. And we asked her, what was your state of mind? I felt great. It was the first time I was really independent.

That girl who she was with Ryan was not Jaylynn Dean. Now she could be Jaylynn Dean. She got away from him, and she was starting over again. And what better way than to be a flight attendant? To see the world.

And her whole family was behind her. They got her a

brand-new wardrobe. They helped her get her passport. They helped her fill out everything. She was moving to Phoenix, Arizona.

This small-town girl who grew up in a small tiny town in Texas, then moved to Amarillo, that went to Oklahoma State. She was going to Phoenix, Arizona to meet new people, to go to new places, to travel the world. How fun to start all over.

And she was so excited. She got here. Sure, she had that bad day when Ryan called her, punishing her, fine. But she was so excited. She was keeping her eye on the prize.

It wasn't easy. What a grueling day. Studying. She was with the girls. She was living with them. It was like college all over again.

And we asked Dr. Mechanic, how would you describe her then? You know, she was doing very well on all domains, an upward trajectory.

For the first time in her life, she was like living on her own. She was independent, free of a toxic boyfriend. She could exercise her own self-determination. Explore new social relationships. She was even eager to start dating. All great signs.

She was thriving. She was. Let's accept it. That's despite her prior trauma, because that's who she is. She is resilience. She has it in spades. In spite of what she went through, in spite of her hardship, she was ready to move on.

She was healing. She was here in Phoenix looking forward to her new life.

We are going to go to November 14th and 15th. As we know it was -- this is the longest day of her life. It started at 5:00, and she had no idea when she woke up that she wouldn't lay her head down again for 24 more hours, and that her life would be forever changed.

Because it was supposed to be the day she waited for. She worked so hard to get where she was. She studied. She graduated. She learned that she was going to have a new life.

And for the Mesa girls, it was Denver, Colorado, their number one choice because there were a lot of flights there. It was a stepping stone to a major airline. Denver was the city all the girls wanted to live in.

That was her life. Being a flight attendant. Seeing the world. Living in Denver. All her dreams were coming true on that day. That's where she was.

And what did they do? They celebrated. They celebrated. She's 19 years old. She accomplished this, and she celebrated.

And she went on a date. She was meeting Scott McLaughlin, handsome, med student, treated her well, and she had a date with him. And she did the responsible thing. She was too drunk to drive.

He wanted to take her home. She said, "You're too

drunk to drive." What did she grow up her whole life watching? The social media ads, the TikTok ads. She trusted Uber. She did what they told her, "Be responsible. Take an Uber home. We are the safest place in the city for you. We screen. We will take care of you." And she believed it.

They opened the -- he opened the car door, and she felt safe. It is dangerous out there. It is safe in here. She was so safe that she laid down in that car. She got in right there, and she laid right down, because she believed Uber, and she thought she was safe.

And we've seen parts of this before, where they were driving. It was -- should have been minutes. Her new life was going to start. She got her hair done. Her eyebrows done. Her nails done, to get her wings. Graduation was two days away.

And then he turns off the GPS. And this is one thing that we know. 24 minutes changed the trajectory of her life.

Other than death, there is something that all women fear, and that is rape. And we all have heard stories, that some rape victims choose not to live anymore. It is our biggest fear.

We arrange our lives to avoid it. How we dress. Where we go. What we say. Who we are with. Unless you are so trusting that you believe you are doing the right thing.

And in a dark parking lot from 12:33 to 12:57, this

back of the car, the dark places that you don't want to go at night. This is where she will be. This is what happens when a women is raped.

And in those 27 minutes, every false lie that her former boyfriend told her came true. That she was garbage. That she didn't matter. That she could be discarded. That she had no choice.

That a strange man who is decades older than her could do whatever he wanted and no one would believe her. She's practically a child.

We don't have to figure out -- or call experts to the stand to figure out what harm that did to her, because we could look at the Uber documents. Because after all, all we've heard was, they've consulted with experts. They have nonprofits. They have the most experts they consulted with.

And they know -- they know what sexual assaults do. It's one of the most horrific things that could happen. It's something we all want to avoid. And this case is really the story of what happens when your worst dream comes true and you have to live with it every day.

And all of these documents that all these experts told Uber, that's all we needed in this case. Because they know the cost. The individual costs. Your loss of friendships.

Will she ever have a boyfriend again? In every intimate moment she will ever have, for 61 years in the future,

do you not think that she will think of that dark night in that passenger car?

Will she have -- will she ever trust a strange man again? The depression. The sexual dysfunction. Hospitalizations. Will she be suicidal? Lower level of functioning when she can't get out of bed or go to work. You never know when there's a retrigger.

And there's relationship costs. There's divorces. Separation. Psychological impacts that will last forever. They know this. They studied it.

Another Uber document. Symptoms. Nightmares. Sleep disturbances. Substance abuses. Panic attacks. All of these things they know. Everything they knew about what was going to happen that night, they knew years before.

And you heard in the opening, Ms. Bueno asked, why are they dealing so much with the past instead of talking about Jaylynn? Because her fate was sealed years ago. They had been studying this precise pattern.

Every single element was matched that day. Everything. She was young. She was 19, barely a child. She's a teenager. She was in a new city for the first time. She trusted them. She's intoxicated. She had too much to drink. And she was tired. She was vulnerable. She was alone. It was late at night, and they knew it.

And we asked Dr. Mechanic, based on all of her

evaluations, there was a difference, because everything changed.

She was -- turned into -- before she -- the world was her oyster. The one thing about Jaylynn Dean that we know, she was never afraid outside in the world. Her turmoil came inside the house. The world outside was her safety net. She shone. No one knew about the trauma at home. No one knew about her toxic boyfriend, except her really good friends.

The world was her oyster, and now she's like a child. She shouldn't be living in Muskogee, Oklahoma. Why is she living there? Because mommy and daddy are there. Because she cannot live alone.

Because she cannot sleep at night, and sometimes she can't sleep alone, so she has to sleep with her mom. She's afraid of meeting new people. Every domain, all her behaviors changed.

And in this case, to save time of course, we didn't bring everyone. We brought experts who reviewed and saw things from everyone. But you saw all the collateral sources. All her friends. All her family. And it is true, she has changed since being raped by her Uber driver. It has forever changed her.

She will always grieve the person she would have been. She had her life set. That person is gone. And that is what has to be compensated for.

There is a new Jaylynn Dean. Do I think she will succeed? God, I hope so. She is so resilient. She has so much talent. She is beautiful inside and out. She is brave.

Did you see her walk up -- at the age of 21, walk up to the stand and face a cross-examination from one of the best lawyers in the country? She did that. She did that for other women. That is who she is.

But is she broken? Yes. Is she fragile? Yes. You see one side of her, but you don't see her at night, when things are scary. When she is alone.

So we all know she requires therapy. She hasn't had it. She can't do it yet, because trauma therapy is so hard. It causes you to relive the most excruciating pain, and she can't go there yet. That's someplace she can't go. But unless she does, bad things are going to happen.

Her anxiety, her distress, it's going to shoot up. Things will get much worse before they get better, but she does need it.

So what does the future hold for her? She's only 21. She has 61 more years to live. She can be retriggered. She got a call at work. It retriggered her. She couldn't go to work.

She can watch a TV show. She can get married. I hope she does. She could have a daughter, and then she will fear for that daughter. She will fear the outside world.

Could she protect her child? All of these things she will think about for 61 years. And I asked Dr. Mechanic, even if she does get therapy, is this going to cure her? And see, this is not like a broken bone. This isn't like something you can treat with medication.

When she has been gone this far and it's chronic, the degrading, the shaming, the humiliation, the sexual trauma, it is a life sentence. It's always going to be a part of you. Your autobiography. Shameful, and it's disgusting. It is literally a life sentence.

She has post-traumatic stress disorder. Now, we've heard so much about her past. And here's the irony. As bad as Ms. Bueno tried to make the past seem, the worse the damages are against Uber.

And here's why. If she was robust and strong and had a happy, perfect childhood, maybe she could withstand this trauma and come out a little stronger. But because she had the past that she had, it made her more vulnerable to injuries. This was the straw that broke the camel's back.

So if the plaintiff only had injuries from before and nothing from Uber, that's not on Uber. But the law says that if she had any pre-existing physical or emotional condition, that was aggravated or made worse by Uber, then she gets the full amount of money that will reasonably and fairly compensate for that.

So it's all part of her. And what the law also calls her is an unusually susceptible plaintiff. That means even if she was more susceptible than someone with a happy rosy background, then you take her as you find her. Sometimes it's called an eggshell plaintiff.

And the law protects both. Some people, like the egg on the left, they are robust. They are happy. They haven't had traumas.

But some people are susceptible. They've had trauma. They're a little cracked, but doing okay. But then something happens, something smashes that egg. So before when -- and we've seen this before, even with her trauma that she had, she was optimistic.

Excited about a new career. She was social. She was dating. She was healing. Sure, she had a history of major depressive disorder and generalized anxiety disorder, which made her more susceptible.

And then in the place where she trusted the most, this happened, and it changed her. Now she has to deal with what she had before, because that's part of her, and it was made worse.

