[*Submitting counsel below*]

UNITED STATES DISTRICT COURT
OF NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION** | No. 3:23-md-03084-CRB |
| | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, OR ALTERNATIVELY NEW TRIAL** |
| This Document Relates to: | Judge: Honorable Charles R. Breyer |
| *Jaylynn Dean v. Uber Techs., Inc.*, N.D. Cal. No. 23-cv-06708 D. Ariz. No. 25-cv-4276 | Ctrm.:  6 – 17th Floor |

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| JAYLYNN DEAN, | No. 25-cv-4276-PHX-CRB |
| Plaintiff, | Judge: Honorable Charles R. Breyer |
| v. | Ctrm.:  501 |
| UBER TECHNOLOGIES, INC., et al., | |
| Defendants. | |

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

LEGAL STANDARDS ...................................................................................................... 1

ARGUMENT .................................................................................................................... 1

I.     Uber's renewed motion for judgment as a matter of law should be denied. ....................... 1

     A.     Uber's argument that Arizona's Qualified Marketplace Statute defeats Plaintiff's apparent agency claim is meritless and forfeited. .................................. 1

     B.     Uber's Terms of Use do not defeat an apparent agency claim as a matter of law. .............................................................................................................................. 3

          1.     *Fadely* is distinguishable. ............................................................................. 3

          2.     *Fadely* does not mean that a contract automatically precludes apparent agency. .............................................................................................. 5

          3.     Uber's argument that the evidence that the jury considered was insufficient in light of the Terms of Use is meritless and forfeited. ........... 6

     C.     The jury was permitted to find Mr. Turay's conduct within the scope of his apparent agency. ......................................................................................................... 9

          1.     In Arizona, sexual torts can be within the scope of employment. ............. 9

          2.     There was sufficient evidence that Mr. Turay's conduct was within the scope of his apparent agency. ............................................................. 12

     D.     The Court should not certify any questions to the Arizona Supreme Court. ........ 14

II.     Uber's motion for a new trial should be denied. ............................................................. 15

     A.     The scope of employment instruction accurately reflected Arizona law. ............. 15

     B.     The Terms of Use instruction accurately reflected Arizona law .......................... 16

CONCLUSION ............................................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

*Amick v. Banner Health*,
2023 WL 5217704 (Ariz. App. Aug. 15, 2023) ............................................................................ 6

*Bell v. Williams*,
108 F.4th 809 (9th Cir. 2024) ...................................................................................................... 1

*Bettcher Indus., Inc. v. Bunzl USA, Inc.*,
661 F.3d 629 (Fed. Cir. 2011) .................................................................................................... 16

*Brown v. Davenport*,
596 U.S. 118 (2022) .................................................................................................................... 12

*Carey v. Maricopa Cnty.*,
2009 WL 750225 (D. Ariz. Mar. 10, 2009) ............................................................................... 11

*Chandrasekhar v. Koszyk-Szewczyk*,
2023 WL 11909594 (Ariz. Super. Ct. July 11, 2023) .................................................................. 4

*Colson v. Maghami*,
2010 WL 2744682 (D. Ariz. July 9, 2010) ................................................................................... 8

*Complaint of McLinn*,
744 F.2d 677 (9th Cir. 1984) ...................................................................................................... 14

*Contreras v. City of Nogales*,
2022 WL 22885260 (D. Ariz. Oct. 25, 2022) .......................................................................... 3, 6

*Coslett* and *Moreau v. Air France*,
356 F.3d 942 (9th Cir. 2004) ........................................................................................................ 8

*Doe v. Roman Cath. Church of Diocese of Phoenix*,
533 P.3d 214 (Ariz. App. 2023) ...................................................................................... 10, 11, 12

*Doe v. Samaritan Counseling Ctr.*,
791 P.2d 344 (Alaska 1990) ........................................................................................................ 10

*Dupree v. Younger*,
598 U.S. 729 (2023) ................................................................................................................... 1, 2

*Duran v. City of Maywood*,
221 F.3d 1127 (9th Cir. 2000) ...................................................................................................... 1

*E.E.O.C. v. Go Daddy Software, Inc.*,
581 F.3d 951 (9th Cir. 2009) ........................................................................................................ 7

*Engler v. Gulf Interstate Eng'g, Inc.*,
280 P.3d 599 (Ariz. 2012) ..................................................................................................... 11, 13

*Fadely v. Encompass Health Valley of Sun Rehab. Hosp.*,
515 P.3d 701 (Ariz. App. 2022) .......................................................................................... 2, 4, 5, 6

*Freund v. Nycomed Amersham*,
347 F.3d 752 (9th Cir. 2003) ................................................................................................... 1, 7

*Ft. Lowell-NSS Ltd. P'Ship v. Kelly*,
  800 P.2d 962 (Ariz. 1990)...................................................................................................... 3

*Hayes v. Cont'l Ins. Co.*,
  872 P.2d 668 (Ariz. 1994)...................................................................................................... 3

*Higgins v. Assmann Elecs., Inc.*,
  173 P.3d 453 (Ariz. App. 2007)...................................................................................... 9, 10

*In re K F Dairies*,
  224 F.3d 922 (9th Cir. 2000)................................................................................................ 11

*In re Mortg. Elec. Registration Sys. (MERS) Litig.*,
  2011 WL 4571663 (D. Ariz. Oct. 3, 2011) ......................................................................... 15

*J.M. Homes, LLC v. Empire I Builders, LLC*,
  2015 WL 4538533 (Ariz. App. July 28, 2015) .................................................................... 2

*Joshua David Mellberg, LLC v. Will*,
  639 F. Supp. 3d 926 (D. Ariz. 2022)................................................................................... 14

*Kremen v. Cohen*,
  325 F.3d 1035 (9th Cir. 2003)............................................................................................. 14

*Larson v. Berumen*,
  1997 WL 608676 (9th Cir. Oct. 27, 1997)........................................................................... 10

*Martin v. Cavalier Hotel Corp.*,
  48 F.3d 1343 (4th Cir. 1995)................................................................................................ 10

*McKown v. Simon Prop. Grp. Inc.*,
  689 F.3d 1086 (9th Cir. 2012)............................................................................................. 11

*MetroPCS Cal., LLC v. F.C.C*,
  644 F.3d 410 (D.C. Cir. 2011) .............................................................................................. 3

*Meyer v. Uber Techs., Inc.*,
  868 F.3d 66 (2d Cir. 2017).................................................................................................... 6

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
  523 F.3d 1051 (9th Cir. 2008)............................................................................................. 16