It was reactivated. All her good progress, all gone, and now she has to deal with the panic disorder. The post-traumatic stress disorder, the social anxiety disorder. The emotional distress. And it has made her fearful and

withdrawn. All her progress is gone.

It's like after she left Ryan, after she lived through all of her life, she is at the bottom -- she is at the bottom when she lost who she thought was someone that she loved.

And she had to climb out of that hole, and she did. She worked so hard. She climbed and she climbed. She did every test. She applied. She moved. She was doing -- succeeding. She was dating.

She could see the light. She graduated. She got her wings in two days. She was going to Denver. And then this happened and it plunged her right back down, and sometimes you don't want to get back out.

And then she gets this letter the very next day, from Mesa Airlines, "Due to your tragic incident on November 14th, we are concerned about your well-being. We want to ensure that you're fit. Please go home."

Go home. You are damaged goods. You can come back later.

And that's what she faced. And Ms. Bueno put up this picture from her social media. We saw a lot about her social media. But to me, it was so sad.

This is the day of her graduation. She posts a picture of her in her flight attendant uniform. Do we think she's happy on this picture? I thought it was one of the saddest moments that I saw.

And then we talked to Chief Tremblay about the consequences of victim blaming. And he told us, sometimes this blaming and shaming that they experience is as bad, if not as significantly psychological harm, it's part of the process, because we all judge people. And we think, oh, it's so horrible to think about, it can't me. I've got to distance myself from that. I'm going to blame her. And that's the problem. It's shameful.

And then Jaylynn herself told us that she really can't sleep. She tries to work night and day, fill every night hour, burning both ends of the candle so she doesn't have to be alone and think about it.

But what she -- you know, this is the resilience of this girl. I would get a letter from Mesa like that, I would give up. She did not. Because she had her dream. She came back to the same city, same hotel, same airlines, and did the same routine. And if you don't think that was triggering, it was. And she said that.

She had to sleep with the lights on, and thank God she had a thoughtful roommate who understood. And then I asked her about all these dreams, how did it affect? She got her wings, because that's Jaylynn. She's going to -- she's so resilient.

But she couldn't do the job. It was -- too scared. She had to barricade herself in her room. If anyone stands too close to her, grazes her, touches her, it triggers her. It's

hard to be around new people.

The outside world is too scary. She won't even go to the store by herself, her dad said. All the feelings of trust she had, it's all gone.

The nights, they are the worst. She can't sleep. She is alone. Being in a dark room to her is being in the back seat of that car where it was pitch black. Because even Mr. Turay said in his deposition, he was looking for the darkest place where no one could see.

And I asked her if it takes her back to the back seat. It does. That's why she sleeps with the light on. That is what she thinks of every night.

Even though she got an award, even though she loves her work, it led her to a new career, it could be very difficult. She told us about the time she got a woman who had been sexually assaulted. She needed to talk to her group at work. She needed to take a few days off.

So what we know about the effects of rape from the experts, what the documents have said, there will be self-destructive thoughts that will occur throughout her lifetime.

It will distort her whole -- all of her relationships, sexual, intimate, healthy, friends, male friends. It will affect her for her lifetime. She will always have a distrust and fear of older and strange men, and a fear of never being

believed.

Vilification by her family, community members. Stigma. Fractured friendships. Derailment of life. She will have it.

So when you look at the past and the future, one of the elements is anxiety, and we know that she will have hypervigilance and fear around unfamiliar men.

She has fear of nighttime. Difficulty sleeping. She avoids social outings. She cancels all the time. She has an inability to live alone, fear of being alone. Who knows if she will ever move out of her mother's house.

Heightened startle response. Anxiety spikes. Fear of dark and confined spaces. And then we have to think about past and future mental pain and suffering. All of the anguish that she had in the past related to and after the sexual assault, it reaggravated her prior emotional trauma and emotional pain.

The humiliation. The anger. Her mental anguish from being victim shamed and blamed, not only by others, Mesa, her grandmother, herself. It's degrading.

The disruption of all that progress and stability she had achieved and worked so hard to build. The overwhelming sadness and grief for the Jaylynn that was meant to be that will never be.

The loss of dignity and her peace of mind. The damages to her feelings of self-worth. All the emotional

numbness and avoidance that she does. She spends most of her days avoiding the topic, filling her mind so she doesn't have to think about it. She doesn't want to heal yet because she can't go back there.

The emotional pain and suffering triggered by life events, and this burden that she's going to carry with her for all of these years going forward.

And then her enjoyment of life. What do we live for except to enjoy life. We work to enjoy life. We live to enjoy it with others that we love. But this has affected her in the past and the future.

She is uncomfortable with physical contact. You hug her, she flinches. Hugging is one of the most healing wonderful things in the world. She doesn't want to travel to new places. She doesn't want to go and see new things.

Fear of dating and relationships. Avoidance of activities. The thing about Jaylynn, she was the brave girl. She was the one that stood up to her parents and said, I'm going to OSU. I don't care about the scholarships.

She lives life cautiously now. That girl is gone. She still will excel, but she's afraid. She stays in her room. Sometimes she doesn't even eat dinner, she just goes into her room.

The missed milestones and experiences because of this. She avoids running even simple errands. We heard from her

father in the video how he'll go into town because God forbid she meets a strange man. And it does socially isolate her. So she doesn't have that enjoyment of life.

So when you decide the full amount of money that will reasonably and fairly compensate her, it's kind of nice to look at it in the past and in the future for all of these elements; pain, mental suffering, loss of enjoyment of life, her anxiety, her discomfort. All of those things are so important.

And we know from Dr. Mechanic who tested her, and these are her results and she went over them, we know her diagnoses. We have gone over them several times. She has all of these.

And, you know, we brought a clinical forensic psychologist, and Uber didn't bring anyone to counter her. So we have her testimony. You heard her on direct and cross-examination, and here is what we know.

During the day when we see her, we see videos, we see someone who is stoic, who is stable, she seems successful. And we -- what's so bad about all of us is we judge rape victims. We watch them, oh, you look too happy, but then if they are sad, get over it. It's very hard.

But when you see someone and you know, part of her trauma is how she calmly relates to things.

But underneath there's so much more damage than people could ever see. The large amounts of her damages is invisible,

and it is that invisibility that makes it that much harder, because no one understands. We judge her whether she's too happy, or we judge her if she can't get over it. There's no winning there.

So how do you measure a woman? How do you measure damages? Who was she? She was brave. She lived in the world. The world was her oyster.

And how do you measure her now? And that is your task. And so we know that in the past how horrifying it was. We know up to this day how horrifying it was, but we have to think about 61 years in the future, and throughout that whole time, she will have retriggering events.

She has to deal with therapy someday. She will deal with fear all her life. Shame. Humiliation. Depression. Anxiety. Post-traumatic stress disorder. She lives in a prison sentence, a life imprisonment, for something that wasn't her fault.

And she lives in that prison, and it has forever changed her, and it will affect every relationship she will ever have.

So to calculate these damages, we really put some thought into all of this. And I'm going to suggest amounts here. You may think they're too low. You may think they're too high. That is your job as a juror to do.

But she must be compensated, because that is what the

law requires. I hate getting up here and talking about money. It seems so crass. Why do we talk about money?

But unfortunately, under the law, this is the only remedy we have. There's no eye for an eye or tooth for a tooth. But we can't say, Uber, now you put someone in a car and have that happen to you.

We don't have a time machine to take her back and say, we wish it couldn't happen. We are going to restore you to where you were. There's no magic remedy here. The law only gives us money, and it must compensate her.

This money is, "We hear you. We believe you. We know the harm you had, and we are going to compensate you for that harm."

So for the past, the rape, it was 24 minutes that changed her life. We assessed it at $2,400,000. You could see the logic there. You may think that is way too low for the worst fear that a woman has.

And then for the past to now, $5.6 million, ongoing trauma since the rape.

And the future 61 years, not even a thousand dollars a day. A lifetime of harm, $16 million. That brings the total to $24 million. And you might sit here and say, God, that is life-changing money. But it is life-changing harm. And that is so important.

Because anything less than compensating her for

life-changing harm is not justice. Partial justice is not justice. It is injustice.

So she must be fully and fairly compensated, because if she is not, the story will not end with her, and we have to end it now.

This debt will be squared, and the amount that we are asking for on behalf of Jaylynn Dean is $24 million.

Now we go to punitive damages, and you heard a lot about this from the jury instructions and also from Ms. Walsh. And what we know, this is what the question is. It's question 5.

And here's the question. Do you find Uber liable for punitive damages?

And we heard the law. And this is different. Before we talked about compensating Jaylynn for her damages. This is totally different. It is an amount to punish Uber and to deter Uber from acting like this again. Very important.

And it must be proven by clear and convincing evidence. It is more than the feather. It means it's highly probable that the factual contentions of the claim are true.

It's not beyond a reasonable doubt. It's somewhere in between. But we don't have to worry about that, because all of that clear and convincing evidence comes straight from Uber, from the testimony and the documents.