*Perez v. Van Groningen & Sons, Inc.*,
  41 Cal. 3d 962 (1986) .......................................................................................................... 10

*Riordan v. State Farm Mut. Auto. Ins. Co.*,
  589 F.3d 999 (9th Cir. 2009)............................................................................................... 14

*Rock Point Sch., Inc. v. Wells Fargo Bank NA*,
  2015 WL 13122940 (D. Ariz. Oct. 27, 2015) ................................................................ 14, 15

*Rose v. Air Liquide USA LLC*,
  2025 WL 509246 (D. Ariz. Feb. 14, 2025)..................................................................... 10, 15

*Ryman v. Sears, Roebuck & Co.*,
  505 F.3d 993 (9th Cir. 2007)................................................................................................ 11

*Samuels v. S. Baptist Hosp.*,
  594 So. 2d 571 (La. App. 1992)........................................................................................... 10

*Smith v. Am. Exp. Travel Related Servs. Co.*,
    876 P.2d 1166 (Ariz. App. 1994)...................................................................................................... 9

*State v. Ewer*,
    523 P.3d 393 (Ariz. 2023)................................................................................................................ 3

*State v. Gordon*,
    581 P.3d 215 (Ariz. 2025)................................................................................................................ 3

*State v. Schallock*,
    941 P.2d 1275 (Ariz. 1997)...................................................................................... 9, 10, 11, 15

*Stencel v. Lyft, Inc.*,
    2024 WL 4008752 (N.D. Cal. Aug. 29, 2024)........................................................................ 11

*Teran v. Citicorp Person-to-Person Fin. Ctr.*,
    706 P.2d 382 (Ariz. App. 1985)...................................................................................................... 6

*Tonner v. United States*,
    2025 WL 2097927 (D. Ariz. July 25, 2025) .......................................................................... 11

*Tritchler v. Cnty. of Lake*,
    358 F.3d 1150 (9th Cir. 2004)........................................................................................................ 1

*United Nat. Maint., Inc. v. San Diego. Convention Ctr., Inc.*,
    766 F.3d 1002 (9th Cir. 2014)...................................................................................................... 17

*United States v. Del Muro*,
    87 F.3d 1078 (9th Cir. 1996)........................................................................................................ 17

*Valley Nat'l Bank v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
    736 P.2d 1186 (Ariz. App. 1987).................................................................................................... 6

*Wiggs v. City of Phoenix*,
    10 P.3d 625 (Ariz. 2000)................................................................................................................ 2

**Statutes**

A.R.S. § 12-1861.................................................................................................................................... 14

A.R.S. § 23-1603...................................................................................................................................... 2

A.R.S. § 23-1603(A) ............................................................................................................................... 1

A.R.S. § 28-9606...................................................................................................................................... 2

**Other Authorities**

Restatement (Second) of Agency § 229 ............................................................................................ 9

## INTRODUCTION

Uber's motion (1) repeats arguments that the Court has previously rejected, or (2) advances new arguments that are forfeited in addition to being meritless. The motion should be denied.

## LEGAL STANDARDS

On a motion for judgment as a matter of law, the Court must "uphold the jury's verdict if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is possible to draw a contrary conclusion." *Bell v. Williams*, 108 F.4th 809, 818 (9th Cir. 2024) (internal quotation marks omitted). The Court "must view all evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in the favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* To warrant a new trial, the movant must show that there was instructional error and that such error was prejudicial. *See Tritchler v. Cnty. of Lake*, 358 F.3d 1150, 1154 (9th Cir. 2004). Jury instructions are not erroneous where they "fairly and accurately cover the issues presented, correctly state the law, and are not misleading." *Duran v. City of Maywood*, 221 F.3d 1127, 1130 (9th Cir. 2000).

## ARGUMENT

**I.    Uber's renewed motion for judgment as a matter of law should be denied.**

    **A.    Uber's argument that Arizona's Qualified Marketplace Statute defeats Plaintiff's apparent agency claim is meritless and forfeited.**

Arizona's Qualified Marketplace statute provides that a covered individual "shall be treated as an independent contractor for all purposes under state and local laws …." A.R.S. § 23-1603(A). Uber argues that the statute, by providing "constructive notice," creates a "presumption" against apparent agency that can be overcome only by "compelling evidence." Mot. at 6. These arguments are forfeited: they did not appear in Uber's Rule 50(a) motion (ECF 5172), and a "party cannot raise arguments in its … motion .... under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion." *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003). While a party may preserve "purely legal issues" by raising them at summary judgment, *Dupree v. Younger*, 598 U.S. 729, 735 (2023), at summary judgment Uber never argued anything about "constructive

-1-

notice," a "presumption," or "compelling evidence."[1] *See* ECF 4356. Nor may those questions "be resolved without reference to any disputed facts." *Dupree*, 598 U.S. at 735.

In any event, Uber's argument is meritless. This Court determined at summary judgment that the statute precluded a respondeat superior claim, which requires that the driver be an employee rather than an independent contractor. But the statute says nothing about apparent agency, which "hinges on principles of estoppel" rather than actual relationships. *Fadely v. Encompass Health Valley of Sun Rehab. Hosp.*, 515 P.3d 701, 706 (Ariz. App. 2022). As such, an apparent agency claim does not require that the individual be an actual agent at all, let alone any type of agent (employee or independent contractor). *See Wiggs v. City of Phoenix*, 10 P.3d 625, 628 (Ariz. 2000) ("While it is always the case that an independent contractor is not a servant, it is not always the case that an independent contractor is not an agent."); *J.M. Homes, LLC v. Empire I Builders, LLC*, 2015 WL 4538533, at *3 (Ariz. App. July 28, 2015) ("[W]hen dealing with apparent authority, the emphasis shifts to the third party's reliance on the acts of the alleged principal and the agent as opposed to any express or implied grant by the principal.") (citation omitted). Indeed, apparent agents are usually not employees because in employee cases, respondeat superior provides a streamlined path to liability.

Uber cites no case barring an apparent agency claim due to A.R.S. § 23-1603.[2] And for good reason: the statute says nothing about apparent agents or vicarious liability more generally. Uber concedes that the Court must apply the "clear and unambiguous text" of the statute. Mot. at 5. In the next breath, however, Uber asks the Court to rewrite the statute based on the contention that the statute's "plain design was to eliminate vicarious liability." Mot. at 1. But the statute does not say that. *Cf.* A.R.S. § 28-9606 (expressly "exempt[ing]" from "vicarious liability" certain "peer-to-peer car sharing program[s]"). Arizona courts "do not look beyond the text of the statute to

---

[1] Even as to the question of whether A.R.S. § 23-1603 categorically precludes an apparent agency claim, on reply in support of summary judgment Uber conceded that the statute applied, if at all, only to Plaintiff's "Respondeat Superior" claim. *See* ECF 4796 at 2.