And then here's what we have to prove. That their

behavior was outrageous, oppressive and -- or intolerable, and Uber knew or intentionally disregarded that its conduct created a substantial risk of significant harm to others.

And then you will have to talk about how reprehensible was the conduct, and here's factors that you think about. Did the conduct cause harm? Did they disregard the health or safety of others? Did it involve a pattern or practice? And did they act with trickery or deceit?

And we've heard a lot about this already from Ms. Walsh, but I'm going to go over it briefly here. And then there has to be a reasonable relationship between the harm she suffered and the punitive damages.

And then we look at the financial condition of Uber. That's why we brought Robert Johnson. And you remember the story he told about his son, when his son was in high school, what's the appropriate amount to punish someone? You have to look at their financial condition and revenue.

So, to sum up what we saw during this trial, Uber deliberately concealed critical safety information for business purposes from women, despite knowing the risk of sexual assault to women who were alone, who may be intoxicated, who are traveling late at night between the hours of midnight and 3:00 in particular, close to a bar. All of those things were concealed.

And then while they were deliberately hiding such

information for business purposes, they kept lulling, billions of dollars' worth of revenue to go into advertising. Lull these vulnerable women into a false sense of security. They engaged in a pattern and practice of attacking the credibility of sexual assault victims.

And even though they knew how horrific sexual assault was, they knew it was foreseeable and preventable, but they always chose profit over protection, prevention, and safety. That is the classic reason for punitive damages.

It exists to stop this conduct. We have seen years and years and years of documents and decisions. Good people from Uber stressing, let's do this.

Good people, but business always wins. Now it's time for you to decide. Does this conduct continue or does it stop now?

If we all tried to write an email to Uber and say, you know, we heard some disturbing things in this trial, we really want you to consider it. Do you think you would get a reply email?

If you -- all nine of you got in a car and drove to San Francisco to knock on Uber's door to say, we didn't like it, do you think we would be let upstairs?

If you tried calling them -- we heard about how hard it was for some victims to even call in. Do you think you would get a return call?

There is only one way to get Uber's attention, and that is through this verdict in this case. That is something they will hear loud and clear. That is something that will dictate their behavior in the future and the rideshare industry.

That's how important today is. That is how important punitive damages are.

And so we saw this. This is the moment that they had. This is the classic example. Should we disclose that these women are vulnerable since we are marketing to them and dragging them into our cars because they believe in us, or do we not?

And the decision was, we do not. And that is deliberate concealment.

Then we see this, and we've all seen this before, attacking the credibility of sexual assault victims:

"I trashed rape victims today to USA Today. Out of three, I trashed two. Sliced their credibility. I look after Gus and Katie's lies. I used to look after my soul, but I don't know where it is anymore."

And this is the Uber Director of Global Product Safety Communication, Andrew Hasbun.

That is Uber, and they know that that's what they're going to do. That's what makes it so hard for someone to come forward and sue Uber, and a 21-year-old did it.

And they deliberately concealed and manipulate the power of S-RAD. They know it works. They know it's effective, but God forbid don't let it get out. There's just too much, and we saw this breadcrumb strategy. We do not want any PR on S-RAD right now. We don't trust anyone.

But it's Uber. They have the best and the brightest. They have an unlimited amount of money. They have a strategy for everything. They have strategized for this defense years ago.

And it started here. Let's do breadcrumbs. Because you know what they feared in this document? It was so powerful and so meaningful that a whistleblower from inside might disclose it, and "we have to be ready for the full leak." They were planning for it ahead.

And then they concealed and manipulated this because they could set this threshold anywhere, and at least tell the woman rider, give us the choice to decide. Don't deprive us of that power.

Tell us. Tell us. Jaylynn Dean said if she had known of her -- that it was higher than average, she wanted to know that, she would never have gotten in that vehicle. So tell us.

And Sunny Wong knew that they have to use S-RAD to avoid high risk trips. He knows it is that an effective product. But again, it's safety versus business, and when you

make it at the risk of hurting people, that's when you must step in.

Because here's what they did. They were rolling the dice on women's safety, hoping, oh, if it's the under the threshold over the threshold, hopefully everything will be okay.

They rolled with the dice, and they deprived women of making informed choices. And we all deserve that right. And as always, we've seen so many documents. I just picked a couple. It's always profit over safety.

This document is called, "Framework for Making Safety-Related Decisions" at Uber. And in the end, we are going to move forward with choices with a net benefit to Uber.

Business always wins. And we saw it in all of these documents. The common theme is, "We stand for safety," but you know what, it's a sham, and it is.

So do you find Uber liable for punitive damages? The answer is a resounding, loud yes. Let the board members, as fancy as they are, we heard about them, hear you loud and clear from Phoenix, Arizona.

So the amount of punitive damages? What's the total amount? And the real question is, in light of their financial condition, what amount is necessary to discourage future wrongful conduct?

Well, we are not dealing with a small company here.

We heard that the revenues shoots up 37 billion, 44 billion. And we heard that they make $120.2 million per day. That was in 2024. Things are even looking rosier now.

But we have this moment. I think Robert Johnson gave us $136 million today, and we know how much they spent in advertising expenses. And we know that they have an undrawn line of credit for $5 billion. Their stock market is worth 177.5 billion.

So here is what we say, their expert told us, yes, one rape a day. One rape a day, gambling with our lives is one day of pay. We will dock you one day of pay. And that's why the amount we are asking for is $120,200,000. That is how you effectuate change.

And this is Lady Justice. She is the symbol of justice in this country. She is blind-folded to things she should not see. She has the equal scales of justice. But what is so important, is for you to realize what is in her right hand.

There is a sword in her right hand, and it represents the mighty power of justice and the law, and that sword exists for moments like this, when a company acts outrageously, intolerably, or deliberately does wrong, and now you hold that sword.

You hold that power, and only you as the nine members of this jury can decide whether it has to be used here.

And when you think of Jaylynn Dean, and hearing about Sandra Day O'Connor, that's her statue downstairs, she wants every woman in America to protect themselves. Because Uber may not have warned them, but through this lawsuit I will.

Now, I am going to sit down soon, but I'm just going to go over briefly what we're going to hear. I call these red herrings. And what is a red herring? A red herring is something that misleads or distracts us from the real issue at hand.

We are here to talk about what happened to Jaylynn, but we heard a lot of things that kind of moved the ball all over. We're just distracted by these red herrings.

One of them is lightning strike. If I had to see this picture one more time -- we heard it from the beginning. We heard it with experts. It's rare to be -- you know, to be raped in an Uber vehicle than to be struck by lightning.

But you know what we saw? They were planning for this day in 2017. Brandon Robinson wrote, "You know, we have to think how rare it is. Let's use all of our millions and millions of safe and uneventful rides and let's throw in the Eats orders too. The stadium, let's build that stadium so huge that the numbers are going to seem tiny. And I really like the seven times more likely to get struck by lightning talking point."

And then Tracy Breeden, who was the head of Women's

Safety and Gender-Based Violence. She writes back, "Brandon, please don't take this personally, but using the lightning example publicly would never be a good idea, ever. People don't want to hear about how rare it is."

But yet, that's what we kept hearing in this trial. And then the moment that was so surprising, Mr. Kansal was asked by Ms. Bueno: What do you think about this lightning example that the jury has heard?

You know what he said? "It's not something I would use." Because he knows, you don't use it. It's inappropriate.

Now, sexual assault is everywhere. We match the world. We live in the world. Everyone is so outside. But this is the image I want you to remember. They said it was unsafe out there, so use us. We are safe. Come to the light. Come to the Uber. We will keep you safe.

There's a difference.

She said okay. Do you remember when Ms. Bueno was crossing Ms. Dean on the stand? She had a highlighter, and she kept highlighting every time she said "okay."

But if you look through the transcript, she is saying like, okay -- 26 times during her interview. She is a teenager. "Like, okay, you mean, I mean," that does not equal consent.

She never said it. It's how they talk. And even -- the detective even knew that, and he basically asked her.

(Video clip is played for the jury.)

MS. CHANG: So he asked her, when you keep saying okay 26 times, are you saying okay? She said, no, I was quiet. And I asked her, did you say okay? And she said, no, she did not.

And then -- this is a moment that flew over my head.

Ms. Stodden came in here and said, we're safer than public transportation in California, and she literally used examples of -- I poked around the internet to see other choices that were available, and she even includes a trolley car in San Francisco, which means they would have to get from Scott's apartment and fly to San Francisco and get on a trolley. It doesn't make sense. It's unrealistic, and why we even were listening to it, we don't know.

And then we keep hearing, "It was below the threshold." Simply, I'm just going to say this, the closer to 10 percent, the more sexual assaults are prevented. Less than ten percent, more butts in the seats, more money.

You set it where you want Uber, but let us know. Give us a choice to protect ourselves. This is the safety alert that came up.

Tell us that we're higher than average, then we can cancel or delay the trip, ride with others, request a woman driver, maybe take a Waymo. Activate -- and here's the key, activate those beautiful safety features before entering the vehicle, including audio recording. Share your trip with a

trusted contact.

So you have to tell us. Let us protect ourselves. You have no right to hide this from us. It's too important.