[2] Neither *Coslett v. Uber Techs., Inc.*, No. 2018-cv-005515 (Ariz. Super. Ct. Mar. 14, 2023), nor *Klosa v. Uber Techs, Inc.*, No. 2019-cv-000428 (Ariz. Super. Ct. Aug. 23, 2022) involved an apparent agency claim. Indeed, both cases rejected non-employee bases for vicarious liability (in *Coslett*, non-delegable duties, and in *Klosa*, actual agency) on the facts, not on the basis of the statute, supporting Plaintiff's position that the statute does not categorically preclude such claims.

discern a legislative purpose absent ambiguity because the plain meaning of the text itself reflects the intent of the Legislature." *State v. Gordon*, 581 P.3d 215, 222 (Ariz. 2025).

Uber assumes that the only reason the legislature would make Uber drivers independent contractors is to preclude vicarious liability. But (1) there are "many exceptions to the rule of nonliability" for the acts of a contractor, *Ft. Lowell-NSS Ltd. P'Ship v. Kelly*, 800 P.2d 962, 967 (Ariz. 1990); and (2) there are ample reasons to make Uber drivers independent contractors beyond tort considerations, such as wage-and-hour and worker's compensation. *See Hayes v. Cont'l Ins. Co.*, 872 P.2d 668, 678 (Ariz. 1994) ("[J]udicial speculation about [legislative] intent is undoubtedly incorrect at times, and when it is, it too frustrates the legislature's intent.").

The only evidence Uber has of this "plain design" is a policy articulated in the Governor's press release of "doing everything we can to support 21st-century companies." Mot. at 5 (citing news articles). Arizona courts typically eschew legislative history, *see State v. Ewer*, 523 P.3d 393, 398 (Ariz. 2023), and appear to have never relied on an executive press release. Even if Governor Ducey's statement was relevant, the policy endorsed ("doing everything we can") is so vague as to be indeterminate. *See MetroPCS Cal., LLC v. F.C.C*, 644 F.3d 410, 414 (D.C. Cir. 2011) ("'The Act must do everything necessary to achieve its broad purposes' is the slogan of the enthusiast, not the analytical tool of the arbiter.").

### B. Uber's Terms of Use do not defeat an apparent agency claim as a matter of law.

An "apparent agency is created when '(1) a principal intentionally or inadvertently leads one party to believe an agency exists, and (2) the party justifiably relies on the principal's representations.'" *Contreras v. City of Nogales*, 2022 WL 22885260, at *3 (D. Ariz. Oct. 25, 2022) (citation omitted). Uber, citing *Fadely*, contends that the company's Terms of Use, by proclaiming Mr. Turay not an agent, defeat any apparent agency claim as a matter of law. The Court previously rejected Uber's reliance on *Fadely*. The Court should do so again.

#### 1. *Fadely* is distinguishable.

In *Fadely*, the court found insufficient evidence to support a finding of apparent agency because the defendant hospital "never led or misled Plaintiff to think that" her treating doctors

-3-

"were [hospital] agents or employees." 515 P.3d at 706. Rather, "[o]n admission," the hospital provided the plaintiff a "two-page" conditions-of-admission form that made clear who was responsible for treating the patient according to the standard of care: "independent practitioners who 'practice independently under their state license and privileges granted by the hospital,' 'maintain sole responsibility for their medical judgment and professionalism,' and 'bill and collect for their services independently from the hospital.'" *Id.*

This case is different from *Fadely* in every way: the relationship between the plaintiff and the company; the content of the agreement; and the circumstances of its making. In *Fadely*, the doctors billed for their services independently from the hospital; here, notwithstanding the artificial "payment agent" construct in the Terms of Use, passengers pay Uber, not their drivers, for transportation, and Uber, not drivers, sets pricing for each ride. *See* Ex. P-03435 (Ms. Dean's receipt showing that "We adjusted the total for your recent ride," i.e., refunding her the money she paid Uber after she reported being raped); Tr. at 3312:19-25 (Uber's Head of Product candidly testifying that, when Uber was considering rolling out female matching, "the kinds of decisions we had to make was do we charge this female rider more because they're asking this female driver to drive much longer? … [W]e made a decision that 'no,' we were going to charge this female rider the exact same price as Uber X….").

The "disclosure" here bears no resemblance to the straightforward, patient-facing form in *Fadely*. The hospital's "two-page" form was "designed to make sure that Plaintiff had the information she needed to make an informed decision about being admitted to [the hospital]." *Fadely*, 515 P.3d at 706; *see also Chandrasekhar v. Koszyk-Szewczyk*, 2023 WL 11909594, at *2 (Ariz. Super. Ct. July 11, 2023) (distinguishing *Fadely* where a form stated that "doctors and surgeons are not 'employees or agents' of the hospital," but did "not clearly identify who is ultimately responsible for the patient's care"). By contrast, Uber's Terms are dense, sprawling, and buried. As the Court observed, the Terms are "nearly overwhelming." Tr. at 2353:7-8. The Terms span twenty-two pages, not two, with the relevant language appearing deep within on page twelve. Ex. P-04531 § 3; *see also* Tr. at 2353:9-22 (the Court discussing how long it would take a person to read the Terms when downloading the app). Uber users are not required to read the Terms before

clicking "I agree." Jurors even saw a demonstrative video illustrating how long it would take simply to scroll to the relevant provision. The evidence confirms what common experience suggests: users do not read the Terms. Unsurprisingly, Ms. Dean did not recall doing so. *Id*. at 1759:24-1760:7.

The Terms employ the technical language found insufficient in *Chandrasekhar* and not the plain statements that drove the result in *Fadely*. *See* Ex. P-04531 § 3 ("Independent third-party providers are not actual agents, apparent agents, ostensible agents, or employees …"). Confusingly, the Terms state "UBER" is a "PROVIDER" of "THE SERVICES," all-caps. *Id*. Eleven pages earlier, the Terms of Use define "Services," initial-caps as "your use of Uber's personalized, multipurpose, digital marketplace platform … and any related content or services, including mobile and/or web-based applications …." *Id*. at 1. In other words, "Services" includes the "platform" and "any related content or services" and "UBER" "PROVIDE[S]" "THE SERVICES." It is anyone's guess how this language communicates that Mr. Turay was acting on his own. The Terms obscure, rather than clarify, who is responsible for the ride.