Social media posts. We heard that. We don't need an expert because social media is not reality, and the truth is in that.

The use of safety tools, and here's the key, all of this means nothing, because no one is going to use them if they don't know that they're at increased risk of sexual assault.

Why would you use it? You need to be prompted exactly when -- and they don't work anyway. And here is the nudge on the right. When you know that you are at a higher than average risk, this is when you tell them, you have all of these options available.

Give us the right to make informed choices. And the use of rideshare before and after, she didn't fear before. So sure, she had men and women before. And now after, after she's been raped and she knows, anyone who touches her will be stunned.

She doesn't engage in conversation. She doesn't go alone at night. Where's her underwear? That's another red herring. Who cares? She was wearing a skort that night, which is a skirt on top of shorts. She wouldn't realize she didn't have underwear for a while and a crop top. It's all red herrings.

And then I'm going to end with this. All of the videos should be played. I'm going to play them all for you. In fact, they ended their case with it.

But here's what I want you to think about. The only video and audio that mattered were never captured by Uber, because they did not have it available to protect women, and what happened in that car was not recorded.

We're going to have one more chance to talk to you after Ms. Bueno speaks, but thank you for your attention.

THE COURT: Ladies and gentlemen, we are going to take a recess now. Remember the admonition given to you. Don't discuss the case, allow anyone to discuss it with you.

We will return at 11:15.

(The jury leaves the courtroom.)

THE COURT: The jury has retired.

(Recess taken at 11:04 a.m.; resumes at 11:14 a.m.)

THE COURT: Please be seated. Obviously the Court observed that there were a series of technical problems in connection with the presentation this morning. The argument -- not of the plaintiff's making it. It is we have to continually check -- move back and forth between different devices.

So the Court has a certain responsibility here. Anyway, I will permit both sides to have an extra 15 minutes in their presentation.

While I understand that the defense obviously planned

on a two-hour presentation, rather than a two-hour-and-15-minute presentation, I think that because of the circumstances beyond the control of the parties, it's warranted, and that will be the order of the Court.

MS. BUENO: Your Honor, we object to that. I certainly think that a few extra minutes due to the technical problems makes sense, but 15 minutes is not appropriate here.

They have five minutes left, and we would suggest an additional five minutes for a total of ten-minute rebuttal. I think giving them 20-minute rebuttal is -- would not be necessary.

THE COURT: I'm giving them actually 15 minutes a side. I think that's right. 20 minutes -- I mean, 20 minutes a side. I think it is appropriate. I don't know how you respond to a two-hour argument -- respond in five minutes. I mean, it just seems to me impossible.

So I thought that an additional -- that each side should have an additional -- I haven't done the math. Maybe the math is -- they have five minutes now left.

MS. BUENO: Correct.

THE COURT: Okay. So -- and they are asking for an additional ten minutes, was that it?

MS. BUENO: Yes.

THE COURT: So that would be 15 minutes. Okay. So I think that's right. 15 minutes.

MS. BUENO: 15 total for rebuttal?
THE COURT: Yes. 15 minutes total, and you get an additional 15 minutes.
MS. BUENO: I think that would be fine.
THE COURT: Great. So we all are in agreement?
MS. WALSH: Thank you, Your Honor.
MS. BUENO: Well, we're not in agreement, but that is Your Honor's order, and we will abide by it.
THE COURT: By "fine" you mean you'll comply with the Court's order?
MS. BUENO: Absolutely.
THE COURT: Well, you have complied with the Court's order on everything, so I --
MS. BUENO: Thank you. And we will continue to do so, Your Honor. Thank you very much.
THE COURT: Okay. Bring in the jury.
And all objections are waived, I understand. Let the record show I --
MS. BUENO: He is laughing while he is saying that.
THE COURT: That I'm laughing.
MS. BUENO: Yes.
And Your Honor, we may just take a break for lunch in the middle.
THE COURT: By the way, whenever you want to take a break, we take a break

MS. BUENO: Got it. I will find a good stopping point.

THE COURT: Are the devices working now?

MS. BUENO: Yes, I think so.

THE COURT: I really feel quite bad about that. You know, it just -- it just is -- I mean, we have the same problem in San Francisco where we go back and forth between the ELMO and the video, and then you have the realtime, and sometimes it's flawless.

I think when Ms. Vartain appeared in front of me, it was flawless, right?

MS. VARTAIN: Obviously, Your Honor.

THE COURT: Obviously it was flawless. But from time to time, we run into these problems.

MS. BUENO: Well, and when we're going back and forth with the parties, sometimes I'm sure that doesn't help.

THE COURT: Anyway, technologically I've been very pleased to be in this court. I think that Justice O'Connor would be pleased.

MS. BUENO: Yes, she would be pleased.

(The jury enters the courtroom.)

THE COURT: Please be seated.

Let the record reflect the jurors are all present. Parties are all present.

Ms. Bueno, you may proceed.

MS. BUENO: Thank you, Your Honor. Good morning.

When we first met during jury selection, I told you this was going to be a tough case, and it was. It was tough for us to present to you because it's a difficult topic, sexual assault. And I know it wasn't easy for you all to listen to a lot of the evidence that came in.

And as I mentioned when we first met, that nothing that I said in this trial, or that Uber said, was intended to minimize in any way the seriousness of these allegations, and so it pained me this morning that there was a suggestion that somehow perhaps we challenged or questioned Ms. Dean's credibility as Uber. That we may have not been sensitive. That we may have been victim blaming.

I think that was the suggestion. And that's not what happened here in this courtroom. And so I want to set that record straight and make sure you understand there is a difference between what Uber did on November 15th, 2023, when Ms. Dean picked up the phone and called us, compared to what you must do on this verdict form and what happened in this courtroom.

On November 15th of 2023, it was the afternoon at 1:38 p.m. when Ms. Dean called Uber and said, I have been raped by my driver. Uber took that at face value. Did not challenge her credibility. Did not ask any questions. And within two minutes, Uber blocked Mr. Turay's account.

Now, you heard that phone call. That is in evidence, and you can listen to it again if you would like. You just heard a piece of it, but that phone call was 11 minutes and 39 seconds.

So what that means is that while Ms. Dean was on the phone with Uber that day, Uber took Mr. Turay off the platform and made that safety lock. And that's important, because it demonstrates that Uber does believe survivors. Uber does take these calls seriously. That's our policy, and that's what we did, and it's a good policy.

Because regardless of what you decide happened in the car that night, it was wrong. It was in violation of Uber's policies, and Mr. Turay knew it. So this is what happened on that day.

But what happened next is that Ms. Dean filed this lawsuit. And she blamed Uber, and Uber alone, for what happened in the car that night. We are the only defendant. And the claim here is that Uber is to blame and Uber is responsible.

And your job is to look at the evidence, which is why we brought it to you. Because you, as jurors, don't just take things at face value like Uber did on that day.

You must analyze the evidence and apply the law that Judge Breyer gave you, and that's the difference in this courtroom. And you're entitled to have that evidence.

So when we presented to you evidence about what happened that night in Ms. Dean's history, that was all to give you the information and the evidence you need to answer the questions at the end of the trial, and it was for absolutely no way to minimize this allegation or these claims. And I hope we can level set with that at the beginning.

And the claims in this lawsuit you've heard about, and we'll talk more about them. They do require you, if you find against Uber, to find one of three things. Negligence, design defect, or apparent agency. And I think the answer to each of those will be no after you analyze the evidence.

Because Uber did act with reasonable care. What happened in that car was not foreseeable. There is not a defect design of this app. And Mr. Turay was not our agent, and not our apparent agent.

But the inquiry doesn't stop there. The jury instructions that the Court read and that you'll have in the back require for each of these claims, causation, which means you can't just determine that Uber is negligent. You have to determine that that negligence caused Ms. Dean's injury, right?

You can't just say, I think it was a defective design. It should have had some features it didn't have on the app.

No. The instructions require you to figure out if that caused Ms. Dean's injury. And it's not enough just to say, I think he was an apparent agent. There's a cause element

of that as well.

So as I go through my discussion today, that's really what I'm going to focus on a lot, causation. Because even if you find in general terms any one of these claims, if it isn't the cause of Ms. Dean's specific injury, which it is not, Ms. Dean cannot prevail.

And that's why at the end of my presentation today I am going to ask you to do something that might be difficult for some of you, which is to find that Ms. Dean did not prove her claims in this case, which is what the evidence shows.

And I'm going to ask you for a verdict in favor of Uber, because that is what the evidence supports.

This evidence to prove the cause of these claims must, must, focus on this driver, this rider, and this trip.

And throughout the course of this trial, you heard a lot about other riders, other drivers. You heard news stories. You heard about lawsuits.

But your job is to look at this driver, this rider, and this trip. And it's not just an attorney saying it. On the second day of trial this was the instruction from Judge Breyer. This is what he told you.

Ladies and gentlemen, the Court received an inquiry to the effect there is now some evidence that there were some other cases involving Uber. Should you take those into consideration? The answer is no. No.

Your job is to consider this driver, this rider, and this trip.