The circumstances of the agreement are alone dispositive. In *Fadely*, the form was provided to, and signed by, the patient immediately before receiving treatment and at the point of care. 515 P.3d at 706 ("[o]n admission"). Here, the evidence showed Ms. Dean accepting the Terms on April 14, 2023, *seven months* before she ever downloaded the Uber rides app and was assaulted. *See* Ex. 04231 (checkbox consent). She signed up for Uber to use Uber Eats (living in a small college town, she had no need for rides). Tr. at 1758:24-1759:23. She was never presented with a clear, contemporaneous disclosure when using Uber for transportation.

Finally, there was no indication in *Fadely* that the hospital affirmatively advertised that the doctors were its agents. Here, Uber affirmatively presents and advertises itself as the transportation provider. It markets the rides, sets the price, processes payment, and communicates directly with the passenger. In that context, a buried contractual disclaimer cannot, as a matter of law, negate the reasonable impression that Uber itself creates.

**2.      *Fadely* does not mean that a contract automatically precludes apparent agency.**

Uber says that these distinctions do not matter because *Fadely* means that a "binding

contract" precludes a reasonable belief in agency. Mot. at 7. But *Fadely* was decided as a fact question concerning which representations the plaintiff saw and under what circumstances, not as a binary question of whether there was a binding contract. *See Fadely*, 515 P.3d at 706 ("Encompass did not represent Drs. Barnes and Patel as its employees or agents to Plaintiff, instead informing her of the independent relationship between them.").[3]

That is why cases applying *Fadely* carefully consider the text and circumstances of agreements in determining whether there is sufficient evidence of apparent agency. In *Contreras*, for example, the court denied summary judgment where the plaintiff signed a conditions-of-admission "form [only] when he was discharged." 2022 WL 22885260, at *4. Accordingly, the plaintiff was entitled to rely on things like the doctor's title and the hospital's "name and letterhead on all medical record and forms," because the conditions form did not effectively "notify" him otherwise. *Id.* at *2-4; *see also id.* at *3 (explaining that in *Fadely*, "Encompass could not be liable" because it "informed the plaintiff of the independent relationship between it and the physicians"). Similarly, in *Amick v. Banner Health*, 2023 WL 5217704 (Ariz. App. Aug. 15, 2023), the court distinguished *Fadely* by comparing the language of the admission forms against the other relevant facts, including the "identification badge" associating the doctor with the hospital. *Id*. at *7-8 ("Under the standard employed in *Fadely*, the record shows genuine issues of material fact as to both requirements of apparent agency."). Neither case expressed any understanding of *Fadely* as holding that a contract, merely by being a contract, precludes apparent agency.[4]

**3.    Uber's argument that the evidence that the jury considered was insufficient in light of the Terms of Use is meritless and forfeited.**

Finally, Uber argues that, if the Terms of Use are not dispositive categorically, the evidence

_____

[3] During trial, Uber relied on the section of *Fadely* headed "Not ambiguous." 515 P.3d at 706. But that portion of the opinion, too, analyzes the conditions-of-admission form in terms of what it represented to the plaintiff, not whether it was a binding contract.

[4] For these reasons, Uber's citation to *Meyer v. Uber Techs., Inc.*, 868 F.3d 66 (2d Cir. 2017) and *Teran v. Citicorp Person-to-Person Fin. Ctr.*, 706 P.2d 382 (Ariz. App. 1985), cases about contract formation, is inapposite. Uber also cites *Valley Nat'l Bank v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 736 P.2d 1186, 1190 n.2 (Ariz. App. 1987), but that case concerned enforceability of liability releases, a contract issue, not a representation-based claim like apparent agency. Finally, Uber relies on *Crawley v. Uber Techs., Inc.*, No. BER-L-5888-20 (N.J. Super. Ct. Sept. 22, 2025), but in that case the plaintiff did not produce any evidence of representations from Uber on which he relied; instead, he relied on a statement from the *driver* that he was "from Uber." *Id*. at 20. Apparent agency depends on representations by the principal, not the agent.

in this trial of Uber's representations and Ms. Dean's beliefs was insufficient. Mot. at 8. This argument did not appear in Uber's Rule 50(a) motion, and so is forfeited. *See Freund*, 347 F.3d at 761.[5] The argument is also meritless. Here, there was overwhelming evidence that, based on Uber's marketing and actions, Ms. Dean believed that Uber hired, controlled, and was responsible for the actions of its driver, and relied on that belief in choosing to take an Uber the night she was assaulted.

Before Uber, it was considered unreasonably dangerous for a young woman to get into a complete stranger's car. That would have been considered hitchhiking. *See* Tr. at 322:9-13, 491:10-13; Ct. Ex. 5A (Ross) at 418:25-419:15. The central challenge for Uber has always been to convince the public, especially women, to trust their safety to a stranger. *See* Ct. Ex. 3A (Hazelbaker) at 53:4-16 ("[T]he idea that getting into a car with a stranger certainly raised the issue of safety broadly."); Ex. P-0694 at 5 ("Safety is a major barrier to new rider growth.").

The solution to that problem was for Uber to convince the public to trust *Uber*—not random strangers—to provide safe rides: "We have to ensure people trust *us* with their safety…" and "establish universal trust *in Uber* as the safest place in every city." Ex. P-00304 at 9. "Increasing user trust *in Uber as a safe ride* will lead to growth." *Id*. at 11. Accordingly, Uber's core safety message is that *Uber* provides the rides, not a driver acting independently, and that Uber, not the driver, is responsible for passenger safety. Uber's billions of dollars of annual marketing tell people to "Ride safely *with Uber*." Ct. Ex. 5A (Ross) at 143:17-20. Call an "*Uber driver*." Ex. 4547; Tr. at 2339:25-2340:17. "[C]all an *Uber*." Ex. P-04548; Tr. at 2340:22-2341:11. "Tag who you're *ubering* home with …." Ex. P-04549; Tr. at 2342:14-2343:15. "Get *an Uber* Home[.]" *Id*. (emphases added for all cites in this paragraph).