And so in my time with you, that's what I'm going to focus on. We're going to talk about each of those things, and then I'm going to talk about this trial. What happened in this courtroom, and why the evidence does not support the claims and questions you're going to be asked at the end.

Now, before I get into this driver, which is my first point, I am going to kind of level set and remind us where we were the first week of trial. It seems like a long time ago. Three weeks ago.

On Tuesday, January 13th, plaintiffs opened their case. They then brought Dr. Drumwright, who was a marketing expert. And we're going to talk more about Dr. Drumwright.

But she made very clear, "I'm just here to talk generally about marketing and advertising for Uber. I'm not here to talk about Ms. Dean."

Then they brought you --

MS. WALSH: Your Honor, objection.

(Pause.)

MS. BUENO: Your Honor, Dr. Drumwright did not offer any case-specific opinions. That is what I said.

THE COURT: No, I think -- well, the problem is yes -- she did -- the problem is, she gave testimony, as I understand it, that was concerning evidence of -- that was given to Uber,

or other information that was given to Uber or what did Uber know.

MS. BUENO: I did not say otherwise, and I'm going to put that in black and white. My point here, and the argument is proper, that she did not talk specifically to Ms. Dean.

She didn't interview Ms. Dean. She didn't ask Ms. Dean what ads she saw. The first witness that came up on the stand talked generally about Uber, Your Honor.

THE COURT: Well talked specifically about Uber. Didn't talk generally about Uber. Talked specifically about Uber, but did not talk specifically about Ms. Dean.

MS. BUENO: Well said. That is right.

So that is what happened. The first witness did not talk specifically about Ms. Dean.

The second witness, Dr. Valliere. This was the sexual assault expert. She did not talk specifically about Ms. Dean either.

Mr. Johnson was the next live witness. He is the one that they came to talk about punitive damages. He was the one that talked about how much money Uber made. What that means. And you saw it. You were here. The entire first week of trial went by without discussing this driver, this rider, and this trip.

That is what happened in this courtroom.

We are going to talk about all of those witnesses. I

put this slide up in opening, and I wanted to put it up here again because I think what I predicted was true.

There was a lot here in the courtroom that you heard that can be better characterized as noise rather than evidence that you need to answer the questions at the end of the case, and today we are going to talk about some of that.

Information and things that were brought to you that ultimately do not matter for the questions you have to answer. And that's what I meant when I said "noise."

This driver, this rider, and this trip. This is why you are here.

The instruction on negligence is very clear. That in order to find Uber liable, there has to be a foreseeable risk. And what that means is that Uber had to have been on notice that what was going to happen did. Foreseeable.

And the evidence is clear that what happened with Mr. Turay was not foreseeable. And this is going to bring me to the discussion of Mr. Turay, this driver.

So the question is, was it foreseeable to Uber that this driver, with the history he had, and with the information Uber had, would break the rules? Would violate the no-sex rule? Was that foreseeable, and the answer to that is no.

So let's talk about Mr. Turay. Mr. Turay is a U.S. citizen. He testified to that. He lives here in Phoenix. He works with disabled people. He went --

MS. LONDON: Objection, Your Honor.

MS. BUENO: This is all in evidence in his deposition.

MS. LONDON: With respect to the time frame of this argument. That evidence has not been admitted, and this violates potentially an MIL.

MS. BUENO: There is nothing I just said that is not in evidence. Mr. Turay is a U.S. citizen.

THE COURT: Once again, ladies and gentlemen of the jury, as I said to you at some point in the last three weeks, attorneys will get up and say what they believe, what they recall, and what they -- as a result of their review of the record, what they believe the evidence has shown.

And they may be correct; they may be incorrect. But it is for you to decide in evaluating any particular argument, whether the evidence in the record warrants that type of argument, that it establishes it.

Anyway, let's move on.

MS. BUENO: Perfect. Perfect.

THE COURT: Go right ahead.

MS. BUENO: Plaintiffs put this slide up in opening with the map of Africa and suggested that there was no background check. This is their words, not mine, on this slide, and suggested that Uber should have gone to Africa and do additional background checks.

There is no evidence in this case that Mr. Turay had

any kind of criminal background. Let's just make that clear. He had been in the United States for ten years at the time of the trip with Ms. Dean. There is no evidence that he had a criminal background in Africa at all.

And they played one clip from Ms. Nilles about the background checks. I think it's important to hear this too.

(Video clip is played for the jury.)

MS. BUENO: No data to suggest that someone who has been in the U.S. ten years and used to live in a different country would be extra risky. Why was it that we spent so much time on his history in Africa? Ask yourself that. There is no evidence of any criminal history from Mr. Turay.

The evidence shows, and what you know, is that the background check was thorough by Uber. There was a consideration of his Social Security number, and he did have one.

There was not only sex offender and global watchlist searches, but national searches, federal searches, county searches, motor vehicle reports.

If you look in the safety report, and you will have access to that, it talks about what Uber does, and it explains that Uber can even go to courthouses, and does go to courthouses, to get records physically to do these type of background checks if there's any reason to suggest criminal history. In Mr. Turay's case, there was none.

He had a clear background check, not once but 12 times. This is the evidence. Over almost a seven-year period, Uber continued to run and monitor his reports, his background check, and he had clear. That is the definitive evidence here. That is the definitive evidence.

And you know there was a suggestion that there was a -- one of these Checkr reports had a 2008 date. And I know there was a suggestion that somehow Mr. Turay provided false information. That is attorney argument. That is noise. There is no evidence to that. None. None.

The evidence is that the background checks were clear. There is no evidence of a false ID that Mr. Turay put into a record. What we have is a third-party background search document that says 2008.

Nothing that Mr. Turay provided is in evidence to suggest that he lied.

And when we talk about Uber in general, they have been throwing shade at the background check process, but we know it works. The safety report data tells us that millions, 2.25 million prospective drivers have not passed the screening.

And when something pops up through the continuous monitoring, 185,000 drivers at least have been removed from the platform.

And throughout my presentation, you are going to see these yellow exhibit stickers. That's the way it's going to

look when you have that back there with you. And those numbers here on the safety report, I encourage you to go look at those and review those. 03816, 03871, and 04073.

That is a wealth of information, and I think looking at those reports would be really helpful, because that safety report has been mischaracterized in this courtroom, and we'll talk a little bit more about that.

But as far as background checks, also keep in mind how far above and beyond Uber goes when looking at the background of drivers.

Taxis, yes, they do background checks, but the Arizona legislature, as you heard, has their own standards for rideshares. They only require background checks and identifying driver information.

Uber goes far above and beyond all these other things with the industry sharing program, annual reruns, innovative safety features, the safety report. None of this is required. It's all things that Uber does to go above and beyond to make the platform as safe as possible.

And you don't have to take my word for it, that's in evidence with Mr. Okpaku, who was the rideshare expert who came and testified.

And he was asked, "What is required under Arizona law is a floor not a ceiling?" He was asked that on cross-examination.

And he said, "Sure."

"You know that Uber could do more, correct?"

And he said, "I believe Uber does do more."

And it's not just his belief. That is what the evidence showed. Uber goes above and beyond the requirements of background checks. There's no evidence to the contrary.

And Mr. Tremblay, this is the law enforcement expert that plaintiffs brought. I asked him, I said, "You didn't talk to Mr. Turay about his naturalization as a U.S. citizen and all of the steps that the FBI took with the investigation and fingerprint and background check. You never asked Mr. Turay about that, did you?"

And he said, "I wasn't investigating Mr. Turay. The scope of my work was to look at crime prevention and advise on -- on the Uber platform. I wasn't investigating this criminal case. I wasn't investigating Mr. Turay."

The law enforcement expert that came into this room for plaintiffs did not investigate this case and did not investigate Mr. Turay. And that's why I was so surprised to see the slides that he showed you.

And I asked him about it. I said, "With that in mind, the idea that you are not investigating this man, you sure did put up a lot of slides that said sexual assault on the left and Mr. Turay's picture on the right, didn't you?"

And you remember that? Mr. Tremblay's entire

presentation said something about sexual assaults, and then had Mr. Turay's picture, which I found to be quite astounding given the fact that he said, I didn't investigate this guy.

And here is just one example. Once again, talking about him growing up in Sierra Leone. And I asked him, I said, "Well, you never went to Sierra Leone and did a background check."

He did not.

"You didn't go to Ghana or Guinea and look for his background, right?"

"Yeah, it wouldn't be practical."

But then he comes up and says somehow that the background check missed something for this man that he didn't investigate.

No. Ask yourself why the law enforcement expert didn't investigate. What you know and what the evidence shows is that Mr. Turay had a series of very positive responses and commentary and feedback from his riders.

We don't need to go through all of this again, but you remember that he earned high praise. People said, "He's a safe driver. Great driver. A great human."

And you know that he had mostly 5-star ratings, and you heard evidence that he had about 10,000 rides. More than half of them had 5 stars. And the evidence in this case showed that about 46 percent of the time somebody rates.

And that means he even had a higher above average rating with the number of people that got out of his car and gave a rating, and when they did, it was overwhelmingly 96 percent of the time 5 stars. That's what the evidence shows.