Uber's deliberate blurring of the lines between the company and its drivers has been an overwhelming success. To the public, "you don't call some dude. You call an Uber driver." Tr. at 623:6-7. "They're Uber drivers. And as Uber drivers, Uber stands behind them." *Id.* at 623:15-17. At trial, the company tried to disavow its marketing, but its U.S. Director of City Operations

---

[5] The sufficiency of the evidence, which Uber's Rule 50(a) motion did not raise, is not a logical extension of the argument that mere "agreement to Uber's Terms … forecloses [an] apparent agency claim" no matter the countervailing evidence. ECF 5172 at 3; *see E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 962 (9th Cir. 2009) (renewed motion limited to arguments previously made or "logical extension[s]" of arguments previously made).

candidly acknowledged on cross-examination that the company "communicate[s] with folks the way that they understand Uber to work." Tr. at 2342:3-6.

As Uber intended, Jaylynn Dean saw these same messages and relied on them. Contrary to Uber's citation-free claim, Ms. Dean testified that she commonly saw Uber's safety advertising—advertising that promised safety *from the Uber driver*—from a young age. *See*, *e.g.*, Tr. at 1758:2-19 (social media ads); *see also id.* at 1777:17-1778:21 (emails from Uber); Ex. P-05003 at 111 (demonstrative showing emails Plaintiff confirmed she received). The trial evidence also included the specific ads she saw on the app store. When she downloaded the Uber rides app in November 2023, she was met with and reassured with Uber's promise of safety, a promise grounded in the fact that it was Uber providing her transportation, not random independent drivers: "Request and Ride *with Uber*." Ex. P-00299 at 7 (emphasis added). Uber told her: "Join the millions of riders who *trust Uber* for their everyday travel needs." *Id.* at 20 (emphasis added); *see also* Tr. at 1778:22-1781:4 (Ms. Dean downloaded from the app store and saw messages there).

Then, when she called the Uber the night of her assault, she did just that: she "ordered an Uber." *Id.* at 1793:11-19. And Uber sent Mr. Turay. Ms. Dean did not "care what kind of driver was there" because she "just trusted Uber." *Id.* at 1803:9-12. She understood herself to be paying Uber, not the driver, for transportation. *Id.* at 1804:2-5.[6] She thought Uber controlled all aspects of the ride and told the driver what to do. *Id.* at 1804:9-11. She believed that Uber was responsible for its driver's actions; for example, she reported his assault directly to the company. *Id.* at 1804:12-14, 1824:3-13. Assignment, compensation, control, and responsibility—the hallmarks of agency.[7]

---

[6] Uber mocks this belief as unsupported, but ignores its own Head of Product's testimony that Uber determines fares, Tr. at 3312:19-25, as well as the evidence showing Uber—not the driver—issuing refunds and soliciting tips. *See* Ex. P-03435 (refund); Ex. P-03237 at 99 (tips). From Ms. Dean's perspective, "Ride with Uber" meant "pay Uber for rides" because that is exactly what she did.

[7] Uber argues (at p. 8) that the jury could not consider "Uber's compliance with Arizona-law safety requirements" as evidence of "control," but does not explain (1) which "compliance" actions it is referencing; (2) how those actions relate to apparent agency; (3) how its portrayal of its drivers was authorized or compelled by Arizona law; or (4) why Uber did not seek to exclude or instruct the jury on this unidentified evidence. The only authority cited—*Coslett* and *Moreau v. Air France*, 356 F.3d 942 (9th Cir. 2004)—did not involve apparent agency claims. Finally, Uber cites *Colson v. Maghami*, 2010 WL 2744682 (D. Ariz. July 9, 2010), but that case held only that a franchisee's "brand signage" alone is not sufficient to constitute a representation that the franchisee is the franchisor's agent. *Id.* at *12. In addition, the plaintiff "candidly admitted during his deposition that nobody … told him that Motorsports was an agent for the manufacturer." *Id.*

**C.**    **The jury was permitted to find Mr. Turay's conduct within the scope of his apparent agency.**

**1.**    **In Arizona, sexual torts can be within the scope of employment.**

As the Court previously observed, while some states categorically preclude sexual torts from the scope of employment, others do not. *See* PTO 17 at 15. Arizona is in the latter category: "[A]cts may be found in the scope even if forbidden or done in a forbidden manner, and even if consciously criminal or tortious." *Higgins v. Assmann Elecs., Inc.*, 173 P.3d 453, 461 (Ariz. App. 2007) (citation omitted).

Uber begins its discussion of Arizona law by misstating it. Uber says that conduct can be within the scope "only if it is, 'at least in part, motivated by a purpose to serve the master rather than solely to serve personal motives unconnected to the master's business.'" Mot. at 9 (quoting *State v. Schallock*, 941 P.2d 1275, 1283 (Ariz. 1997)). Uber omits the immediately following statement in *Schallock*: "[T]he act in question is not the ultimate tortious act but rather conduct related to the tort." 941 P.2d at 1283. So, in *Schallock*, the court, applying the factors in Restatement (Second) of Agency § 229, found sexual assault within the scope of employment based on "the time and place of the conduct" and "the previous relation between master and servant." *Id.* at 1282. The court found a triable question of fact even though the "tortious act" was obviously not "motivated… to serve the master," but rather arose from "solely … personal motives." *Id.* at 1283.

Uber says that *Schallock* reflects a "narrow exception" applicable only to "managerial sexual harassment." Mot. at 10. But while *Schallock* naturally focused on the facts of the case in front of the court, *Schallock* gave no indication that its reasoning was a ticket good for one day only. Rather, *Schallock* began by rejecting the holding of *Smith v. Am. Exp. Travel Related Servs. Co.*, 876 P.2d 1166, 1171 (Ariz. App. 1994) that functionally meant "an employer is never vicariously liable for an intentional tort" as "sweep[ing] much too broadly." *Schallock*, 941 P.2d at 1281. Instead, the court set out a general rule: the question for the jury is not 'did the employer authorize sexual assault,' 'did the sexual assault benefit the employer,' or 'was the sexual assault motivated to serve the employer.' Rather, the question is "whether the service itself in which the tortious act was done was within the ordinary course of such business or within the scope of such

authority." *Id.* at 1285 (quoting *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1348 (4th Cir. 1995)); *see also Rose v. Air Liquide USA LLC*, 2025 WL 509246, at *13 (D. Ariz. Feb. 14, 2025) ("A plaintiff need not allege that the tort itself was in furtherance of the employer's business, but rather, that the 'service itself in which the tortious act was done was within the ordinary course of such business.' … [T]his requires inquiry into 'when the act took place, where it took place, and whether it was foreseeable.'") (quoting *Schallock*, 941 P.2d at 1285).