And why does this matter? Foreseeability, right? That's where I started with this. Was it foreseeable to Uber that this man, with a clear background check not once but 12 times, who is a U.S. citizen and lived in this country ten years and had great feedback and was a rideshare driver for 6.5 years, and had 96 percent of reviewers gave him 5 stars, was it foreseeable that he would break the rules?

And the answer to that is no. No. And that's why Uber cannot be held liable for negligence, because this was not a foreseeable act.

Now, I do want to mention the eight complaints out of 10,000 rides. You heard about two of them. We don't need to go into great detail, but you heard about Jennifer and Kevin, remember?

And Jennifer had 19 complaints. One of them was against Mr. Turay, and this was the one where she said, "He said I was beautiful." And then she said, "It started an argument with my boyfriend who was also in the car."

And there was a whole lot of hubbub about Jennifer. And in fact, the Judge gave you an instruction. And I want to remind you what that instruction was. Judge Breyer said on

January 28th, the following words:

There is evidence in this case concerning Jennifer, that on March 25th, 2019, Uber banned Jennifer for safety support abuse for making substantially identical complaints against drivers, including Mr. Turay, seeking a refund.

There's also evidence that Mr. Turay's Safety Lens included the complaint Jennifer made against him, even though Uber had identified it as false. You can consider this evidence.

Then he went on to say: It is not evidence, and you must disregard any suggestion that Jennifer did not commit support abuse.

It's also not evidence, and you must disregard any suggestion that Uber knowingly permitted Jennifer back on the platform.

It is also not evidence, and you must disregard any suggestion that Jennifer is the victim of domestic violence. It is not evidence, and you must disregard any suggestion that Jennifer's complaints against drivers, including Mr. Turay, are accurate based on her presence in the courtroom during Ms. Cissna's testimony.

And I wanted to read that to you exactly so I was 100 percent accurate about what the Court said about all of this hubbub with Jennifer.

And then there's Kevin. Kevin was also a support

abuser. You remember him -- or her. And this is the rider that also was -- made a complaint that was against Mr. Turay, as well as many, many other drivers. And this was determined to be support abuse because Kevin was looking for a refund.

And you heard about this concept of support abuse throughout the trial, both Jennifer and Kevin, where they tried to get a refund. And you heard that 10 to 20 percent of all reports against Uber are these kind of fake fraudulent support abuse. Where somebody says something to try to get their money back, and that's a big number, but unfortunately it's the correct one.

So it brings us back to foreseeability. Foreseeability.

Mr. Turay. There was nothing in his record to suggest that he was going to break the rules and have sex with a passenger. There was nothing. Foreseeable it was not.

What else Uber knew about Mr. Turay is that he had recommitted to the community guidelines, not once but twice. He also completed the sexual assault and sexual misconduct education.

If you want to go and look at these records, you can. It's Trial Exhibit 04070 that is in the record. No question. And there's no question Mr. Turay knew these rules.

(Video clip is played for the jury.)

MS. BUENO: He knew the rules. He knew the no-sex

rule. And he knew it because he completed the training.

And you heard some of these modules. You can watch them again if you'd like. These were the modules created by RAINN, the third-party advocacy group that's dedicated to stopping sexual violence who worked with Uber to make these modules.

And Dr. Valliere, the plaintiff's expert, came and said, "I think these are vague, confusing, and subject to misinterpretation."

And so I showed them to her.

(Video clip is played for the jury.)

MS. BUENO: And she said that was vague, confusing, and subject to misinterpretation.

I think not. It's pretty clear. And that message was well received. It was well received by Mr. Turay.

(Video clip is played for the jury.)

MS. BUENO: Mr. Turay knew it was wrong. He knew he broke the rule. He knew it. He watched the sexual assault misconduct training. He knew Uber would kick him off if he did it, and he did it.

Was it foreseeable to Uber that this driver with the background he had who had completed all of the guidelines, watched all of the videos, was it foreseeable that he would break the rules? No.

And what we know about that sexual assault and sexual

education training is that it did make an impact. There was a lot of questions about, oh, Uber doesn't have numbers to show that what they're doing is actually working. This is all safety sentiment.

You remember those questions and suggestions.

But you did see evidence. Here is an example of one of them, P-00283. Where there are studies and data to show that drivers who completed sexual assault and sexual misconduct had a 10 percent lower incident rate compared to drivers who didn't complete, and that 98 percent completion rate.

So there is data to show this energy and effort and resources that Uber is putting into training is paying off.

Now, I have to just briefly mention this speeding alert thing, which I think is also some noise. Because there was a discussion about Mr. Turay speeding.

And if you want to look at that, pull up P-00518 back there. This is his Mobile Events Log. There was a suggestion that he had hundreds of speeding -- excessive speeding alerts and speeding.

So we went back and looked at that. I mean, there were times on that log where he was at 24 miles an hour and it was speeding, but why are we talking about this, right?

There's no evidence in the record to show that somebody who speeds is going to end up sexual assaulting somebody in a car. That's just not right.

Plaintiff showed you couple of documents related to dangerous driving, but speeding was not included in that. So why are we talking about that? This is noise. Why are we talking about that?

And RideCheck, this slide up here in the middle where I have plaintiff's slide. This was shown to you with Mr. Tremblay. Like oh my goodness, Mr. Turay had long stops and midway drop-offs and route deviations.

But what you heard about RideCheck is that there's a lot of false positives and a lot of reasons why that can happen.

And you heard from Mariana Esteves that over 99 percent of the time -- I mean, elsewhere in her testimony she said 99.5 percent, there is not even a safety incident. It's just a regular trip.

And when there is a safety incident, most of the time it's something like a car wreck or something wrong with an accident, a motor vehicle accident, not sexual assault.

So again, this idea of putting up the slide about Mr. Turay and his number of stops, noise. That's not information or evidence that suggests that this was foreseeable to Uber. Certainly not.

So what did Uber know about Mr. Turay as of November 15th, 2023. This man had 12 clear background checks, thousands of 5 star reviews, overwhelmingly positive comments. He had

completed the sexual assault training, recommitted to the community guidelines.

He had no criminal history. None. He had 10,000 trips. Had was a rideshare driver for 6.5 years. 4.95 percent rating. And he had accepted the no-sex rule. Was this foreseeable to Uber? And the answer to that has to be no.

So this driver, this rider, this trip.

Now I want to talk about this rider, Ms. Dean. We are going to talk at length about some of Ms. Dean's emotional damages in a while, but right now I want to focus on the evidence about Ms. Dean that's relevant for you on the liability questions.

And Ms. Dean downloaded the Uber app, the evidence is clear, because her teachers suggested it, right? We talked to her about it. Actually I think her counsel asked her: Literally your teachers told you, "You need to get around. We'll shuttle you from the hotel, but you need to download the app."

So that is why she downloaded the app. And that's important, because there was a suggestion that perhaps Uber influenced her with marketing or promises of safety or misrepresentations. The evidence shows that she downloaded the app at the suggestion of her teachers.

And in fact, when I asked her, she acknowledged. "It's true, isn't it, you cannot tell the jury any specific ad

or specific marketing campaign that you saw, you just remember general?" And she said yes.

So I took a step further, and I showed her the specific ads that Dr. Drumwright had shown you and confirmed with her that she doesn't remember any of those specifically. So that's when I was talking about that first week of trial, when I said, "She wasn't talking case specific." This is what I meant when I put up that calendar and we had that exchange a few minutes ago.

MS. WALSH: Your Honor, the same objection, for the record.

MS. BUENO: May I proceed, Your Honor?

THE COURT: Wait.

You may proceed.

MS. BUENO: I said to her -- I said, "None of the opinions that you've given to the jury today or this morning are specific to Ms. Dean." And she agreed.

Her assignment was to try to understand the company advertising and marketing. That's the point. It wasn't about this driver or this rider or this trip. And that's what you have to decide. That's your job.

And so what else about the rider is important for liability? Well, she told you, and this again is questions her counsel asked her, "Is there a difference now than after the incident" -- and these questions, just to be clear, were in the

context of her using rideshare now, after the incident.

And she said, yes, "There is a difference now. After I was raped, I have just realized that Uber isn't going to protect me. I need to protect myself. So now I know drivers aren't allowed to engage in conversation. So if, you know, a driver gets inappropriate, I do know now that I have the option to record -- to record it."

But she had that option and could have had that information before this incident, and in fact we know she did. The evidence shows that on November 12th of 2023, just three days before this incident, she was sent and received the community guidelines.

And of course those guidelines indicate that it's inappropriate for drivers to ask personal questions or flirt or engage in inappropriate conversations. This was information Ms. Dean had.

She also had the ability to audio record this trip. This wasn't just after. At the time of this incident with Mr. Turay, she could have taken that initiative to audio record the trip if she wanted to, and she did not.

And in fact, the evidence shows that all of the safety features that we have discussed throughout the trial that I'm showing to you now were available to Ms. Dean at the time of the trip, and she did not take advantage of these.

This driver, this rider, and now let's talk about this

trip.