Uber relies on the statement in *Doe v. Roman Cath. Church of Diocese of Phoenix*, 533 P.3d 214 (Ariz. App. 2023), that "*Schallock* is narrowly applicable to cases involving longstanding abuse and harassment in the workplace by a manager with authority to hire and fire, promote and demote, and instruct and control subordinates the manager victimizes." *Id.* at 223-24 (internal quotation marks and alterations omitted). But *Doe* cited the very same reasoning in *Smith* that *Schallock* rejected as "sweep[ing] much too broadly." 941 P.2d at 1281. *Doe* also ignored that *Schallock* expressly relied on cases from other jurisdictions presenting facts outside of the "narrow[]" context to which *Doe* confined it. *See Schallock*, 941 P.2d at 1283.[8]

*Doe* is also inconsistent with how other cases have interpreted *Schallock*. In *Higgins*, the court affirmed a jury verdict where a supervisor assaulted an employee and, while doing so, told her she was fired. 173 P.3d at 456. The court acknowledged that "the acts took place outside the office on a holiday weekend," the employer "had no reason to expect the [employee] to act in such a manner," and "[f]iring [the other employee] appeared to further only [the supervisor's] personal interests." *Id.* at 461. There was no longstanding misconduct. Nevertheless, the court affirmed the verdict because part of the conduct—the firing—was within the employee's "authority." *Id.* Then, in *Larson v. Berumen*, 1997 WL 608676 (9th Cir. Oct. 27, 1997), the Ninth Circuit explained that *Schallock* applied where "an employee was aided in accomplishing the tort by the existence of the agency relation," noted *Schallock*'s reliance on cases outside the managerial context, and expressly rejected the argument that *Schallock* should be reduced to its facts. *Id.* at *1. And in *Tonner v.*

---

[8] *See Doe v. Samaritan Counseling Ctr.*, 791 P.2d 344, 347-48 (Alaska 1990) (pastoral counsel during therapy sessions); *Perez v. Van Groningen & Sons, Inc.*, 41 Cal. 3d 962 (1986) while driving master's equipment, servant gave plaintiff ride for personal reasons); *Samuels v. S. Baptist Hosp.*, 594 So. 2d 571, 573-74 (La. App. 1992) (rape of patient by nursing assistant).

*United States*, 2025 WL 2097927 (D. Ariz. July 25, 2025), which Uber itself cites, the court found scope-of-employment sufficiently pleaded under *Schallock* even though "Plaintiff was not an employee and Skeet was not a supervisor." *Id.* at *5; *see also Carey v. Maricopa Cnty.*, 2009 WL 750225, at *10-11 (D. Ariz. Mar. 10, 2009) (relying on *Schallock* for the legal standard to determine whether "tortious interference and defamation" were within the scope).

Uber also relies on *Engler v. Gulf Interstate Eng'g, Inc.*, 280 P.3d 599, 602 (Ariz. 2012), but *Engler* described *Schallock* in a way consistent with *Larson* and much broader than the cramped depiction in *Doe*: "The employee in *Schallock* was able to carry out his harassment in part because he was a supervisor, and the harassment occurred as part of his 'supervision' of the plaintiff …." *Id.* at 603. Contrast *Engler*'s understanding of *Schallock* with the core holding of *Doe*: "We [] decline [the plaintiff's] invitation to adopt [a] rule that priests or ministers may be acting within the scope of their employment when using their employer-granted authority to engage in tortious misconduct." 533 P.3d at 224.[9]

Despite all of this, Uber urges that the Court must follow *Doe* to the word because (1) it is an Arizona intermediate appellate court case and (2) the Arizona Supreme Court denied review in *Doe*. Neither argument works. *First*, courts often "follow [a] state intermediate appellate court decision" only where "there is no relevant precedent from the state's highest court." *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007); *see also McKown v. Simon Prop. Grp. Inc.*, 689 F.3d 1086, 1091 (9th Cir. 2012) ("We must also keep in mind that *only* the Washington Supreme Court's decisions are binding …."). Here, there *is* "relevant precedent" from the Arizona Supreme Court, namely *Schallock* itself (and *Engler*, which, as explained above, conflicts with *Doe* too). *See In re K F Dairies*, 224 F.3d 922, 925 (9th Cir. 2000) (disregarding two decisions from the California Court of Appeal that were "directly on point" because those cases were "in conflict with generally established principles … as articulated by the California Supreme Court"). *Second*, there

---

[9] Finally, Uber relies on *Stencel v. Lyft, Inc.*, 2024 WL 4008752 (N.D. Cal. Aug. 29, 2024), but that case understood the employer's post-assault suspension of the driver as "negat[ing] any inference of express or implied authorization." *Id*. at *4. This reasoning ignores *Schallock*'s rejection of *Smith*'s requirement that "acts" be "expressly or impliedly authorized," and *Schallock*'s explanation that "[c]onduct within the scope of employment may be either of the same nature as that authorized *or* incidental to that authorized." 941 P.2d at 1281-82.

is no indication that the Arizona Supreme Court's denial of discretionary review expresses any view on the merits. *See Brown v. Davenport*, 596 U.S. 118, 142 (2022) (describing as "a familiar practice" a state supreme court's denial of discretionary review "import[ing] no expression of opinion upon the merits of the case") (citation omitted).

### 2. There was sufficient evidence that Mr. Turay's conduct was within the scope of his apparent agency.

Uber's sufficiency-of-the-evidence arguments all proceed from the premise that *Schallock* has an artificially "narrow reach" and therefore the verdict can survive only if the facts of the case precisely match those in *Schallock* as characterized by *Doe*. Mot. at 11-12. As explained above, that argument is incorrect, so the Court can deny the motion on that basis alone.

In any event, *Doe* is distinguishable. In that case, the "Diocese Defendants lacked notice that Pecore posed a sexual danger to children." 533 P.3d at 224. Instead, the only evidence of "notice" submitted by the plaintiff was of the priest's "involvement in a sexual relationship with another consenting adult," a fact that did "not bear on *any* risk he may have posed to children." *Id*. at 220 (emphasis added). Here, the robust factual record permitted the jury to find that Uber was on notice that Mr. Turay posed a risk to riders.

Driver sexual assault of passengers is a known and widespread problem at Uber. *See, e.g.*, Ct. Ex. 15A (Hasbun) at 86:12-13 ("We have a sexual assault problem."); Ct. Ex. 5A (Ross) at 181:07-08 ("Our customers face devastating experiences every day on the Uber platform."); Ct. Ex. 3A (Hazelbaker) at 457-62 (numbers "WAY higher" than reported); Tr. at 2118:20-24 (In 2023, Uber received a report of rape by an Uber driver every 28 hours).