There has been some question about who called the Uber. And I want to talk to you a little bit about some of the evidence you've heard, and then we are going to talk about why it matters.

(Video clip is played for the jury.)

MS. BUENO: So the night -- this is the forensic interview with Detective Lopez. And if you want to watch it, it's 04078.

This is the interview that she did that morning after she got to the police station and after the examination. She said, "I called the Uber myself." And there's a transcript that's also in evidence that you can look at and see all of her words.

In fact, these videos we've been showing you, there are transcripts, if you want to read them in addition to seeing them. And she mentioned multiple times in this transcript that she called the Uber herself.

She also said that in the video you watched yesterday when she was talking to the man with the body cam footage, Officer Bah was his name. She also said, "I called the Uber myself."

Then when she was on the stand in this trial, she said, "It was both of us who ordered it." And then when there was more questions about it, hey, there seems to be a

controversy, she said it was a joint effort. "He kind of helped me just because I was really out of it, but I know it was on my phone."

And then you saw, and we played for you, her deposition transcript. That was June 27th of 2025. The question was, "Do you recall looking at the app at all before the car pulled up that night?" And she said no.

Then, as you remember, she testified that she had a break with her lawyer, talked to her lawyer, and then came back and said, "I do remember just having the phone in my hand, I wasn't scrolling on it, but the driver profile was pulled up."

Who ordered the Uber? What did she see? And this matters. It matters for several reasons. And you might be wondering why this all -- evidence all came in. But let's think about it for a minute. There's an allegation here that we failed to warn.

And in fact, I took some notes about it in the plaintiff's closing arguments and there was, you know, this note that we should have provided a safety notice when somebody calls for a ride. We should have said, "Oh, it's dark, you are alone, you are a woman at night, be extra vigilant."

Well, but if Ms. Dean never saw the app, she would never have seen that notice, right? And there was a suggestion that the information we provided about Mr. Turay was not enough. But if she didn't call it, she didn't see the app,

what difference does that make? How can that go to prove liability?

Do you see where I'm going with this? This is why this matters. And it also matters because whether or not she chose Uber, or Scott chose Uber, is pretty darn important, when you know she had Lyft on her app that has the Women Preferences. You know she had Waymo on her phone.

So whether or not she made the conscious decision to choose Uber or not matters. So you can look at that evidence and the inconsistencies. She told the police she called it herself. So that's the first reason.

It matters for the liability questions, but it also matters about what her state was that evening. There's also been a lot of questions about how intoxicated she was.

You know, the testimony was that she was so drunk that she got into the car, she laid straight down, she was going in and out of consciousness and passing out. You heard that. Okay?

So if that's the case, it's contrary to what others said. So, for example, Mr. Turay, you heard him say, she was not stumbling in any sort of way.

Scott McLaughlin said he remembered her just walking like a normal person, how you and I would walk right now sober.

Now, he's the one who said, and we'll talk about this because I want to talk about the timeline -- but he's the one

who said, she took a 90-minute nap. They ate Chick-fil-A. She sobered up at his place, and by the time she left, she was in good shape.

And remember that when she got back to the hotel that night, she called her parents, even before the 911 call. And when her mom was asked, "Did she seem drunk?" Her mom said no.

When her dad was asked, "Did she sound like she had been drinking?" He said no.

And this was just minutes after the incident with Mr. Turay. The two people who know her best in her life said she did not sound intoxicated.

So again, this matters for a lot of different reasons when we're talking about the case, but one of them is, was she the one that had her phone and made the selection of Uber or not, and the conflicting stories make a difference when you are considering the evidence. That's why this is relevant and why we needed to bring this to you.

So now I am going to talk a little bit about the timeline, because I hope it will be helpful.

This is the same clock that I put up in opening statement. You have seen it before. So let's remind ourselves where we are here.

Ms. Dean goes to Mr. McLaughlin's house at 9:00 p.m. And that was on November 14th. We know that after that period of time, they had sex a couple of times, they were drinking,

she threw up. She took a 90-minute nap. She ate Chick-fil-A, and then she left his house.

And you heard his testimony, and he said that -- when asked why did she leave, he said, well, I'm busy, right, I'm busy. That's why she left his house.

That was at 12:20 when she called the Uber.

You also know, and she testified, that she spoke with Mr. Turay on the phone before she got in, because you remember she said the apartment complex was confusing, she needed to call, and there was a discussion about how to find her.

And so that happened sometime in between 12:20 when she called for the ride and when Mr. Turay started the ride with her in it, which was at 12:33.

Okay. So it's 12:33. And Ms. Dean gets in the car. And there's no question that they start to engage in some kind of sexual banter, right? We know that. And we know that Ms. Dean said -- told him that they slept together.

(Video clip is played for the jury.)

MS. BUENO: You also remember yesterday -- this is with Detective Lopez, but the video you saw yesterday with Officer Bah, she acknowledged the same thing.

She got into the car and mentioned that she had slept with Scott. And then there's no question there was additional discussion in a sexual nature. And there's no question that at 12:38, Mr. Turay turned off the app.

So this is when Mr. Turay completes the trip, turns off the app. It's at 12:38. And what happens next is that Mr. Turay is looking for a place for them to park to have sex. And you know, of course from Mr. Turay's testimony, that he said she was wanting to do it and was encouraging this situation. And we know that they drove around for about five minutes.

And we know this because I asked Mr. Tremblay, during those five minutes or so in between the RideCheck and the parking, you agree with me that Ms. Dean did not respond to the RideCheck notification. She did not respond.

So approximately 12:43 is when they parked. So the question is, what was happening between 12:38 and 12:43 when they parked? All right. That's when you heard about the Life360 and all of that that was tracking during that time.

And you heard Mr. Turay say yesterday that after he turned off the app and he's finding a place to park, he stopped at a light, and he mentioned that Ms. Dean had touched him between the legs.

You know, there was a discussion, and you heard his testimony, that she was naked in the back seat. You heard details about that. I don't need to go into all of that.

But this was what Mr. Turay said was happening at this time, and Ms. Dean had five minutes from the time she got the RideCheck and when it parked at 12:43.

Here's what Mr. Turay said.

(Video clip is played for the jury.)

MS. BUENO: You heard the testimony. According to Mr. Turay and his side of the story, that she requested, at that time, for him to perform oral sex. Then they had vaginal sex, oral sex again, then he took her to the hotel.

And obviously at that time, the trip was completed, the app was turned off, and he had to get an address from her to ask where she was going, right? That was also evidence at that time, because he no longer had her address in the app, which will be important when we're talking about legal issues as well.

So then we know that the sexual encounter happened sometime after 12:43, when they parked, and we know that it was at 12:57, which would have been about 14 minutes later, that she was dropped off at the hotel.

(Video clip is played for the jury.)

You saw this video before. Mr. Turay pulls up. Ms. Dean opens the car door. She walks into the hotel. Mr. Turay waits for her to get inside before he pulls away.

And then here's another view of the exact same situation.

(Video clip is played for the jury.)

MS. BUENO: 12:57 a.m. So this would have been 14 minutes after the sexual encounter. Then we know what happened

next. She talked to Mr. Bagby, the hotel clerk. You heard from him. And this is when she said she called 911 after she talked to her parents.

And so we know the time of the 911 call was at 1:07. So 12:57 she walks in, ten minutes go by when she talks to Mr. Bagby. She talks to her parents. They encourage her to call the police.

And then at 1:07 is when she calls 911. And the police are prompt. They are quick. They show up at 1:21.

The interview begins with her at 1:21. This is also in evidence. This is P-01922, what you watched yesterday.

Now, you can look at the time stamp in the upper right-hand corner of all these videos to see exactly what time it was. This video -- this particular part of the video starts at 1:26, but the actual video itself, when the cops arrive, are at 1:21, which is what I have on the board.

(Video clip is played for the jury.)

MS. BUENO: The reason I did this timeline is to point out that 1:21, when she starts talking to the police, is not that long after the incident with Mr. Turay at 1:43 [sic].

So think about that. That's like less than 40 minutes between when she says she was unconscious, passed out in the back seat, in and out of consciousness, and when she's having this discussion with the police where she seems quite lucid.

In fact, when asked to spell Mr. McLaughlin's name she

says very clearly M-C-L-A-U-G-H-L-I-N. No problem. She seems lucid. Her parents say she doesn't sound like she's drinking. And that matters when you are considering the evidence of her state at the time of the incident.

And she clearly says here that she remembers him saying, "I'm going to look for a place for us to do stuff." That's the evidence. And you can watch all of this again, to hear what she said that night. Both to the officers at the hotel, and also when she got to the police station.

And we know from Nurse Weaver's notes that when she got to the police station and an exam was done, she did discuss that there was oral sex involved.

And what else the nurse's exam revealed was about physical injuries. Now Ms. Dean was asked about her physical injuries, and I asked her to confirm that none of the bruises she had on her body were caused by Mr. Turay.

And the reason I asked this was because when she was answering questions from her counsel, she seemed to suggest that he bruised her during the encounter. And so I asked her to clarify, and she said, yes, they were caused by him.