As a result, Uber has a sophisticated understanding of factors that predict the likelihood of a sexual assault, factors that flagged Mr. Turay as risky. Tr. at 1357 at 9-19. Risk factors that Uber itself identified pertaining to Mr. Turay included: (1) an incomplete background check; (2) false documents or documents with incorrect information; (3) one-star ratings; (4) "professionalism, "comfort," or "conversation" feedback tags; (5) "route deviations," including "long stops" and "midway drop-offs"; and (6) "dangerous driving." *Id*. at 1370:11-1397:12, 1409:9-1422:18. Uber received one report of sexual misconduct that it deemed credible at the time, yet took no action

against Mr. Turay (other than giving him one "notation"). *Id.* at 1003:18-1011:18. And Uber's own sexual assault risk assessment algorithm deemed the pairing between Mr. Turay and Ms. Dean riskier than even the average nighttime ride in Phoenix, even though both nighttime rides and Phoenix rides are unusually dangerous. Ct. Ex. 8A (Wong) at 166-68, 380, 403-04.

Uber does not otherwise challenge the evidence as sufficient under *Schallock*, but it is. Mr. Turay committed the assault in the place and time of his agency (the vehicle, during the ride), while he was doing tasks authorized by his principal (driving Ms. Dean to her destination in his vehicle under his control), and he abused the authority granted him by Uber to commit his tortious act. *See* Tr. at 1809:25-1810. He was only "able to carry out his [rape] in part because he was a[n Uber driver], and the [rape] occurred as part of his [transportation] of the plaintiff." *Engler*, 280 P.3d at 603; *see also*, *e.g.*, Ct. Ex. 5A (Ross) at 392 (acknowledging that Uber's "products inherently bring people closer," creating a "risk … of interpersonal violence"); Tr. at 595:1-12 (explaining Uber presents a "great environment" for sexual "offenders" because "they're matched with the victim in an environment that they control. The victim is isolated with them. They have control of where this car is going, where it ends up, whether they turn on the safety locks. … [T]hey have control of it all."); Ex. P-00753 at 14 (Uber's analysis showing that "[t]he typical scenario for a non-consensual intercourse incident is where a male driver picks up an intoxicated female rider" and that "the majority of these drivers would most likely not have engaged in sexual misconduct had they not been in this specific situation with this 'opportunity' for sexual misconduct").

Uber protests that Mr. Turay's conduct violated its "Community Guidelines," but the jury saw that Uber not only knows its Guidelines do not deter sexual misconduct, but affirmatively ensures a lack of consequences for violating those same Guidelines. Uber recognized that "[t]here is a fundamental lack of knowledge of Uber's 'no sex' policy and understanding of consent in general." Ex. P-03554 at 6; Tr. at 673-74. Drivers are deactivated only if they receive "three notations," with "pretty alarming" sexual conduct (touching a thigh, threats of rape, propositions for oral sex) earning only "one notation." Tr. at 706-7. By not enforcing its Guidelines, Uber communicated to Mr. Turay that violating those Guidelines would result in no consequences. Mr. Turay repeatedly violated the Guidelines; each time, not only did Uber not impose any

-13-

consequences, but it affirmatively praised Mr. Turay as "valuable to us" and a "safe," "professional," "wonderful" and "valued" driver who provides "extraordinary service to our riders," and reassured him that only "continued reports" or "serious or repeated claims" would even *potentially* result in consequences. Tr. at 980-1078.

The reason for this lax approach? Because internally, when Uber asked "What is the real purpose of [safety] standard and what is our obligation as a company?" the answer was "Our purpose/goal is **not** to be the police – our bar is much lower and our goal is to protect the company and set the tolerable risk level for our operations." Ex. P-01024 at 3 (emphasis in original). Uber accepted this "tolerable risk" even though it knew that, to prevent sexual assault, "it has to be crystal clear to drivers what the consequences are for future misconduct." Ex. P-00695 at 16; Tr. at 711.

### D.    The Court should not certify any questions to the Arizona Supreme Court.

The "Ninth Circuit has stated that the certification process should be invoked 'only after careful consideration' and should not be done so lightly." *Joshua David Mellberg, LLC v. Will*, 639 F. Supp. 3d 926, 933 (D. Ariz. 2022) (quoting *Kremen v. Cohen*, 325 F.3d 1035, 1037 (9th Cir. 2003)). Even "where state law is unclear, resort to the certification process is not obligatory." *Riordan v. State Farm Mut. Auto. Ins. Co.*, 589 F.3d 999, 1009 (9th Cir. 2009). And, "mere difficulty in ascertaining local law is no excuse for remitting the parties to a state tribunal for the start of another lawsuit." *Id.* (citation omitted). Where, as here, "a party requests certification for the first time after losing on the issue, that party must show 'particularly compelling reasons' for certifying the question." *Rock Point Sch., Inc. v. Wells Fargo Bank NA*, 2015 WL 13122940, at *1 (D. Ariz. Oct. 27, 2015) (quoting *Complaint of McLinn*, 744 F.2d 677, 681 (9th Cir. 1984)).

Uber cannot meet the requirements for certification, let alone the "particularly compelling reasons" standard. *First*, Uber does not identify any "questions of law" lacking "controlling precedent in" Arizona. A.R.S. § 12-1861. On the scope-of-employment issue, the relevant question of law is whether sexual assault is per se outside the scope of employment. But the Arizona Supreme Court has already answered this question "no." Beyond that, the issue is not a question of law but a question of fact, and the sufficiency of the evidence in one case does not warrant certification. On the Terms of Use issue, the elements of an apparent agency claim are well-

established in Arizona cases, none of which say, or even suggest, that a contract precludes such a claim. A federal court can read those cases, including *Fadely*, and apply them to these facts.

*Second*, even if the issues cited by Uber were undecided, certification would still not be warranted. Apparent agency has been one of the core claims in this MDL since inception, and at the forefront of the *Dean* case in particular. It has been briefed, argued, and ruled upon. At no point did Uber argue that the law was unsettled or request certification. *See In re Mortg. Elec. Registration Sys. (MERS) Litig.*, 2011 WL 4571663, at *2 (D. Ariz. Oct. 3, 2011) (rejecting request to certify question as untimely where "[t]he parties have spent countless hours briefing this question, this Court has examined the precedent cited by both sides, and issued multiple rulings"); *Rock Point Sch. Inc.*, 2015 WL 13122940 at *1 (denying certification where "the Court cannot conclude that certification would save time, money, and resources because the parties have already fully briefed the issue and this Court has issued its ruling").