Then I played her this video, which you have already seen.

(Video clip is played for the jury.)

MS. BUENO: And then I asked her again, "Do you recall telling Detective Lopez that you think you had a scrape" --

"had the bruises but not the scrape before."

And she said that's correct.

And so the scrape that was recorded by Nurse Weaver, and this is also in evidence, this is Nurse Weaver's exam report, indicated there was a five centimeter by four centimeter area of a red abrasion to the middle of her back. That was the only note. You can read the entire physical exam.

And there's absolutely no evidence that this came from the encounter with Mr. Turay, as opposed to Mr. McLaughlin or otherwise.

Now, I did say in opening statement I was going to play some audio for you and video, and we played some of it yesterday. We didn't play it all, but this is in evidence if you want to listen to it in its entirety.

There is going to be plenty for you to watch and listen to, and I think it's important. I think it's notable that the plaintiffs did not play for you any interviews of Ms. Dean with law enforcement.

There was a comment in the plaintiff's opening today that I jotted down that said, why interviews matter. That was top of the slide. And why do interviews matter? They matter because they provide information that you need as jurors.

Those interviews were not played with you. The only video that plaintiffs played for you was Kenny Bagby, the hotel clerk, not once but twice. They didn't play any discussion of

Ms. Dean with Officer Bah or Detective Lopez. Ask yourself why. Ask yourself why.

The allegation here is that a sexual assault occurred and that Uber is to blame. Which of plaintiff's paid experts investigated whether a sexual assault occurred on this trip?

Dr. Drumwright didn't. We talked about her. She came to talk generally about advertising and marketing.

Dr. Valliere, who is the sex assault expert, did not investigate this trip.

Of course Mr. Johnson didn't. He's the guy that talked about money.

But Tremblay, the law enforcement expert, didn't investigate whether or not a sexual assault occurred.

Ms. Keller was the statistician. She certainly didn't.

And Dr. Mechanic didn't either.

None of the witnesses brought by the plaintiffs came to investigate or talk to you about this particular incident.

And I told you this driver, this rider, this trip.

None of their experts talked about this trip and whether or not there was a sexual assault. And ask yourself why.

And the two on this list that probably have the qualifications and expertise to do it, first Dr. Valliere. I said, "Let's be 100 percent clear, you are not offering an

opinion that sexual misconduct did or did not take place in this particular case, correct?"

She said, "No, that's up for the fact finders."

You, ladies and gentlemen, are the fact finders. She didn't do it.

And the law enforcement expert, "You didn't interview Ms. Dean?"

He said, "No, that would be out of the scope."

"You didn't interview Mr. Turay?"

"Again, out of my scope."

And what did he mean by "scope"?

He meant his assignment. His assignment from the plaintiffs. Nobody asked him to do those things. Ask yourself why.

Uber took immediate action. We talked about this when I started. Within two minutes of Ms. Dean calling, Uber removed Mr. Turay and his access to the app.

And you heard that Uber responded to Ms. Dean. Followed up. Sent her some resources. Gave her hotline information for survivors. And she said that no response was needed.

But after the quick investigation two days later, Mr. Turay was permanently deactivated. That is what the evidence shows.

And you heard from the witness stand Ms. Allison

Cissna, who works here in Phoenix, who was involved in that investigation. And she said that Uber followed all of the policies and procedures, took her report at face value, and got Mr. Turay off the platform.

This driver, this rider, this trip.

And I think this might be a good place for a lunch break, but let me just say before we close, this is why you're here. This driver, this rider, this trip.

And so when we come back from lunch, I'm going to transition and talk about this trial and how all of these case specific, Ms. Dean specific, Mr. Turay specific, issues matter.

Because not only do they have to prove negligence, design defect, and apparent agency, they have to prove that those claims caused Ms. Dean's injury, which they cannot do.

So thank you. We will see you after lunch.

THE COURT: Okay, ladies and gentlemen. We will take a recess until 10 to 1:00. Remember the admonition given to you. Don't discuss the case, allow anyone to discuss it with you, form or express an opinion.

You are excused.

(The jury leaves the courtroom.)

THE COURT: Okay. The jury has retired.

MS. LONDON: Thank you, Your Honor. I would just -- the plaintiff requests a couple of curative instructions based on some of the comments from counsel.

The first one was with respect to incomplete reference to the instruction about consideration of other cases.

THE COURT: Well, I was actually -- even if you hadn't gotten up, I was going to ask Ms. Bueno if she would be so kind as to give me the page in which -- I can read for myself the rest of what I said rather than the three dots that were shown to the jury.

MS. LONDON: Thank you, Your Honor.

THE COURT: Okay. So I will take a look at that, and then we can return to that.

MS. LONDON: Sounds good.

Also, obviously counsel and I do not want to be popping up and objecting during counsel's closing. We do have some concerns about a couple of things.

One is reference to what the experts testified as -- as just noise rather than evidence. It was relevant enough for Your Honor to admit it into evidence, and we think that's an improper way of characterizing these experts, all of whom gave evidence relevant to the case.

THE COURT: I would say that it's perfectly fair to characterize a witness's testimony as "noise." If they wish to say "noise." They wish to use any word that they want to use, they can use it in argument.

And I think it's also fair for you to respond that if it had no relevance at all, it would not be admitted into

court. Obviously it has relevance because the Court admitted it.

Anyway, so as to that objection, it's overruled.

MS. LONDON: Okay. And then finally a reference to Mr. Turay, like working in a domestic violence shelter and whatnot. That's actually not the evidence. And more fundamentally -

THE COURT: Well, you can say whatever the evidence is.

MS. BUENO: I said "disabled people."

MS. LONDON: Sorry, saying that he works with disabled people.

Here's the concern, Your Honor. We have, I think, very successfully managed to avoid giving the impression to the jury one way or the other what the outcome of this criminal matter was.

And it's obviously extremely prejudicial to the plaintiff for the jury to be speculating that he's out there free in the world working in some way. And it's -- I understand, Your Honor, you may be not persuaded by that --

THE COURT: You are right. I am not.

MS. LONDON: But I am lodging the objection for us.

THE COURT: Okay. I will tell you what is of concern to me, is the -- now the second reference counsel made to "the cause." That the plaintiff has to show "the cause."

MS. CHANG: That exactly --

THE COURT: That's a misstatement of the law, and it's misleading, and so the Court will give a curative instruction that the burden is to prove that the injuries -- that any injury was as a result of a cause -- I don't know. I have it in the instruction.

But I think I do have to say something at the outset. And I want to advise counsel that I'm going to do it. Because not only did you say it once, you said it twice. That, you know, it has to be proven "the cause."

And, you know -- I don't know, your graphic, your graphic -- you circled "cause," and then your argument is "the cause."

And the fact is, only it has to be shown that it was "a cause." So it is misleading. And it's misleading as a matter of law, and that's why the Court has concern in it. So I will give a curative instruction on that issue.

MS. BUENO: Would Your Honor allow me to cure it when I go into that and explain that I misspoke?

THE COURT: Yes, I will.

MS. BUENO: Thank you.

THE COURT: Yes I will, absolutely. Make sure it's clear.

MS. BUENO: I will let them know I misspoke.

THE COURT: I don't want to weigh in unless I have to,

however, can I please look -- before we leave, I'd like to look at the golden words that you told the jury came from the Court, because of course that's not evidence.

MS. CHANG: The only other issue that we were going to object to but did not because we don't want to pop up during the closing is her repeated references to the experts not opining as to the causation in this case.

Because I believe that was all the subject of some motions, that the law is that it's the fact finders.

MS. BUENO: We have it.

THE COURT: They have it. I don't like to hold computers. First of all, there's a likelihood that I will drop it; and secondly, we don't have to go secondly. Okay.

MS. LONDON: First instruction or the second?

MS. BLAKE: That is the one that was cited on that page.

MS. LONDON: Because, Your Honor, there was a previous instruction regarding the expert witnesses and what could be considered.

MS. BLAKE: That's part of it.

MS. LONDON: You got both of those? Okay.

MS. BUENO: And for the record, what we're looking at is page 513 of the trial transcript, starting at line 18.

THE COURT: Okay. I -- I think it's misleading. I mean, I think it has to be clarified. It has to be clarified

because the implication is just disregard it all, has nothing to do with this case. That's the implication.

Well, you can argue it has nothing to do with the case, if you'd like, you can certainly argue that. But you can't argue that the judge ruled that it has nothing to do with the case, and that's the implication.

MS. BUENO: So would Your Honor like us to read the entire answer and the entire instruction?

THE COURT: I think I should read it. I don't think you should read it.

MS. BUENO: Would you then -- I'm happy for that. If that would be curative, you can just say, here is the --

THE COURT: Here it is, and I will read as much of it as I think is necessary to clear it up.

MS. BUENO: Perfect. That would be great.

THE COURT: Okay. Thank you. Let's recess.

(Recess taken at 12:23 p.m.)

C E R T I F I C A T E

I, ELVA CRUZ-LAUER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 4th day of February, 2026.

s/Elva Cruz-Lauer
Elva Cruz-Lauer, RMR, CRR