## II.    Uber's motion for a new trial should be denied.

### A.    The scope of employment instruction accurately reflected Arizona law.

Uber asserts that the scope instruction misstated the "inquiry under *Schallock*." Mot. at 14. It did not. As discussed above, the inquiry under *Schallock* is whether "'the service itself in which the tortious act was done was within the ordinary course of [the employer's] business,'" considering "when the act took place, where it took place, and whether it was foreseeable.'" *Rose*, 2025 WL 509246, at *13 (quoting *Schallock*, 941 P.2d at 1285); *see also Schallock*, 941 P.2d at 1283 ("[T]he act in question is not the ultimate tortious act but rather conduct related to the tort."). The jury instruction accurately conveyed the relevant law.

Uber argues that the instruction did not point the jury to the "conduct related to the tort" such that "the jury could reasonably infer the principal authorized the assault." Mot. at 14. This argument misrepresents both *Schallock* and the instruction. *Schallock* did not require that evidence show "the principal authorized the assault." Rather, "[c]onduct within the scope of employment may be either of the same nature as that authorized *or* incidental to that authorized." 941 P.2d at 1282. And the Court's instruction *did* point the jury to the conduct related to the tort: "the legitimate conduct and services performed by Mr. Turay as a driver" as opposed to the "alleged nonconsensual

sexual encounter itself." ECF 5187 at 23. Next, Uber says that the Court erred by framing the relevant conduct as that "incidental to the sexual encounter." But Uber never explains how the Court's language fails to direct the jury to consider whether the tortious conduct bore a sufficient connection to Uber's business and Turay's authorized conduct, considering the relevant factors.

Uber also never states what, in its view, the instruction *should* have said, and for good reason: Uber never proposed an instruction that was even arguably consistent with *Schallock. See Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 639 (Fed. Cir. 2011) ("[A] party seeking to alter a judgment based on erroneous jury instructions must establish that …. it requested alternative instructions that would have remedied the error.") (citation omitted). Instead, contrary to *Schallock*, Uber's proposed instruction required that "[t]he sexual encounter [be] motivated at least in part by a purpose to serve the employer." ECF 4838 at 78.

Finally, Uber never establishes any prejudice from the failure to wordsmith the scope instruction in ways that Uber never specified. *See Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1065 (9th Cir. 2008) (instructional error "harmless" where "it is more probable than not that the jury would have reached the same result"). Instead, Uber cites "accumulated prejudice" based on the exclusion of the police report and a video recording involving Mr. McLaughlin. Mot. at 15. But the report and video have nothing to do with the scope-of-employment issue. Nor does Uber acknowledge the Court's reasons for excluding that evidence. *See* Tr. at 1459-64, 1518-27 (finding the police report unreliable); *id*. at 1869 & Exs. P-01927, 04078 (admitted police interview itself); Tr. at 1288-92, 1900-09 (explaining why the McLaughlin video did not come in).

**B.     The Terms of Use instruction accurately reflected Arizona law.**

Uber says that the Court's instruction to the jury was erroneous and requires a new trial because instead of saying that "Plaintiff was bound by the Terms," the Court instructed the jury that Plaintiff and Uber were "parties to a contract." Mot. at 16. The instruction was correct.

Uber argues that by "failing to instruct the jury that the Terms constituted an enforceable contract binding on Plaintiff, the instruction left the jury free to speculate that the agreement was unenforceable." Mot. at 16. This argument fails for two reasons. *First*, the agreement's enforceability was irrelevant. The question is what Uber represented to Ms. Dean, not whether she

clicked a check-box acknowledging it. For example, imagine the Terms of Use, instead of being presented in the app, were merely on Uber's website. Or imagine they were unconscionable. Either way, the Terms would *not* be an enforceable contract, but Plaintiff would not have been entitled to an instruction saying so. Uber could still present the Terms, even if unenforceable, as evidence in defense against an apparent agency claim because they were representations Uber made to Plaintiff. Unsurprisingly, the only case Uber cites involving instructional error relating to "a contract's legal effect," *id.*, involved an actual contract claim, one for "intentional interference with [a] contractual relationship," where a plaintiff must prove "a disruption or breach of their contractual rights." *United Nat. Maint., Inc. v. San Diego. Convention Ctr., Inc.*, 766 F.3d 1002, 1009 (9th Cir. 2014).

*Second*, Uber cannot show prejudice from the Court's selection of words. "[P]arties to a contract" means the same thing as "bound to a contract." Plaintiff's counsel never argued that the contract was not enforceable (in Uber's words, "inapplicable"). Rather, the evidence highlighted by Uber—that Plaintiff did not recall reading the Terms, that Plaintiff agreed to the terms months earlier in an entirely different context, and that Uber does not make the Terms particularly easy to read—all went to the questions before the jury: whether Uber represented Mr. Turay as its agent, and whether Plaintiff reasonably relied on those representations. If the jury "deem[ed] the Terms … insignificant," Mot. at 17, that is because the evidence revealed them to be so.

Uber also argues that the instruction "downgraded a binding legal agreement to the same evidentiary status as … Uber's advertising." *Id*. Other than cross-referencing its *Fadely* argument, Uber cites no cases stating that the Terms of Use are "not simply one more piece of evidence" or have "central legal significance." *Id*. Regardless, a party is not entitled to jury instructions highlighting the evidence on which it relies. *See United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996) (affirming refusal to give instruction that "merely highlighted the particular evidence [the defendant] believed supported his claim of innocence"). Indeed, as the Court observed, Uber's proposed instruction would have been prejudicial to Plaintiff, as it suggested that the contract is determinative of the issue, when it is not. *See* Tr. at 2600:12-19.

## CONCLUSION

Plaintiff respectfully requests that the Court deny Uber's renewed motion.

Dated: April 10, 2026

Respectfully submitted,

By*: /s/ Sarah R. London*
Sarah R. London (SBN 267083)

**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
slondon@girardsharp.com

By*: /s/ Rachel B. Abrams*
Rachel B. Abrams (SBN 209316)

**PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Facsimile: (415) 840-9435
rabrams@peifferwolf.com

By*: /s/ Roopal P. Luhana*
Roopal P. Luhana

**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com

*Co-Lead Counsel*

### FILER'S ATTESTATION

I am the ECF User whose ID and password are being used to file this document. In compliance with N.D. Cal. L.R. 5-1(i)(3), I attest that the signatories above concurred in this filing.

Dated: April 10, 2026

By:     */s/ Andrew R. Kaufman*
Andrew R. Kaufman